Marc J. Randazza (CA SBN 269535)
Alex Shepard (CA SBN 29058)
Jay M. Wolman (*pro hac vice* forthcoming)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
Fax: 305-437-7662
ecf@randazza.com

*Attorneys for Plaintiffs*
*T. Greg Doucette & Law Offices of*
*T. Greg Doucette, PLLC*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **THOMAS GREGORY DOUCETTE,** an individual, and **LAW OFFICES OF T. GREG DOUCETTE, PLLC,** a North Carolina professional limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>**RONALD KEVIN STONE**, an individual, **NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC.,** a North Carolina corporation, and **DROPBOX, INC.,** a Delaware corporation,<br><br>Defendants. | Case №.: _____<br><br>**COMPLAINT FOR USE OF THE DMCA NOTICE AND TAKEDOWN PROVISION FOR AN IMPROPER PURPOSE IN VIOLATION OF 17 U.S.C. § 512(F)** |

Plaintiffs T. Greg Doucette ("Mr. Doucette") and the Law Offices of T. Greg Doucette, PLLC, (collectively "Plaintiffs") hereby complain against Defendants Ronald Kevin Stone ("Stone") and North Carolina Division Sons of Confederate

Veterans, Inc. ("NCSCV" or "Sons of Confederate Veterans"; collectively "Defendants"), and nominally against Dropbox, Inc., in order to achieve complete relief, as follows:

## INTRODUCTION

1. Mr. Doucette is a North Carolina lawyer and former member of the Board of Governors of the consolidated University of North Carolina ("UNC"). "Silent Sam" is a statue of a Confederate soldier that was placed on what is now the campus of UNC Chapel Hill in 1913, as a reminder to African Americans that North Carolina was part of the Confederacy and that, despite losing the Civil War, certain Confederate values would remain in place – notably, the subjugation and inferior position of former slaves, their descendants, and any new arrivals who looked like them.

2. Some claim that memorials like these are there to celebrate "southern heritage" rather than as memorials to the subjugation of African Americans.

3. When Silent Sam was unveiled in 1913, KKK supporter Julian Carr announced that the Confederate soldiers it honored had saved "the very life of the Anglo Saxon race in the South," and told the following story:

> "One hundred yards from where we stand, less than ninety days perhaps after my return from Appomattox, I horse-whipped a negro wench until her skirts hung in shreds, because upon the streets of this quiet village she had publicly insulted and maligned a Southern lady, and then rushed for protection to these University buildings where was stationed a garrison of 100 Federal soldiers. I performed the pleasing duty in the immediate presence of the entire garrison, and for thirty nights afterwards slept with a double-barrel shotgun under my head."

4. With a metaphorical flamethrower taken to this myth of "southern pride," student protesters tore the statue down on Monday, August 20, 2018. The University of North Carolina did not restore the statue to its former "glory."

5. On November 27, 2019, the Sons of Confederate Veterans filed a lawsuit against UNC for its failure to return Silent Sam to his location, despite lacking standing (and knowing it) to bring such a suit. Despite the fact that the NCSCV lacked standing, seven minutes after the suit was filed, a state court judge approved a settlement between the parties.

6. The settlement gave both the statue and $2.5 million of University funds to the Sons of Confederate Veterans. That settlement is either improper and corrupt, or is doing a fantastic job of masquerading as something improper and corrupt.

7. The day the settlement was approved, the "commander" of the NCSCV, Ronald Kevin Stone, announced this "victory" to the members of the NCSCV – not all of whom agreed with it. Some of the dissenting members sent Mr. Doucette the victory proclamation.

8. The content of that victory proclamation confirmed many of Mr. Doucette's suspicions about this deal being corrupt and improper. In the victory proclamation, Defendants admitted that they knew they lacked standing to sue UNC and further alluded to improper influence being at least part of the explanation for the settlement and quick-as-lightning court approval.

9. Mr. Doucette published the victory proclamation and his commentary on it on Twitter and on the file sharing web site <dropbox.com> to show the public what it had a right to know. But, Defendants filed a bad faith takedown notice under the Digital Millennium Copyright Act ("DMCA") claiming Plaintiffs violated their copyright in the victory proclamation, without considering

or in disregard of Plaintiffs' right to publish it as fair use. This bad-faith notice caused Dropbox to limit Plaintiffs' account, causing injury.

**PARTIES, JURISDICTION, AND VENUE**

10. Plaintiff Thomas Gregory Doucette is a citizen of North Carolina.

11. Plaintiff Law Offices of T. Greg Doucette, PLLC, is a North Carolina professional limited liability company.

12. Defendant Ronald Kevin Stone is, on information and belief, a citizen and resident of North Carolina.

13. Defendant North Carolina Division Sons of Confederate Veterans, Inc. is a North Carolina non-profit corporation.

14. Defendant Dropbox, Inc. ("Dropbox") is a Delaware corporation with its principal place of business at 1800 Owens Street, San Francisco, California 94158. At all relevant times herein, Dropbox maintained a designated agent under 17 U.S.C. § 512 at Dropbox, Inc., 333 Brannan Street, San Francisco, CA 94107 and/or at its principal place of business.[1] Dropbox is named as a defendant herein only to achieve complete relief; Plaintiffs seek no damages against Dropbox.

15. This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338, as this case arises under the U.S. Copyright Act.

16. This Court has personal jurisdiction over Defendants because a) in using Dropbox, they consented to personal jurisdiction and venue in the state and Federal courts in San Francisco, California; and b) the sending of the takedown notice at issue constitutes sufficient minimum contacts under Cal. Code Civ. Proc. § 410.10 and U.S. Const., Amdt. XIV, where Defendants purposefully directed their

---

[1] *See* https://www.dropbox.com/dmca and https://dmca.copyright.gov/osp/publish/history.html?search=dropbox&id=3c0075cdd377972b704125dcb5a44df5 .

acts toward California, committing an intentional act, expressly aimed at California, causing Plaintiffs harm in California as they have been deprived of the full use of their California-based Dropbox account.

17. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) & (c), as the allegedly infringing material is situated in this judicial district and the takedown notice at issue giving rise to the claims occurred in this judicial district, and Defendants are otherwise subject to this Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

18. Mr. Doucette has been a North Carolina attorney since August 24, 2012, he is a member in good standing of the bar of North Carolina, and he is a former member of the UNC Board of Governors.

19. At all relevant times herein, Mr. Doucette practiced law and shared legal news through his law firm, Law Offices of T. Greg Doucette, PLLC ("TGDLaw").

20. At all relevant times herein, TGDLaw maintained a Dropbox account, which it used to share documents to its clients and to the public.

21. Dropbox is "a web-based file hosting service that uses 'cloud' storage to enable users to store and share files with others across the Internet using file synchronization." *Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646, 652 (E.D. Tex. 2015).

22. When Plaintiffs wish to share and discuss legal news, they regularly do so through their Twitter account, @greg_doucette.

23. At all relevant times herein, Plaintiffs used their Twitter account to publicize hyperlinks to documents shared through their Dropbox account relevant to legal news.

24. In 1913, a bronze statue of a purported Confederate soldier[2] was placed at the University of North Carolina at Chapel Hill.

25. Over the years this statue, formally known as the "Confederate Monument," became known as "Silent Sam."

26. The pedestal for Silent Sam contains two bronze plaques reading:

"Erected under the auspices of the North Carolina division of the United Daughters of the Confederacy aided by the alumni of the university."

And

"To the sons of the university who entered the War of 1861-65 in answer to the call of their country and whose lives taught the lesson of their great commander that duty is the sublimest word in the English language."[3]

27. Upon information and belief, the Silent Sam statue became the subject of protest beginning in the Civil Rights Movement of the 1960s.

28. At its 1913 unveiling, KKK supporter Julian Carr praised Confederate soldiers with saving "the very life of the Anglo Saxon race in the South," and told the following story:

"One hundred yards from where we stand, less than ninety days perhaps after my return from Appomattox, I horse-whipped a negro wench until her skirts hung in shreds, because upon the streets of this quiet village she had publicly insulted and maligned a Southern lady, and then rushed for protection to these University buildings where was stationed a garrison of 100 Federal soldiers. I performed the pleasing duty in the immediate presence of the entire garrison, and for thirty nights afterwards slept with a double-barrel shotgun under my head."

---

[2] Ironically, the model for the statue was a Bostonian. *See* Gutierrez, Michael, "UNC's Silent Sam and Honoring the Confederacy," We're History (July 7, 2015) available at http://werehistory.org/silent-sam/.

[3] "Duty, then, is the sublimest word in our language" was a phrase attributed to Confederate General Robert E. Lee, but it was exposed as a forgery in 1916. *See* Charles A. Graves, Letter to the Editor, "Forged Letter with Lee's Name," NEW YORK TIMES (Nov. 11, 1917) p. 84.

These remarks were found in UNC's archives in 2009 and the protest that resulted in the toppling of the statue was fomented by a protest of the April 2018 arrest of a woman who read the remarks and covered the statue in ink and blood.[4]

29. The statue was torn down by protesters on Monday, August 20, 2018, and UNC officials never returned it to its former place.

30. On November 27, 2019 – the Wednesday before the 4-day Thanksgiving holiday weekend – UNC announced that a judge entered a consent judgment that morning to settle a lawsuit filed by NCSCV wherein the statue would be turned over to NCSCV and UNC would pay NCSCV $2.5 million to be used toward its display (including housing) and care.[5]

31. Upon learning of this, Mr. Doucette began discussing this curious outcome, launching a Twitter thread on the subject beginning on November 27, 2019, at 2:56 p.m.

32. Following review of further reports, Mr. Doucette launched another thread discussing the legal proceedings on November 30, 2019 at 6:07 p.m.

33. Just prior to beginning that second thread, Mr. Doucette had logged into VCAP, the civil case-tracking system used in North Carolina, and located the docket for *NC Division Sons of Confederate Veterans v. University of North Carolina at Chapel Hill and University of North Carolina Board of Governors*, Case No. 19 CVS 1579 (Orange Cty., N.C., Sup. Ct).

34. Mr. Doucette learned that the lawsuit had been filed at 11:10 a.m. on the morning of November 27, and the settlement (after a full answer was filed)

---

[4] *See* Farzan, Antonia, "'Silent Sam': A racist Jim Crow-era speech inspired UNC students to topple a Confederate monument on campus" WASHINGTON POST (Aug. 21, 2018) available at https://www.washingtonpost.com/news/morning-mix/wp/2018/08/21/silent-sam-a-racist-jim-crow-era-speech-inspired-unc-students-to-topple-a-confederate-monument-on-campus/.
[5] *See* https://www.northcarolina.edu/news/2019/11/UNC-System-reaches-settlement-allowing-disposition-Silent-Sam.

was approved a mere seven minutes later.  See case documents, attached as **Exhibit 1**.

35. Mr. Doucette immediately came to the conclusion that there was something corrupt, untoward, or at least worthy of public discussion, in this story.

36. NCSCV had no standing to bring any lawful claim against UNC regarding the statue; UNC's own defenses in its answer asserted as much.  See **Exhibit 1** at 148.

37. In fact, the consent judgment settlement had already been signed by UNC Board of Governor's chairman Randy Ramsey on November 22, 2019; the property interests in the statue (such as they were) assigned to NCSCV on November 23, 2019; and the consent judgment signed by UNC system interim President, Dr. William Roper, on November 26, 2019.  The Board of Governors University Governance Committee did not even meet to approve the settlement until 10:00 a.m. the morning of November 27, 2019 – just before the lawsuit was filed.

38. On December 2, 2019, Mr. Doucette received a copy of a victory proclamation from Stone to the NCSCV membership (hereinafter "victory proclamation" or "memorandum"), which Mr. Doucette shared, in screenshot form, on Twitter at 12:05 p.m.

39. Mr. Doucette then compiled the victory proclamation into PDF format, which he posted to the TGDLaw Dropbox account with a link at https://www.dropbox.com/s/u5w53zmvwhqqn01/SCV%20Internal%20Victory%20Statement.pdf?dl=0, which he thereupon shared on Twitter at 2:01 p.m. that same day.

40. A copy of that PDF appears at **Exhibit 2**.

41. The letter supports the theory that the lawsuit was a sham and a fraud on the court, as everyone knew NCSCV lacked standing, as it states, in relevant part:

> Since August of 2018 when he was ripped down, we have been looking for a way through our attorney, Boyd Sturges, to accomplish one of two things: either to have the memorial restored to its place of honour on campus while being properly protected; or to gain possession of the memorial and make an equally prominent public display for it at UNC's expense.
>
> …
>
> As we have mentioned dozens of times, despite consulting every known legal source, including those parties who have had success with SCV suits in Virginia and Tennessee, we could not get past the issue in North Carolina law of legal standing in the Silent Sam case so to bring a suit. Even if we had filed suit, our complaint would have been challenged and dismissed immediately without result. After extensive consultation (with judges, retired judges, etc.), we were 100% certain that this would be the outcome.
>
> …
>
> Further, we have not allowed the issue of standing to be mentioned in any way in the settlement so as not to hamper any future suits we may have to file regarding other memorials.
>
> …
>
> Full credit is to be given to our attorney, Mr. Sturges, as it was only through his expertise, his good connections with and respect by all the parties involved, and his influence that we were approached by the enemy and were able to work with officials at the very highest levels of the University and State government.

**Exhibit 2**.

42. At 5:27 p.m. that day, Mr. Doucette received a notice from Dropbox that Stone, for himself and NCSCV, filed a DMCA Complaint against him regarding the posting of the memorandum on Dropbox. *See* notice from Dropbox, attached as **Exhibit 3**.

43. As Division Commander, Stone was fully authorized to "issue all necessary orders" as the "executive head" of NCSCV, pursuant to Art. VII, § 1 of

the Constitution of the North Carolina Division Sons of Confederate Veterans. *See* NCSCV Constitution, attached as **Exhibit 4**.[6]

44. In that DMCA Complaint, pursuant to 17 U.S.C. § 512(c), Defendants asserted to Dropbox that the posting of the memorandum infringed upon their copyright.[7]

45. Specifically, in using the form created by Dropbox, Defendants stated, under penalty of perjury:

> I hereby state that I have a good faith belief that the sharing of copyrighted material at the location above is not authorized by the copyright owner, its agent, or the law (e.g., as a fair use).
>
> I hereby state that the information in this Notice is accurate and, under penalty of perjury, that I am the owner, or authorized to act on behalf of, the owner, of the copyright or of an exclusive right under the copyright that is allegedly infringed.
>
> I acknowledge that under Section 512(f) any person who knowingly materially misrepresents that material or activity is infringing may be subject to liability for damages.

*See* **Exhibit 5**.[8]

46. Stone, for himself and NCSCV, committed perjury. Just as he had no good faith belief that there was standing to sue, thereby committing a fraud on the courts of North Carolina, he had no good faith basis to assert that Plaintiffs' sharing of the memorandum was not authorized by law as a fair use.

47. The Copyright Act expressly identifies "criticism, comment, [and] news reporting" as non-infringing fair use. 17 U.S.C. § 107.

48. Plaintiffs' use was noncommercial and not for profit, which is presumptively fair use.

---

[6] Available at: https://www.ncscv.org/images/constitution/ncdivconstitution2016.pdf.
[7] In so doing, Defendants necessarily admitted to its authenticity.
[8] Available at: https://www.dropbox.com/copyright_complaint.

49. The work at issue is purely informational with little, if any, creative aspect. *See Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153-54 (9th Cir. 1986) ("The scope of fair use is greater when informational as opposed to creative works are involved.")

50. There was no market for the memorandum; thus, there is no harm to any potential market for it.

51. Due to Defendants' DMCA Complaint, Dropbox notified Plaintiffs that:

a) It removed or disabled access to the memorandum; and

b) It disabled public sharing on Plaintiffs' account.

See **Exhibit 3**.

52. As Dropbox subscribers, Plaintiffs lost the value of the full use of the service for which they pay $ 45 per month.

53. Although Plaintiffs attempted to mitigate harm by filing a counter notification pursuant to 17 U.S.C. § 512(g), Defendants have not withdrawn their DMCA Complaint and, as a result, full service has not yet been restored by Dropbox.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Declaratory Relief – 28 U.S.C. § 2201)

54. Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

55. Defendants have accused Plaintiffs of copyright infringement for publishing Defendants' victory proclamation and expressly made such claim to Dropbox in the DMCA Complaint.

56. Therefore, a case or actual controversy exists between Plaintiffs and Dropbox regarding whether Plaintiffs' actions infringed upon the intellectual property rights of Defendants.

57. Plaintiffs reasonably believe that their use of the memorandum was and is lawful under the U.S. Copyright Act.

58. In the absence of a declaration from the Court, Dropbox may continue to abide Defendants' bad-faith DMCA Complaint or future complaints from the other Defendants or other third parties seeking to hide the truth, and limit services to Plaintiffs.

59. Plaintiffs seeks a declaration of their rights from this Court that they have not directly, contributorily, or vicariously infringed upon Defendants' copyright and that Dropbox should not abide any copyright claims by Defendants as to the victory proclamation.

**SECOND CLAIM FOR RELIEF**
**(Misrepresentation of Copyright Claims**
**Under the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 512)**

60. Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

61. Plaintiffs did not infringe any copyright owned or administered by Defendants.

62. Alternately if this Court adheres to the erroneous view that fair use is an affirmative defense to copyright infringement, rather than "not infringement," Plaintiffs had a privilege to use the material for the purpose they used it.

63. Any use of any materials or information by Plaintiffs was a self-evident, non-infringing, and fair use under 17 U.S.C. § 107.

64. Upon information and belief, Defendants knew or should have known that Plaintiffs did not infringe any copyrights on the date they sent their DMCA takedown notice to Dropbox.

65. Defendants sent the DMCA notice for the purpose of interfering with Plaintiffs' news reporting and discussion and/or for the purpose of suppressing criticism of Defendants.

66. This is an improper use of the DMCA takedown scheme, and it is specifically prohibited by law. 17 U.S.C. § 512(f).

67. Defendants violated 17 U.S.C. § 512(f) by knowingly materially misrepresenting that Plaintiffs infringed Defendants' copyright.

68. Stone, individually and for NCSCV, actually knew of the material falsity of his representations with respect to copyright infringement, as he knew or should have known independently or through counsel that the use of the allegedly copyrighted work was fair use.

69. Defendants hoped to use the DMCA process to suppress speech and not in order to address real copyright concerns, since even a perfunctory review of the applicable law would demonstrate that the tweeting of the Dropbox link could not possibly result in liability for copyright infringement. Yet, Defendants used the DMCA process under this knowingly erroneous pretense.

70. If he did not know of the material falsity of his representations, Stone was willfully blind as to the material falsity.

71. As a direct and proximate result of Defendants' actions, Plaintiffs have been injured in an amount to be determined at trial.

72. Such injury includes, but is not limited to, the financial and personal expenses associated with the loss of the use of Dropbox sharing and the deactivation of the link, as well as harm to his free speech rights under the First Amendment.

73. Plaintiffs have been forced to retain the services of an attorney to pursue this action, and they are entitled to recover their attorney's fees and any and all costs associated with pursuing this matter, as permitted under 17 U.S.C. § 512(f).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

A. A declaration from this Court, pursuant to 28 U.S.C. § 2201, that Plaintiffs have not directly, contributorily, or vicariously infringed upon Defendants' copyright and that Dropbox should not abide any copyright claims by Defendants as to the victory proclamation;

B. An award of actual damages;

C. An award of Plaintiffs' reasonable costs and expenses, including their reasonable attorneys' fees pursuant to 17 U.S.C. § 512(f);

D. Injunctive relief prohibiting further disturbance of Mr. Doucette's publication of the materials by any defendant, and;

E. For such other and further relief as the Court deems just and proper.

Dated: December 13, 2019     Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza (CA SBN 269535)
Alex J. Shepard (CA SBN 295058)
Jay M. Wolman (*pro hac vice* forthcoming)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
Fax: 305-437-7662
ecf@randazza.com
*Attorney for Plaintiffs*
*Thomas Gregory Doucette &*
*Law Offices of T. Greg Doucette, PLLC*