# EXHIBIT 1

Documents in *NCSCV v. University of North Carolina*, No. 19CVS1579

# STATE OF NORTH CAROLINA

FILED

Orange _____ County

File No. 19CVS 1579

2019 NOV 27  A 11: 11

ORANGE CO., C.S.C.

BY _____ aa

**In The General Court Of Justice**
☐ District   ☒ Superior Court Division

*Name And Address Of Plaintiff 1*
North Carolina Division Sons of Confederate Veterans, Inc.
805 Cool Springs Road
Sanford, North Carolina 27330

*Name And Address Of Plaintiff 2*

# GENERAL
# CIVIL ACTION COVER SHEET

☒ INITIAL FILING   ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

## VERSUS

*Name And Address Of Defendant 1*
The University of North Carolina
910 Raleigh Road
Chapel Hill, North Carolina 27514

*Name And Address Of Attorney Or Party, If Not Represented*
*(complete for initial appearance or change of address)*
C. Boyd Sturges III
101 Church Street
Louisburg, North Carolina 27549

*Summons Submitted*
☐ Yes   ☐ No

*Telephone No.* 919-496-2137   *Cellular Telephone No.*

*NC Attorney Bar No.* 22342   *Attorney Email Address*

*Name And Address Of Defendant 2*
The University of North Carolina Board of Governors
910 Raleigh Road
Chapel Hill, North Carolina

☐ Initial Appearance in Case   ☐ Change of Address

*Name Of Firm*
Davis, Sturges & Tomlinson PLLC   *Fax No.*

*Summons Submitted*
☐ Yes   ☐ No

*Counsel For*
☐ All Plaintiffs   ☐ All Defendants   ☐ Only: *(list party(ies) represented)*

☐ Jury Demanded In Pleading   ☐ Complex Litigation   ☐ Stipulate to Arbitration

## TYPE OF PLEADING

*(check all that apply)*
☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☐ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other *(specify and list separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

*(Over)*

AOC-CV-751, Rev. 3/19, © 2019 Administrative Office of the Courts

002

## CLAIMS FOR RELIEF

- ☐ Administrative Appeal (ADMA)
- ☐ Appointment Of Receiver (APRC)
- ☐ Attachment/Garnishment (ATTC)
- ☐ Claim And Delivery (CLMD)
- ☐ Collection On Account (ACCT)
- ☐ Condemnation (CNDM)
- ☐ Contract (CNTR)
- ☐ Discovery Scheduling Order (DSCH)
- ☐ Injunction (INJU)

- ☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP)
- ☐ Medical Malpractice (MDML)
- ☐ Minor Settlement (MSTL)
- ☐ Money Owed (MNYO)
- ☐ Negligence - Motor Vehicle (MVNG)
- ☐ Negligence - Other (NEGO)
- ☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN)
- ☐ Possession Of Personal Property (POPP)

- ☐ Product Liability (PROD)
- ☐ Real Property (RLPR)
- ☐ Specific Performance (SPPR)
- ☐ Other *(specify and list each separately)*

| Date | Signature Of Attorney/Party |
|------|------------------------------|
|      |                              |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) |
|-----|---------------------------|
|     |                           |
|     |                           |
|     |                           |
|     |                           |
|     |                           |

*CERTIFIED TRUE COPY FROM ORIGINAL*
*Clerk of Superior Court Orange County*

| No. | ☐ Additional Defendant(s)   ☐ Third Party Defendant(s) | Summons Submitted |
|-----|---------------------------------------------------------|-------------------|
|     |                                                         | ☐ Yes  ☐ No |
|     |                                                         | ☐ Yes  ☐ No |
|     |                                                         | ☐ Yes  ☐ No |
|     |                                                         | ☐ Yes  ☐ No |
|     |                                                         | ☐ Yes  ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

# STATE OF NORTH CAROLINA

_____Orange_____ County

**FILED**

2019 NOV 27   A 11: 11

ORANGE CO., C.S.C.

BY _____

| | |
|---|---|
| *File No.* | 19 CVS 1579 |

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|

*Name Of Plaintiff*
North Carolina Division Sons of Confederate Veterans, Inc.

*Address*
805 Cool Springs Road

*City, State, Zip*
Sanford, North Carolina 27330

**VERSUS**

**CIVIL SUMMONS**
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

*Name Of Defendant(s)*
The University of North Carolina

The University of North Carolina Board of Governors

*Date Original Summons Issued*
11/27/2019

*Date(s) Subsequent Summons(es) Issued*

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| The University of North Carolina | The University of North Carolina Board of Governors |
| 910 Raleigh Road | 910 Raleigh Road |
| Chapel Hill, North Carolina 27514 | Chapel Hill, North Carolina 27514 |

⚠ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!
**¡IMPORTANTE!** ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* 11/27/2019 | *Time* ☐ AM ☐ PM |
|---|---|---|
| C. Boyd Sturges III | *Signature* | |
| 101 Church Street | | |
| Louisburg, North Carolina 27549 | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)** | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Signature* | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

004

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

CERTIFIED TRUE COPY
FROM ORIGINAL

Clerk of Superior Court Orange County

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

005

19 CVS 1579

STATE OF NORTH CAROLINA

COUNTY OF ORANGE

NORTH CAROLINA DIVISION SONS OF
CONFEDERATE VETERANS, INC., a North
Carolina corporation,

      Plaintiff,

      v.

THE   UNIVERSITY   OF   NORTH
CAROLINA and THE UNIVERSITY OF
NORTH   CAROLINA   BOARD   OF
GOVERNORS,

      Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

File No. 19CVS 1579
2019 NOV 27 A 11: 10

ORANGE CO., C.S.C.

BY _____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**VERIFIED COMPLAINT**

Plaintiff North Carolina Division Sons of Confederate Veterans, Inc., a North Carolina corporation, respectfully alleges and states as follows:

## PARTIES

1.     Plaintiff North Carolina Division Sons of Confederate Veterans, Inc. ("SCV" or "Plaintiff") is a North Carolina registered nonprofit corporation organized under the laws of North Carolina with headquarters in Sanford, Lee County, North Carolina.

2.     SCV's Articles of Incorporation filed with the North Carolina Secretary of State provide that SCV was organized for the following purposes:

> To associate in one united, compact body men of Confederate ancestry, and to cultivate perpetuate and sanctify the ties of fraternity and friendship entailed thereby; to aid and encourage the history and achievement from Jamestown to this present era, constantly endeavoring to see that the events of the War Between The States and the heroic contributions of the Confederate soldiers of Indian Territory are authentically and clearly written, and that all documents, relics and momentoes [sic] produced and handed down by those active participants therein are properly

006

treasured and preserved for posterity; to aid and assist in the erection of suitable and enduring monuments and memorials to all Southern valor, civil and military, wherever done and wherever found; to instill into our descendants a devotion to and reverence for the principles represented by the Confederate States of America, to the honor, glory and memory of our fathers who fought in that cause . . . .

. . . .

Said corporation is organized exclusively for charitable, religious, educational, and scientific purposes . . . . [T]he corporation shall not carry on any other activities not permitted to be carried on . . . by a corporation exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code . . . .

*See* Exhibit A (Articles of Incorporation, North Carolina Division Sons of Confederate Veterans, Inc. (filed Jul. 11, 1988)).

3.      As a registered nonprofit corporation under North Carolina law, Plaintiff has the capacity to bring this action and is authorized to bring this action pursuant to the provisions of its charter and rules of internal governance, and the signatory to this Verified Complaint has the authority to institute this action on behalf of Plaintiff.

4.      The University of North Carolina ("the UNC System") is a public, multi-campus university system authorized and governed by Article IX, Section 8, of the North Carolina Constitution and Chapter 116 of the North Carolina General Statutes.

5.      The University of North Carolina Board of Governors ("the UNC BOG") is the body politic and corporate organized and authorized under Section 116-3 of the North Carolina General Statutes and is charged under Section 116-11 with (among other things) governing the constituent institutions of the UNC System, including the University of North Carolina at Chapel Hill ("UNC-CH" or "the University"), and with the general determination, control, supervision, management, and governance of all affairs of the constituent institutions of the UNC System. Under N.C. Gen. Stat. § 116-3, the UNC BOG is able to be sued in "all courts whatsoever."

2

6.     UNC-CH is located on a parcel of land in Chapel Hill, North Carolina ("the University campus"), part of which includes McCorkle Place in the 200 block of East Franklin Street.

7.     Because this action involves conduct and circumstances related to the realty of the University campus and the affairs of the constituent institutions, the UNC System and the UNC BOG (collectively, "Defendants") are proper parties in their positions of authority, control, governance, dominion, supervision, management, development, administration, direction, and oversight of the realty of the University campus and the affairs of the constituent institutions and all conduct and circumstances related to the realty of the University campus and the affairs of the constituent institutions.

8.     Any defense of sovereign immunity that Defendants may have is not applicable to Plaintiff's monument law, contract, gift, and declaratory judgment actions in this Complaint, and upon information and belief Defendants have waived sovereign immunity as to those claims.

9.     Non-party The United Daughters of the Confederacy – North Carolina Division, Inc. ("UDC") is a North Carolina nonprofit corporation organized under the laws of North Carolina with headquarters in Raleigh, Wake County, North Carolina.

10.     UDC's Articles of Incorporation filed with the North Carolina Secretary of State provide that UDC was organized for among the following purposes:

> [T]o achieve the objectives of the United Daughters of the Confederacy, which include historical, benevolent, memorial, educational and patriotic programs, plans events and scholarships by members who are lineal or collateral descendants of men and women who served the cause of the Confederate States of America. . . . [These purposes] are exclusively charitable, literary and educational within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 . . . .

*See* Exhibit B (Articles of Incorporation, The United Daughters of the Confederacy – North Carolina Division, Inc. (filed Sept. 16, 1992)).

3

## JURISDICTION, VENUE, LIMITATIONS, AND STANDING

11.     This Court has subject matter jurisdiction over Plaintiff and Defendants pursuant to N.C. Gen. Stat. §§ 7A-240 and 1-253 *et seq.* and because the amount in controversy exceeds $25,000.

12.     This Court has personal jurisdiction over Plaintiff and Defendants pursuant to N.C. Gen. Stat. § 1-75.4. Plaintiff is a North Carolina corporation and Defendants are all North Carolina entities.

13.     For the purposes of this Complaint, "the Confederate Monument" means the combination of the statue, pedestal, and bronze tablets created and configured by artist John Wilson in 1913.

14.     This Court has in rem jurisdiction over the subject matter of this action, in particular the Confederate Monument, under N.C. Gen. Stat. § 1-75.9.

15.     Venue for this action is proper in Orange County under N.C. Gen. Stat. §§ 1-76(4), 1-79(a), and 1-82.

16.     The causes of action pled in this Complaint accrued no earlier than on or about January 14, 2019, when Defendants did not reannex the Confederate Monument to the realty of the University campus as described below. As such, all claims are within any relevant statute of limitations within the North Carolina General Statutes.

17.     As described in detail below, on June 2, 1913, UDC presented UNC-CH (then "The University of North Carolina") with a monument ("the Confederate Monument") honoring University students and graduates who served in the Confederate armed forces.

18.     Prior to the filing of this Complaint, UDC assigned any and all of its existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses

4

in action related to the Confederate Monument, to Plaintiff. *See* Exhibit C (Memorandum of Assignment).

19.     Because Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff has standing to bring this lawsuit.

20.     Because Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff is a real party in interest in this lawsuit.

## FACTUAL BACKGROUND

21.     UDC was organized and adopted a Constitution and By-Laws on April 28, 1897. *See* Exhibit D (Minutes of Organization, United Daughters of the Confederacy, North Carolina Division).

22.     Upon information and belief, one of UDC's early aims was to preserve the history of the Confederate effort in the Civil War, including the accomplishments of women who supported the Confederate armed forces and the families of Confederate soldiers during the War. As part of this undertaking, UDC raised money to finance the creation and erection of monuments throughout North Carolina to honor various Confederate heroes and ideals.

23.     At the Eleventh Annual Convention of UDC in October 1907, a resolution was introduced "that the next work undertaken by [UDC] be the erection, on the campus at the State University, of a monument to the students and faculty, who went out from its walls in 1861 to fight and die for the South." This resolution passed the Convention. *See* Exhibit E (United Daughters of the Confederacy, North Carolina Division, *Minutes of the Eleventh Annual Convention* at 71 (1907)).

5

24.     In early 1908, a UDC representative wrote to University of North Carolina President Francis P. Venable on behalf of UDC to suggest that UDC raise funds to erect a monument for the University campus in Chapel Hill that would honor UNC-CH students who had served in the Confederate armed forces. In this letter, the UDC representative asked Venable for permission to place such a monument on the University campus.

25.     UDC's request was presented during the June 1, 1908, meeting of the University of North Carolina Board of Trustees. The Board of Trustees approved UDC's request for permission to erect a monument on the University campus. *See* Exhibit F (University of North Carolina Board of Trustees Minutes).

26.     On June 9, 1908, Venable responded to UDC to offer cooperation with UDC's plans to erect a monument on the University campus and to propose a meeting with UDC representatives to discuss the kind of monument that would be erected. *See* Exhibit G (letter)

27.     UDC named a Chapel Hill Monument Committee to work on the plans for creating and erecting a monument on the University campus. *See* Exhibit H (United Daughters of the Confederacy, North Carolina Division, *Minutes of the Twelfth Annual Convention* at 73-75 (1908)).

28.     On or about March 20, 1909, a UDC representative wrote Venable the following about plans for the monument: "I hope it will not be many years before it will stand silent & alone, on our beautiful University grounds, reminding future generations of the sacrifice of those men, nothing can dim . . . ." *See* Exhibit I (letter)

29.     Over the next several months, Venable and UDC representatives corresponded about the plans for the monument. They eventually decided that (1) the Confederate Monument would be a statue and would be placed on a central location on the University campus, (2) UDC

6

would raise the money for the creation and purchase of the monument, and (3) any additional funds necessary to complete the project would come from private donors. *See, e.g.*, Exhibit J (letter).

30.     In an October 5, 1909, letter to Venable, a UDC representative wrote the following about plans for Venable to speak at UDC's Convention: "I think the Daughters are much pleased at the idea of your talking to them & I hope you will place before them many reasons why we should build a handsome monument at our State University to perpetuate our Southern history." *See* Exhibit K (letter).

31.     On or about October 14, 1909, Venable spoke at UDC's Thirteenth Annual Convention in support of the effort to erect the monument on the University campus. A motion was made to unveil the monument in 1911, the fiftieth anniversary of when the students and faculty left the University to join the Confederate armed forces. This motion passed the Convention. *See* Exhibit L (United Daughters of the Confederacy, North Carolina Division, *Minutes of the Thirteenth Annual Convention* at 65-67 (1909)).

32.     Venable and representatives of UDC settled on John Wilson, a renowned sculptor from Massachusetts who taught art at the Copley Society of Boston and at Harvard University, to create the monument. *See* Exhibit M (letter); Exhibit N (Wikipedia biography of John Wilson).

33.     UDC members worked to raise funds for the monument into 1910, but it appeared that they would not be able to raise sufficient funding in time for the monument to be erected in 1911. In August 26, 1910, and September 5, 1910, letters to John Wilson about the work on the monument, Venable noted that he was acting as the "agent" of the UDC committee and that he was helping to raise funds from private donors. *See* Exhibit O (August 26, 1910, letter); Exhibit P (September 5, 1910, letter).

7

34.    In August 1910, a UDC representative wrote the following to Venable: "I asked

[John Wilson, the artist] who was to sign the contract. He did not know. I told him none of us

women could do it of course." *See* Exhibit Q (letter).

35.    On June 19, 1911, Venable wrote the following in response to the August 1910

letter he received:

> I have assumed that you would prefer the business end of this to be handled by me,
> but it is entirely satisfactory to me if you wish to sign this contract and to have the
> payments made by the Treasurer of the U.D.C. . . . Of course, Mr. Wilson [the
> artist] understands that my signing this does not bind the University nor myself
> personally.

*See* Exhibit R (letter).

36.    On June 21, 1911, a UDC representative wrote back the following to Venable:

> Your letter with the contract for the monument was received last night. Of course I
> do not wish to sign it. You are the proper one to do so. . . . [The UDC
> representative's husband] says he prefers for the business end of it to be handled by
> you – the money to be collected and turned over to you . . . .

*See* Exhibit S (letter).

37.    During much of the period of negotiations between UDC and Venable about who

would be responsible for signing the contract, North Carolina law on the doctrine of coverture

provided that married women did not have the right to make contracts in their own name without

being adjudged a "free trader" and being subject to a privy examination. *See, e.g.*, N.C. Revisal of

1905, § 2094 (attached as Exhibit T). This statute was repealed on March 6, 1911. *See* N.C. Laws

1911, c. 109 (attached as Exhibit U).

38.    Over time, UDC and Venable also negotiated other terms related to the monument,

including the cost of the monument and its design. *See* Exhibit V (letter).

39.    On June 29, 1911, the contract for the creation of the monument was signed

between "John Wilson, sculptor of Boston, Massachusetts, of the first part" and

8

"_____ of the second part," with a blank space for the name of the other party to the contract. The contract was signed by John Wilson, Francis P. Venable, Frank S. Richardson (upon information and belief a witness for John Wilson), and Thos. J. Wilson, Jr. (upon information and belief Registrar for the University). *See* Exhibit W (contract).

40.     The contract for the monument called for the sculpting of a bronze figure ("the statue"), representative of a Confederate soldier, to be placed on top of a granite pedestal ("the pedestal") with bronze tablets that displayed information about the monument, the University students who served in the Confederate armed forces, and UDC's involvement in the creation of the monument.

41.     UDC members continued to raise money for the monument in 1912 and 1913 with the aid of private donors solicited by Venable and others connected to UNC-CH. Plans were made for the monument to be completed during the Spring of 1913. Venable and UDC agreed that the monument would be unveiled during the commencement ceremonies in June 1913. *See* Exhibit X (letter).

42.     At the June 2, 1913, commencement ceremonies, Mrs. H.A. London, chair of UDC's Chapel Hill Monument Committee, presented the Confederate Monument to the University and made the following remarks:

> As Chairman of the Monument Committee of [UDC] I have the honor, and it gives me much pleasure, to present in their name to the trustees of the University of North Carolina this monument which is erected in memory of those students of this University who served in the [Confederate armed forces]. . . . We have erected this monument not only in honor of the dead but also of the living. . . . *Accept this monument and may it stand forever as a perpetual memorial to those sons of the University who suffered and sacrificed so much at the call of duty.*

*See* Exhibit Y (remarks) (emphasis added).

9

43.     In accepting the Confederate Monument on behalf of the University, Venable made the following remarks:

> [N]ow in commemoration of a great era and of a noble ideal there has been erected on [the] campus this beautiful monument. . . . It was to that patriotic organization, [UDC], that the gracious thought first came of erecting this monument to the sons of the University that entered the War. Four years ago [UDC] asked permission of the Trustees to place the monument upon the campus, which was gladly granted them. . . . In the name of the University and with an abiding gratitude *I accept the gracious gift of this monument*, embodying as it does grateful memory for the past and high hope for the future.

*See* Exhibit Z (emphasis added).

44.     The Confederate Monument installed on the University campus included the statue of the soldier, the granite pedestal, and the bronze tablets as described above. When installed, the Confederate Monument was annexed to the realty of the University campus at McCorkle Place.

45.     On or about October 9, 1913, Mrs. London provided a report to the Seventeenth Annual Convention of UDC on behalf of the Chapel Hill Monument Committee about the installation proceedings at the June 1913 University commencement. In her report, Mrs. London made the following remarks:

> The Chapel Hill Monument was unveiled during the last commencement at the University. It is very beautiful. It is not only in memory of the boys who left the University from 1861 to 1865, but also those who attended the University and afterwards became Confederate soldiers. . . . Dr. Venable and others have worked unceasingly for it and now it stands there for all time and it will be an object lesson to all future generations – and will impress upon the present day students their obligation to respond to the call of duty.

*See* Exhibit AA (United Daughters of the Confederacy, North Carolina Division, *Minutes of the Seventeenth Annual Convention* at 50-51 (1913)).

46.     Upon information and belief, beginning no later than the 1960s, there were various protests about the history of the Confederate Monument and its place on the University campus.

10

These protests intensified in 2017 and 2018, with several large rallies against the Confederate Monument and numerous incidents of vandalism. *See, e.g.*, Exhibit BB (article).

47.     Upon information and belief, on or about the night of August 20, 2018, over 250 people protested at the site of the Confederate Monument. During this protest, a group of protestors rigged ropes to the Confederate Monument and pulled the statue off of the Confederate Monument's pedestal. Upon information and belief, Defendants or their representatives, including representatives of UNC-CH, were present at the time that people pulled the statue off of the pedestal of the Confederate Monument. *See* Exhibit CC (article).

48.     Upon information and belief, both the statue and the pedestal of the Confederate Monument were damaged when protestors pulled the statue off of the Confederate Monument's pedestal.

49.     Neither Defendants nor their representatives reinstalled the statue on the pedestal of the Confederate Monument.

50.     Upon information and belief, on or about August 20, 2018, Defendants or their representatives, including representatives of UNC-CH, loaded the statue portion of the Confederate Monument onto a truck and took it to an undisclosed location.

51.     On or about January 14, 2019, then-UNC-CH Chancellor Carol Folt ordered that the pedestal on which the statue portion of the Confederate Monument was mounted was to be removed from the University campus. *See* Exhibit DD (article).

52.     On or about the evening of January 14, 2019, Defendants or their representatives, including representatives of UNC-CH, severed the pedestal of the Confederate Monument from the realty of the University campus, removed the pedestal of the Confederate Monument from the University campus, and took the pedestal of the Confederate Monument to an undisclosed location.

53.     Upon information and belief, Defendants or their representatives, including representatives of UNC-CH, used drills, forklifts, and other industrial equipment to sever the pedestal of the Confederate Monument from the realty of the University campus, thereby damaging the Confederate Monument further in the process.

54.     On or about August 22, 2018, then-UDC President Peggy W. Johnson wrote the following email to Haywood Cochrane, then-Chair of the UNC-CH Board of Trustees, about the Confederate Monument:

> I, as a representative of the United Daughters of the Confederacy, request that the Boy Soldier, [referred] to as Silent Sam, be returned to the United Daughters of the Confederacy. We are willing to take possession of both the base and the sculpture. We have been saddened that the message of this monument [has] been so misconstrued. He no longer belongs on the campus of UNC Chapel Hill.

*See* Exhibit EE (email).

55.     Defendants or their representatives have not returned the Confederate Monument to UDC.

56.     Upon information and belief, Defendants or their representatives are currently storing the Confederate Monument on public property under the dominion or supervision of Defendants or their representatives.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment – Monument Law)

57.     The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

58.     This action is brought pursuant to the North Carolina Declaratory Judgments Act, N.C. Gen. Stat., Ch. 1, Art. 26.

59.     An actual justiciable controversy exists between the parties.

60.     Chapter 100 of the North Carolina General Statutes governs all activities related to "Monuments, Memorials, and Parks," including any "object of remembrance," which is defined in N.C. Gen. Stat. § 100-2.1 as "a monument, memorial, plaque, statue, marker, or display of a permanent character that commemorates an event, a person, or military service that is part of North Carolina's history."

61.     The Confederate Monument qualifies as an "object of remembrance" under N.C. Gen. Stat. § 100-2.1.

62.     Except as provided in Chapter 100, "a monument, memorial, or work of art owned by the State may not be removed, relocated, or altered in any way without the approval of the North Carolina Historical Commission."

63.     Under N.C. Gen. Stat. § 100-2.1, an "object of remembrance" located on "public property" may not be permanently removed from that property and may only be relocated under very limited conditions.

64.     McCorkle Place on the University campus is property owned and controlled by Defendants and as such is "public property" under North Carolina law.

65.     An "object of remembrance" that is temporarily relocated must be returned to its original location within ninety days of the completion of the project that required its temporary removal.

66.     An "object of remembrance" that is permanently relocated may only be relocated to a site of "similar prominence, honor, visibility, availability, and access that are within the boundaries of the jurisdiction from which it was relocated" and may not be relocated to a museum, cemetery, or mausoleum unless it was originally placed at such a location.

13

67.     An "object of remembrance" may be relocated only in the following circumstances: (a) when appropriate measures are required by the State or a political subdivision of the State to preserve the object of remembrance, or (b) when necessary for construction and related efforts for buildings, open spaces, parking, or transportation projects.

68.     The Confederate Monument was not returned to its original location on McCorkle Place on the UNC-CH campus within 90 days.

69.     Upon information and belief, the Confederate Monument has not been relocated to a site of "similar prominence, honor, visibility, availability, and access that are within the boundaries of the jurisdiction from which it was relocated."

70.     The Confederate Monument was not relocated due to appropriate measures being required by the State, a political subdivision of the State, or Defendants to preserve the Confederate Monument.

71.     The Confederate Monument was not relocated due to it being necessary for Defendants to do so for construction, renovation, reconfiguration of buildings, open spaces, parking, or transportation projects.

72.     The North Carolina Historical Commission has not approved the removal, relocation, or alteration of the Confederate Monument from the site of its annexation to McCorkle Place on the University campus.

73.     Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

14

74.     Because Defendants' actions with respect to the Confederate Monument after Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, have not complied with the provisions of Chapter 100 of the North Carolina General Statutes, Plaintiff (as owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument) is entitled an order of the Court declaring the rights and liabilities of the parties, in particular that Chapter 100 of the North Carolina General Statutes mandates that the Confederate Monument shall be returned its original location.

75.     Based on N.C. Gen. Stat. § 100-2.1, this Court should enter an order requiring that the Confederate Monument be returned to its original location and that Defendants reannex the Confederate Monument to the realty at McCorkle Place on the University campus.

### SECOND CLAIM FOR RELIEF
### (Declaratory Judgment – Contract)

76.     The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

77.     This action is brought pursuant to the North Carolina Declaratory Judgments Act, N.C. Gen. Stat., Ch. 1, Art. 26.

78.     An actual justiciable controversy exists between the parties.

79.     The writings back and forth between representatives of UDC and Venable in his capacity as the President of UNC-CH constitute a meeting of the minds about (1) the conditions under which UDC would raise funds for the erection of the Confederate Monument on the University campus, (2) the conditions under which UNC-CH would allow UDC to annex the Confederate Monument to the realty of the University campus, and (3) that the Confederate Monument would remain annexed to the realty of the University campus forever.

15

80.     The consideration UNC-CH gave UDC in exchange for the Confederate Monument was the use and enjoyment of a portion of the realty of the University campus on which to annex the Confederate Monument.

81.     The consideration UDC gave UNC-CH in exchange for the ability to annex the Confederate Monument to the realty of the University campus was the money it raised, and expended, to fund the creation and purchase of the Confederate Monument and the presentation of the Confederate Monument to UNC-CH.

82.     As such, the writings back and forth between representatives of UDC and Venable in his capacity as the President of UNC-CH constitute a binding contract under North Carolina law.

83.     Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

84.     As owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff is entitled to an order of the Court declaring the rights and liabilities of the parties, in particular that the writings back and forth between representatives of UDC and Venable in his capacity as the President of UNC-CH constitute a valid and binding contract under North Carolina law.

85.     In the alternative, Mrs. London's public statement at the June 1913 commencement presenting the Confederate Monument to the University – "Accept this monument and may it stand forever as a perpetual memorial" – and Venable's public acceptance of the Confederate Monument

after Mrs. London's statement constituted a parol modification of the written contract entered into between UDC and UNC-CH.

86.     As owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff is entitled to an order of the Court declaring the rights and liabilities of the parties, in particular that the writings back and forth between representatives of UDC and Venable in his capacity as the President of UNC-CH constitute a valid and binding contract under North Carolina law about the annexation of the Confederate Monument on the realty of the University campus at McCorkle Place and that the public statements of Mrs. London and Venable about the Confederate Monument at the June 1913 commencement were a parol modification of that written agreement.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract)

87.     The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

88.     The writings back and forth between representatives of UDC and Venable in his capacity as the President of UNC-CH constitute a binding contract under North Carolina law.

89.     This contract between UDC and Venable on behalf of UNC-CH provided that (1) UDC would raise money to fund a monument honoring University students who had served in the Confederate armed forces, (2) Venable would act as UDC's agent in raising funds for the Confederate Monument from private donors, and (3) UNC-CH would annex the Confederate Monument to the realty of the University campus to remain there "forever."

17

90. The consideration UNC-CH gave UDC in exchange for the Confederate Monument was the use and enjoyment of a portion of the realty of the University campus on which to annex the Confederate Monument.

91. The consideration UDC gave UNC-CH in exchange for the ability to annex the Confederate Monument to the realty of the University campus was the money it raised, and expended, to fund the creation and purchase of the Confederate Monument and the presentation of the Confederate Monument to UNC-CH.

92. At the time that the Confederate Monument was annexed to the realty of the University campus at McCorkle Place, it was the intent of both UDC and UNC-CH that the Confederate Monument would remain annexed to the realty of the University campus in perpetuity.

93. The annexation of the Confederate Monument on the realty of the University campus on the UNC-CH campus and its remaining on the UNC-CH campus in perpetuity were material terms of the contract between UDC and UNC-CH.

94. The statue portion of the Confederate Monument was removed from the UNC-CH campus on August 20, 2018, and the pedestal portion of the Confederate Monument was removed from the UNC-CH Campus on January 14, 2019.

95. The removal of the Confederate Monument from the UNC-CH campus was a breach of a material term of the contract between UDC and UNC-CH.

96. Defendants' breach of the contract is ongoing.

97. Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the

18

Confederate Monument, including any and all choses in action related to the Confederate Monument.

98.    Plaintiff is entitled to enforce the terms of the contract between UDC and UNC-CH, and to bring this action against Defendants for breach of the contract.

99.    As a direct and proximate result of Defendants' actions in breach of the contract, Plaintiff has suffered certain damages, including monetary damages in excess of $25,000.

## FOURTH CLAIM FOR RELIEF
### (Specific Performance)

100.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

101.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

102.    Based on the valid and binding contract between UDC and UNC-CH, Plaintiff is entitled to specific performance by Defendants of the contractual provision that the Confederate Monument be annexed to the realty of the University campus.

103.    Based on the material terms of the contract between UDC and UNC-CH, this Court should enter an order requiring specific performance of Defendants to reannex the Confederate Monument to the realty of the University campus.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment – Conditional Gift)

104.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

19

105.   This action is brought pursuant to the North Carolina Declaratory Judgments Act, N.C. Gen. Stat., Ch. 1, Art. 26.

106.   An actual justiciable controversy exists between the parties.

107.   When the Confederate Monument was annexed to the realty of the University campus at McCorkle Place, it became a fixture, and thereby part of the realty, under North Carolina law.

108.   When UDC presented the Confederate Monument to UNC-CH, it intended to present the Confederate Monument and did present the Confederate Monument under the condition that the Confederate Monument be annexed to the University campus "forever."

109.   The condition that the Confederate Monument remain annexed to the realty of the University campus "forever" was an express material condition subsequent of the gift.

110.   UDC's presentation of the Confederate Monument to UNC-CH was a conditional gift under North Carolina law.

111.   UNC-CH accepted the Confederate Monument as a gift from UDC subject to the express material condition subsequent that the Confederate Monument remain annexed to the realty of the University campus "forever."

112.   When UDC presented the Confederate Monument to UNC-CH as a conditional gift, any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, transferred to UNC-CH subject to the express material condition subsequent.

113.   When Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, Defendants intended that the Confederate

20

Monument be independent from the realty of the University campus permanently, and the Confederate Monument then reverted to personal property under North Carolina law.

114.   When Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, the condition upon which UDC presented the Confederate Monument to UNC-CH failed, and any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, reverted to UDC.

115.   UDC's conditional gift of the Confederate Monument to UNC-CH and the reversion of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, to UDC did not violate the common law rule against perpetuities. North Carolina law provides that reversionary interests, as future interests retained by grantors, are considered vested at the time of the grant and are not subject to the common law rule against perpetuities.

116.   UDC's conditional gift of the Confederate Monument to UNC-CH and the reversion of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, to UDC did not violate the North Carolina uniform statutory rule against perpetuities. N.C. Gen. Stat. § 41-18 provides that the uniform statutory rule does not apply to nonvested property interests held by a charity in the event that the nonvested property interest is preceded by an interest held by a governmental agency or subdivision of the government.

117.   N.C. Gen. Stat. § 36C-4-405 also provides that no gift shall be invalidated by the rule against perpetuities.

21

118.    As Defendants have breached the express material condition subsequent of the gift, Plaintiff (as owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument) is entitled to have possession of the Confederate Monument awarded to it.

119.    As the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff can enforce the express and material condition subsequent of the gift.

120.    Plaintiff is entitled an order of the Court declaring the rights and liabilities of the parties, in particular that Plaintiff holds any and all legal and equitable rights, title, and interests in the personal property of the Confederate Monument, including any and all choses in action related to the Confederate Monument.

### SIXTH CLAIM FOR RELIEF
### (Quiet Title)

121.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

122.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

123.    Plaintiff is entitled to an order of the Court quieting title to the Confederate Monument in favor of Plaintiff and against Defendants so as to free the property from the cloud resting upon it and adjudging Plaintiff to be the owner of any and all legal or equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

22

## SEVENTH CLAIM FOR RELIEF
### (Trespass to Chattel)

124.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

125.    On or about August 22, 2018, UDC asked Defendants to return the Confederate Monument to it, but Defendants did not return the Confederate Monument to UDC.

126.    At the time that Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, the Confederate Monument reverted to personal property and was a chattel under the law of North Carolina.

127.    At the time that Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, reverted to UDC.

128.    At the time that Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, UDC had the right to take possession of the Confederate Monument whenever it desired, and therefore had constructive and virtual possession of the Confederate Monument.

129.    At the time that Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, Defendants interfered with UDC's possession of the Confederate Monument without justification, authority, or lawful excuse.

130.    Defendants continue to engage in the unauthorized and unlawful interference with Plaintiff's possession of the Confederate Monument and the dispossession of the Confederate Monument from Plaintiff (in Plaintiff's capacity as the owner of any and all rights, title, and

23

interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument) without justification, authority, or lawful excuse.

131.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in The Confederate Monument, including any and all choses in action related to the Confederate Monument.

132.    As a direct and proximate result of Defendants' actions in trespassing against Plaintiff's legal and equitable rights, title, and interests in the Confederate Monument, Plaintiff has suffered certain damages, including monetary damages in excess of $25,000.

## EIGHTH CLAIM FOR RELIEF
### (Conversion)

133.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

134.    When Defendants or their representatives did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, the Confederate Monument reverted to personal property and any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, reverted to UDC.

135.    Defendants or their representatives took possession of the Confederate Monument after Defendants did not reannex the Confederate Monument to the realty of the University campus.

136.    On or about August 22, 2018, UDC asked Defendants or their representatives to return the Confederate Monument to UDC.

24

137.    Defendants or their representatives did not return the Confederate Monument to UDC.

138.    The actions of Defendants or their representatives in retaining possession of the Confederate Monument constitute an unauthorized exercise of the rights, title, and interests of ownership over personal property that rightfully belongs to Plaintiff (as the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument).

139.    The actions of Defendants or their representatives in wrongfully retaining possession, dominion, and control of the Confederate Monument were and are intentional, willful, wanton, and show a reckless disregard of the legal and equitable ownership rights, title, and interests belonging to Plaintiff.

140.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

141.    As a direct and proximate result of the actions of Defendants or their representatives in converting the Confederate Monument, Plaintiff has suffered certain damages, including monetary damages in excess of $25,000.

### NINTH CLAIM FOR RELIEF
#### (Replevin/Claim and Delivery)

142.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

143.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the

Confederate Monument, including any and all choses in action related to the Confederate Monument.

144.    As the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, and the constructive possessor of the Confederate Monument, Plaintiff is entitled to actual possession of the Confederate Monument.

145.    UDC, the predecessor-in-interest to Plaintiff for the purposes of ownership in and rights, title, and interests in the Confederate Monument, requested on August 22, 2018, that Defendants or their representatives return the Confederate Monument to UDC.

146.    Defendants or their representatives did not return the Confederate Monument to UDC.

147.    Defendants or their representatives continue to withhold possession of the Confederate Monument from Plaintiff (the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument) intentionally, willfully, wrongfully, and unlawfully.

148.    Plaintiff is entitled to recover possession of the Confederate Monument from Defendants or their representatives.

149.    Plaintiff is entitled to a judgment against Defendants directing delivery of the Confederate Monument from Defendants to Plaintiff.

### TENTH CLAIM FOR RELIEF
#### (Quasi-Contract/Unjust Enrichment)

150.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

031

151.   UDC conferred a benefit onto Defendants through the conditional gift of the Confederate Monument.

152.   Defendants accepted the conditional gift of the Confederate Monument from UDC.

153.   Once Defendants or their representatives did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, the Confederate Monument reverted to personal property of which UDC possessed any and all legal and equitable rights, title, and interests, including any and all choses in action related to the Confederate Monument.

154.   Defendants or their representatives did not return the Confederate Monument to UDC after Defendants did not reannex the Confederate Monument to the realty of the University campus.

155.   By retaining the Confederate Monument after the legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, reverted to UDC. After having not returned the Confederate Monument to UDC after UDC asked for its return, Defendants have been enriched at UDC's expense under circumstances that, in equity and good conscience, call for an accounting by Defendants.

156.   Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

157.   As a direct and proximate result of the actions of Defendants or their representatives in retaining the Confederate Monument and being unjustly enriched, Plaintiff (as owner of the legal and equitable rights, title, and interests in the Confederate Monument, including any and all

27

choses in action related to the Confederate Monument) has suffered certain damages, including monetary damages in excess of $25,000.

## ELEVENTH CLAIM FOR RELIEF
### (Constructive Trust)

158.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

159.    Defendants have been unjustly enriched by taking possession of the Confederate Monument after the legal and equitable rights, title, and interests in it reverted to UDC and by refusing to return the Confederate Monument to UDC.

160.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

161.    Because of the unique nature of the Confederate Monument, Plaintiff's claim in this regard cannot adequately be satisfied by an award of money damages.

162.    As owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, Plaintiff is entitled to an order of the Court imposing a constructive trust on the Confederate Monument for the benefit of Plaintiff to secure Plaintiff's right of possession of the Confederate Monument.

## TWELFTH CLAIM FOR RELIEF
### (Negligence/Damage to Property)

163.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

28

164.    During a time when Defendants or their representatives had possession, dominion, and control of the Confederate monument, the Confederate monument was damaged.

165.    At the time that Defendants or their representatives did not reannex the Confederate Monument to the realty of the University campus, Defendants or their representatives had possession, dominion, and control of the Confederate Monument.

166.    Upon information and belief, on or about January 14, 2019, Defendants or their representatives damaged the Confederate Monument in the course of handling or securing the Confederate Monument.

167.    Upon information and belief, the failure of Defendants or their representatives to use ordinary care in handling or securing the Confederate Monument was a concurrent cause of the damage to the Confederate Monument.

168.    Upon information and belief, the failure of Defendants or their representatives to use ordinary care in handling or securing the Confederate Monument was a proximate cause of the damage to the Confederate Monument.

169.    The negligence of Defendants or their representatives resulting in the damage to the Confederate Monument is not insulated from the intentional torts and/or negligence of others.

170.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

171.    As a direct and proximate result of the negligence of Defendants or their representatives with respect to their handling and securing of the Confederate Monument, Plaintiff has suffered certain damages, including the diminution in value of the Confederate Monument and

29

the costs of repairing damages to the Confederate Monument, including monetary damages in excess of $25,000.

## THIRTEENTH CLAIM FOR RELIEF
### (Injunction)

172.    The allegations in each of the Paragraphs in this Complaint are realleged and incorporated by reference as if fully set forth herein.

173.    Equitable relief such as an injunction is appropriate when an award of money damages will not make the plaintiff whole.

174.    The Confederate Monument is a unique and historical creation that is over 100 years old and is protected by Chapter 100 of the North Carolina General Statutes.

175.    Based on the assignment agreement between UDC and Plaintiff, Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

176.    Because the Confederate Monument is a unique and historical creation protected by law, Plaintiff has no adequate remedy at law if the Court does not grant injunctive relief compelling Defendants to reannex the Confederate Monument on the realty in the location where it was originally installed on the University campus.

177.    Defendants' breach of the contract between UDC and Defendants and failure to reannex the Confederate Monument in its original location on the realty of the University campus in accordance with N.C. Gen. Stat. § 100-2.1 entitles Plaintiff to a permanent and mandatory injunction ordering and compelling Defendants to reannex the Confederate Monument on the realty of the University campus at McCorkle Place, the location where it was originally installed on the University campus.

178.   In the alternative, because the Confederate Monument is a unique and historical creation protected by law, Plaintiff has no adequate remedy at law if the Court does not grant injunctive relief compelling Defendants to deliver the Confederate Monument to Plaintiff.

179.   In the alternative, Defendants' conduct resulting in the failure of the condition subsequent of the gift UDC presented to Defendants, Defendants' ongoing and continuing trespass against Plaintiff's legal and equitable rights, title, and interests in the Confederate Monument, and Defendants' conversion of the Confederate Monument, entitle Plaintiff to a permanent and mandatory injunction ordering and compelling Defendants to deliver the Confederate Monument to Plaintiff in its capacity as the holder of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

WHEREFORE, based on the foregoing, Plaintiff prays to the Court and requests the following relief:

A.   A declaration and order of the Court that Chapter 100 of the North Carolina General Statutes mandates that the Confederate Monument shall be returned to its original location and that Defendants reannex the Confederate Monument to the realty at McCorkle Place on the University campus; and

B.   A declaration and order of the Court that UDC and UNC-CH formed a valid contract about the placement of the Confederate Monument on the realty of the University campus, or that Mrs. London's statement "Accept this monument and may it stand forever as a perpetual memorial" was a parol modification of the valid contract that UDC and UNC-CH had entered into about the Confederate Monument, and that Plaintiff may enforce that contract in its capacity as the current owner of any and all existing legal and equitable rights, title, and interests in the

31

Confederate Monument previously owned by UDC, including any and all choses in action related to the Confederate Monument previously owned by UDC; and

C.      A judgment of specific performance ordering Defendants to replace the Confederate Monument on the realty of the University campus; and

D.      A permanent and mandatory injunction ordering Defendants to replace the Confederate Monument on the realty of the University campus at McCorkle Place; and

E.      In the alternative, a declaration and order of the Court that UDC's presentation of the Confederate Monument to UNC-CH was a conditional gift with the express material condition subsequent that the Confederate Monument be annexed to the realty of the University campus "forever," and that the actions of Defendants in failing to reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, resulted in any and all rights, title, and interests in the Confederate Monument reverting to UDC, and that Plaintiff is the current owner of any and all existing legal and equitable rights, title, and interests in the Confederate Monument previously owned by UDC, including any and all choses in action related to the Confederate Monument previously owned by UDC; and

F.      In the alternative, a judgment directing delivery of the Confederate Monument to Plaintiff, the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument; and

G.      In the alternative, a judgment quieting the title to the Confederate Monument in favor of Plaintiff and against all Defendants so as to free the Confederate Monument from the cloud resting upon it and to render Plaintiff's title to the Confederate Monument clear and undisputable; and

H.    In the alternative, a permanent and mandatory injunction ordering the delivery of the Confederate Monument to Plaintiff, the owner of any and all legal and equitable rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument; and

I.    In the alternative, the imposition of a constructive trust on the Confederate Monument for the benefit of Plaintiff to secure Plaintiff's right of possession of the Confederate Monument; and

J.    The recovery of actual damages from Defendants, jointly and severally, in an amount sufficient to compensate for damage to the Confederate Monument resulting from Defendants' conduct and other injury to Plaintiff; and

K.    The recovery of costs and expenses incurred in this action, including an award of attorneys' fees, to be taxed jointly and severally against all Defendants; and

L.    A trial by jury of all issues so triable; and

M.    An award of any other and further relief as may be just and proper.

This, the __27__ day of __November_____, 2019.

**DAVIS, STURGES & TOMLINSON, PLLC**
Attorneys at Law

_____
C. Boyd Sturges III, N.C. Bar No. 22342
101 Church Street
P.O. Drawer 708
Louisburg, North Carolina 27549
Phone: 919-496-2137
Email: bsturges@dstattys.com

*Attorney for North Carolina Division Sons of Confederate Veterans, Inc., a North Carolina corporation*

CERTIFIED TRUE COPY
FROM ORIGINAL

Clerk of Superior Court Orange County

33

STATE OF NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

File No. 19CVS_____

| | | |
|---|---|---|
| NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **VERIFICATION** |
| THE UNIVERSITY OF NORTH CAROLINA and THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

I, Kevin Stone, depose and say that I have read the foregoing Verified Complaint; that I have the power and authority to sign this Verified Complaint on behalf of Plaintiff; that I declare that the contents thereof are true of my own personal knowledge; and that I declare that, as to matters about which I have no personal knowledge, I believe them to be true based on my review of the attached documents and other matters of record.

*(Signature follows on next page)*

34

Kevin Stone
Division Commander
North Carolina Division Sons of Confederate
Veterans, Inc.

CONRAD BOYD STURGES

I, _____, a Notary Public for said County and State, do hereby
certify that _____Kevin Stone_____ personally appeared before me this day and
acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this, the 27 day of March, 2019.

(Official Seal) Notary Public

My commission expires
_____10/9___, 20 20

35

# EXHIBIT A



## ARTICLES OF INCORPORATION

### OF

North Carolina Division Sons of Confederate Veterans, Inc.
(Name of Corporation)

## A NON-PROFIT CORPORATION

We, the undersigned natural persons of the age of twenty-one years or more, acting as incorporators for the purpose of creating a non-profit corporation under the laws of the State of North Carolina, as contained in Chapter 55A of the General Statutes of North Carolina, entitled "Non-Profit Corporation Act", and the several amendments thereto, do hereby set forth:

1. The name of the corporation is North Carolina Division Sons of Confederate Veterans, In

2. The period of duration of the corporation shall be ____perpetual_____
(May be perpetual or for a limited period)

3. The purposes for which the corporation is organized are:
To associate in one united, compact body of men of Confederate ancestry, and to cultivate perpetuate and sanctify the ties of fraternity and friendship entailed thereby; to aid and encourage the history and achievement from Jamestown to this present era, constantly endeavoring to see that the events of the War Between the States and the heroic contributions of the Confederate soldiers of Indian Territory are authentically and clearly written, and that all documents, relics and momentoes produced and handed down by those active participants therein are properly treasured and preserved for posterity; to aid and assist in the erection of suitable and enduring monuments and memorials to all Southern valor, civil and military, wherever done and wherever found; to instill into our descendents a devotion to and reverence for the principles represented by the Confederate States of America, to the honor, glory and memory of our fathers who fought in that cause.

4. The corporation is to have the following class or classes of members: (If there are to be no members, so state.)
None

5. Directors of the corporation shall be elected in the following manner: Directors and Officers to be elected annually in accordance with the By-Laws of this organization.

6. The address of the initial registered office of the corporation is as follows:
Street address, (if none, so state) Post Office Box 1927P - 3967 Tara Drive
396

City or town _____Raleigh_____

County _____Wake_____

The name of the initial registered agent of the corporation at the above address is _____
_____Byron Brady, Division Commander_____

7. The number of directors constituting the initial board of directors shall be __four (4)__,
and the names and addresses (including street and number, if any) of the persons who are to serve
as directors until the first meeting of the corporation or until their successors are elected and
qualified are:

| NAME | STREET ADDRESS (if none, so state) | CITY OR TOWN |
|---|---|---|
| Byron Brady | 3962 Tara Drive P.O. Box 19271 | Raleigh, N.C. |
| Charles Clark III | 1338 Beasley Road | Wilmington, N.C. |
| Danny Moody | P.O. Box 265 | Fuquay Varina, N.C. |
| Keith Bartlett | 8 Appian Way | Arden, N.C. |

8. The names and addresses (including street and number, if any) of all the incorporators are:

| NAME | STREET ADDRESS (if none, so state) | CITY OR TOWN |
|---|---|---|
| Byron Brady | 3962 Tara Drive P.O. Box 19271 | Raleigh, N.C. |
| Larry E. Norman | P.O. Box 666 | Louisburg, N.C. |

9. In addition to the powers granted corporations under the laws of the State of North Caro-
lina, the corporation shall have full power and authority to

None except allowed by the Laws of the State of North Carolina and as
authorized by the By-Laws of this organization not inconsistent with the laws
of the State of North Carolina.

10. * The internal affairs of this non profit corporation shall be
governed by the By-Laws of this organization duly adopted and ratified as
set forth in the By-Laws of the North Carolina Division Sons of Confederate
Veterans. See attachment "Rider to Articles of Incorporation of North Carolina
Division Sons of Confederate Veterans, Inc.

IN TESTIMONY WHEREOF, we have hereunto set our hands, this the _____20th_____ day of _____June_____, A.D. 1988___.

_____
Byron E. Brady
_____
Larry E. Norman

STATE OF _North Carolina_____
COUNTY OF _Franklin_____

This is to certify that on the ____20th____ day of ____June_____, A.D. 1988___, before me, a _____Notary Public_____ personally appeared Byron E. Brady and Larry E. Norman

who, I am satisfied, are the persons named in and who executed the foregoing Article of Incorporation, and I having first made known to them the contents thereof, they did each acknowledge that they signed and delivered the same as their voluntary act and deed for the uses and purposes therein expressed.

In Testimony Whereof, I have hereunto set my hand and official seal, this the ____20th_____ day of _____June_____, A.D. 19_88__.

(L. S.)

My Commission Expires: 5-31-91

*Insert any provisions desired to be included in the Articles of Incorporation such as: regulation of internal affairs of the corporation, any matters required to be set forth in the bylaws, etc. See Chapter 55A of the General Statutes.

RIDER TO ARTICLE OF INCORPORATION OF NORTH CAROLINA DIVISION SONS OF
CONFEDERATE VETERANS, INC.

10*

   Said corporation is organized exclusively for charitable,
religious, educational, and scientific purposes, including, for
such purposes, the making of distributions to organizations that
qualify as exempt organizations under section 501(c)(3) of the
Internal Revenue Code of 1954 (or the corresponding provision of
any future United States Internal Revenue Law).

   No part of the net earnings of the corporation shall inure to
the benefit of, or be distributable to its members, trustees, officers,
or other private persons, except that the corporation shall be
authorized and empowered to pay reasonable compensation for services
rendered and to make payments and distributions in furtherance of the
purposes set forth in Article Third hereof.  No substantial part of
the activities of the corporation shall be the carrying on of propaganda,
or otherwise attempting to influence legislation, and the corporation
shall not participate in or intervene in (including the publishing or
distribution of statements) any political campaign on behalf of any
candidate for public office.  Notwithstanding any other provision of
these articles, the corporation shall not carry on any other activities
not permitted to be carried on (a) by a corporation exempt from Federal
income tax under section 501(c)(3) of the Internal Revenue Code of
1954 (or the corresponding provision of any future United States
Internal Revenue Law) or (b) by a corporation, contributions to
which are deductible under section 170(c)(2) of the Internal Revenue
Code of 1954 (or the corresponding provision of any future United
States Internal Revenue Law).

   Upon the dissolution of the corporation, the Board of Trustees
shall, after paying or making provision for the payment of all of the
liabilities of the corporation, dispose of all of the assets of the
corporation exclusively for the purposes of the corporation in such
manner, or to such organization or organizations organized and
operated exclusively for charitable, educational, religious, or
scientific purposes as shall at the time qualify as an exempt
organization or organizations under section 501(c)(3) of the
Internal Revenue Code of 1954 (or the corresponding provision of
any future United States Internal Revenue Law), as the Board of
Trustees shall determine.  Any such assets not so disposed of shall
be disposed of by the Court of Common Pleas of the county in which
the principal office of the corporation is then located, exclusively
for such purposes or to such organization or organizations, as said
court shall determine, which are organized and operated exclusively
for such purposes.

# EXHIBIT B

92  259  5037

0⁻0312991

**FILED**

SEP 16 1992,

RUFUS L EDMISTEN
SECRETARY OF STATE
NC CAROLINA

## ARTICLES OF INCORPORATION

### OF

## THE UNITED DAUGHTERS OF THE CONFEDERACY - NORTH CAROLINA DIVISION, INC.

I, the undersigned natural person of the age of eighteen years or more, acting as incorporator for the purpose of creating a nonprofit corporation under the laws of the State of North Carolina, as contained in Chapter 55A of the General Statutes of North Carolina entitled "nonprofit Corporation Act," and the several amendments thereto, do hereby set forth:

1.  **Name.**  The name of the corporation is The United Daughters Of The Confederacy - North Carolina Division, Inc.

2.  **Duration.**  The period of duration of the corporation is perpetual.

3.  **Purposes.**  The purposes for which the corporation is organized are to achieve the objectives of the United Daughters of the Confederacy, which include historical, benevolent, memorial, educational and patriotic programs, plans events and scholarships by members who are lineal or collateral descendants of men and women who served the cause of the Confederate States of America.

   G.  To establish a fiscal system to receive charitable donations, trusts, etc., and to carry out charitable trusts and trusts for benevolent and philanthropic purposes in line with the above stated objectives.

   H.  To engage in any lawful act or activity for which a non-profit organization may be organized under Chapter 55A of the General Statutes of North Carolina.

   I.  Notwithstanding any other provisions of these Articles, the purposes for which the corporation is organized are exclusively charitable, literary and educational within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue Law.

4.  **Members.**  The corporation shall have members, received by application in a manner provided in the By-laws.

5.  **Election of Directors.**  The directors of the corporation shall be elected in the manner provided in the By-Laws.

6.  **Address.**  The address of the initial registered office of the corporation is 302 North Blount Street, Raleigh, NC, Wake County, North Carolina and the initial registered agent at such address is Mrs. E. Thomas Drake.

7.  **Initial Directors.**  The number of directors constituting the initial board of directors shall be nine (9), and the names and addresses of the persons who are to serve as directors until the first meeting of the corporation or until their successors are elected and qualified are as follows:

Mrs. E. Thomas Drake
358 Brevard Road
Asheville, NC  28806

Mrs. C. Knox Council, Jr.
314 Country Club Drive
Jacksonville, NC  28546

Mrs. Benjamin Tart
Rt. 2, Box 317
Ramseur, NC  27316

Mrs. Kenneth L. Money
3532 Kirby Smith Drive
Wilmington, NC  28409

Pamela Carter Foy
Rt. 21, Box 1490
Lexington, NC  27292

Mrs. Roderick A. Molinare
3789 Kirklees Road
Winston-Salem, NC  27104

Mrs. Annette MacRae
P. O. Box 940
Bethel, NC  27812

Mrs. Don R. Averitte
420 Olde Shannon Road
Red Springs, NC  28377

Mrs. Jesse F. Grimes
Rt. 3, Box 230
Pikeville, NC  27863

8.  **Incorporator.**  The name and address of the incorporator is:

A. Frank Johns
P. O. Box 3585
Greensboro, NC  27402

9.  **Powers.**  Notwithstanding any other provisions of these Articles, this corporation will not carry on any other activities not permitted to be carried on by (a) a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue Law or (b) a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 or any other corresponding provision of any future United States Internal Revenue Law.

10.  **Dissolution.**  In the event of dissolution, the residual assets of the corporation will be turned over to one or more organizations which themselves are exempt as organizations described in Section 501(c) (3) and Section 170(c)(2) of the Internal Revenue Code of 1986 or corresponding Sections of any prior or future law, or to the federal, state or local government for exclusive public purpose.

IN WITNESS WHEREOF, I have hereunto set my hand this the _10th_ day of September, 1992.

_(signature)_ (SEAL)

NORTH CAROLINA

GUILFORD COUNTY

I, Denise Y. Willis, a Notary Public for said County and State, do hereby certify that A. Frank Johns personally appeared before me this day and acknowledged the due execution of the foregoing Articles of Incorporation for the purposes therein expressed.

WITNESS my hand and notarial seal this the _10th_ day of September, 1992.

_Denise Y. Willis_
Notary Public

My Commission Expires:

_9/4/96_

DENISE Y. WILLIS
NOTARY PUBLIC
GUILFORD COUNTY, NC
Commission Expires 9-4-96

**EXHIBIT C**

**MEMORANDUM OF ASSIGNMENT**

This Memorandum of Assignment memorializes an agreement by and between THE UNITED DAUGHTERS OF THE CONFEDERACY – NORTH CAROLINA DIVISION, INC., a North Carolina corporation ("**UDC**"), and NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation ("**SCV**").

WHEREAS, UDC desires to assign to SCV, and SCV desires to assume, any and all of UDC's reversionary and other existing legal or equitable property rights, title, and interests in and to the Confederate Monument presented by UDC to the University of North Carolina on or about June 2, 1913 ("the Monument"), to the extent that North Carolina law provides for such interest(s).

NOW, THEREFORE, UDC and SCV assert and acknowledge that UDC has assigned any and all of UDC's reversionary and other existing legal or equitable property rights, title and interests, to SCV pursuant to a written agreement entered into on or about November ___23___, 2019, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and assert and acknowledge that the signatories to this Memorandum of Assignment have the power and authority pursuant to the by-laws and governing rules of their organizations to enter into this Memorandum of Assignment on behalf of their organizations and to bind their organizations to this Memorandum of Assignment.

IN WITNESS WHEREOF, UDC and SCV have caused this Memorandum of Assignment to be executed by their duly authorized and empowered representatives as of the Effective Date.

1

## MEMORANDUM OF ASSIGNMENT - SIGNATURE PAGE

**THE UNITED DAUGHTERS OF THE CONFEDERACY – NORTH CAROLINA DIVISION, INC., a North Carolina corporation**

Date: _11-23-19_

By: _Sara N. Powell_

Name: _Sara N. Powell_

Title: President

STATE OF NORTH CAROLINA
COUNTY OF _Lee_

I, _Ava Holt Coley_, a Notary Public for said County and State, do hereby certify that _Sara N. Powell_ personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this, the _23_ day of _Nov_, 2019.

(Official Seal) Notary Public

My commission expires

_2-15_, 20_23_.

AVA HOLT COLEY
Notary Public – North Carolina
Lee County
My Commission Expires Feb 15, 2023

2

## <u>MEMORANDUM OF ASSIGNMENT - SIGNATURE PAGE</u>

**NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation**

Date: _11 - 23 -19_

By: _R Kym S_

Name: _R Kevin Stone_

Title: Division Commander

STATE OF NORTH CAROLINA
COUNTY OF _____ Fr-kl._

I, _CONRAD BOYD STURGGW W_____, a Notary Public for said County and the State of North Carolina, do hereby certify that _Kevin Ston_____ personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this, the _23u_ day of _Novll_, 2019.

(Official Seal) Notary Public

My commission expires
_10/9_, 20_20_.

3

EXHIBIT D

## MINUTES OF ORGANIZATION
### AND OF
## 1ST AND 2ND ANNUAL CONVENTIONS



## United Daughters
### of the
## Confederacy
## NORTH CAROLINA DIVISION

H.

CONSTITUTION AND BY-LAWS

OF THE

NORTH CAROLINA DIVISION UNITED DAUGH-
TERS OF THE CONFEDERACY.

CONSTITUTION.

ARTICLE I.

NAME.

North Carolina Division Daughters of the Confederacy.

ARTICLE II.

OBJECT.

The object of this Association shall be social, benevo-
lent, historical and memorial:—To accomplish these pur-
poses, it will seek, 1st To bring into its organization all
women throughout the State who are loyal to the memo-
ries and principles of the Confederate Cause.

2nd.—To give assistance when needed to survivors of
the war and those dependent upon them.

3rd.—To collect and preserve relics, objects and inci-
dents of historic value, to record deeds of heroism, espec-
ially those of Southern women, and to unite with the
Confederate Veterans in the determination that the portion
of American history relating to the late war shall be pro-

---

perly taught in the public schools of the State and to use
its influence toward attaining this object in all private
schools.

4th.—To honor the memory of those who fell in the
services of the Confederate States, and to remember grate-
fully those survivors who having faithfully served and
suffered, remain loyal to the Confederate Cause.

ARTICLE III.

MEMBERSHIP.

All chapters which are properly chartered in this State
thereby become members of this Division—seven or more
women can organize a chapter anywhere in North Carolina
by applying for a charter through the State headquarters.

The qualifications for membership in the chapters are
laid down in the Constitution of the United Daughters of
the Confederacy, and are such as to render the Daughters
of the Confederacy in time a strictly hereditary Society.

ARTICLE IV.

OFFICERS.

The officers of the Division shall be a President, four
Vice Presidents, Recording Secretary, Corresponding
Secretary, Treasurer, Registrar and Historian, the last to
be elected for a term of years at the discretion of the Divis-
ion, the rest to be elected annually.

ARTICLE V.

MEETINGS.

Section 1.   The Division shall meet annually near the

---

## 6        MINUTES OF 1ST AND 2ND ANNUAL CONVENTION

second Wednesday in October at such a place as the preceding convention shall designate.

An annual meeting shall be held by all the Chapters in the State on the 19th of January. (General Lee's birthday,) or on the day following if that day falls on Sunday.

Section 2. Each chapter shall be entitled to all meetings of the State Division, to one representative for every twenty-five members or fractions thereof over seven. Any one or more delegates from a chapter can cast the whole vote of said chapter.

### ARTICLE VI.

### FEES, DUES, ETC.

Section 1. A fee of five Dollars ($5.00) shall be charged each chapter for its charter and one hundred blanks; fifty cents shall be charged for each additional one hundred blanks.

Section 2. Upon organization and upon each succeeding January 1st, each Chapter shall pay into the Treasury of the State Division ten cents per capita for every member who may at that date be in good standing on its roll.

Section 3. The seal of the State Division shall be the same as that of the United Daughters of the Confederacy, with the addition of the name of the State on the outer rim.

Section 4. The badge to be worn by members of this division shall be the same as set forth in the Constitution of the United Daughters of the Confederacy.

### ARTICLE VII.

### SPECIAL POWERS.

Section 1. This Division shall have power to make and

## UNITED DAUGHTERS OF THE CONFEDERACY.        7

adopt such rules and regulations and by-laws as it may deem proper and expedient, provided such be not repugnant to the laws of North Carolina or the Constitution of the United Daughters of the Confederacy.

### ARTICLE VIII.

### CONSTITUTION

This Constitution can be changed or amended by a two-thirds vote of the delegates representation in regular session assembled, and after notification of, at least, thirty days before the meeting at which amendment is to be made.

### BY-LAWS

No. 1. The President shall preside at all meetings, announce the business before the Division, state and put all questions, preserve order and decorum, and decide all questions of order. She shall have the general supervision of all affairs of the Division, appoint all committees and approve all orders drawn on the Treasurer for payment of money. She shall call special meetings of the Division at request of the Chapter.

No. 2. The Vice-President shall assist the President in her work, especially that of establishing chapters, and in convention in the absence of the President the senior Vice-President shall act as President and discharge the duties of that office.

No. 3. The Recording Secretary shall keep a minute book, in which an accurate report of the meetings of the Division shall be recorded and keep a roll of the Chapters

No. 4. The Corresponding Secretary shall conduct the correspondence, file all letters of importance, and keep an accurate note of all letters written by her for the Division. She shall notify all committees of their appointment and shall furnish the names of all to their respective chairmen.

No. 5. The Treasurer shall collect all State dues, and disburse the same under orders of the President for the current expenses of the Division, she shall give receipts to Treasurers of Chapters for the annual assessment received from them, and shall send her report with her book to the auditing committee two weeks prior to the annual Convention.

No. 6. An auditing committee composed of three members, shall be appointed by the President, whose duty it shall be to audit the books of the Treasurer two weeks prior to the annual convention and make report at same.

No. 7. The Registrar shall keep a register of the names of all members of all chapters, and the date of their admission to membership. The Recording Secretaries of the various Chapters shall send to her from time to time, the applications for membership they have received. The Registrar shall have custody of all applications for charters.

No. 8. The Historian shall collect all records and incidents connected with the Confederacy and its glorious war for independence, especially the part taken by North Carolina, and by the women of the State, as well in self sacrifices and untiring effort after the war, in the reconstruction of the South, as in patient endurance of hardship and patriotic devotion during the struggle, and shall safely keep and preserve the same. She shall have custody of



all historical papers, and shall claim the cooperation of all the Historians of the various Chapters of the State.

Adopted April 28th, 1897.

C369.17
U58
1897_1900

# ORGANIZATION OF THE
# North Carolina Division,
# United Daughters of the Confederacy.

A meeting called for the purpose of organizing a North Carolina Division of the United Daughters of the Confederacy,

------

Pursuant to a call from the Charter Chapter, the Cape Fear Chapter, United Daughters of the Confederacy, delegates from several chapters in the State of North Carolina met in Wilmington, N. C. at the Wilmington Light Infantry armory April, 28, 1897 at II o'clock, A. M.

Meeting called to order by the President of Cape Fear Chapter U. D. C. who announced the first thing was to decide who should preside at the meeting. It was the unanimous sense of the meeting that Mrrs. Wm. M. Parsley preside and Miss M. F. Sanders act as Secretary.

A committee on Credentials was appointed by the President consisting of Mrs. Jas. Carmicheal and Miss M. F, Sanders, upon examination of same reported as follows:—Mrs. N. Louise Blount and Miss Annie T. Bragaw from the Pamlico Chapter, and Mrs. Parsley, proxy for the Asheville Chapter. Delegates then took their places in the Convention.

A communication from the Raleigh Chapter, regarding an article in a Baltimore paper showing that the G. A. R., and other organizations at the North proposed to have a school history prepared in which all persons participating in the war for Southern Independence were to be branded as "traitors and rebels", the great hero, Robert E. Lee, especially to be denounced, was read and the Raleigh Chapter's sentiments of indignation heartily endorsed. It was decided to refer the matter to the United Confederate Veterans with the request that they present same for action at their next reunion at Nashville, Tenn.

The greater part of the time was occupied in reading and discussing a Constitution and By-laws. The Constitution was read seriatim, very thoroughly discussed, and after some slight amendments was adopted.

A nominating committee, consisting of Mrs. Jas. Carmichael and Miss Bragaw, was appointed, who made the following report.

| | | |
|---|---|---|
| President, | Mrs. Wm. M. Parsley, | Wilmington. |
| 1st Vice Pres. | Miss Lida T. Rodman | Washington. |
| 2nd. Vice Pres. | Mrs. J. S. Henderson, | Salisbury. |
| 3d Vice Pres. | Mrs. Jno Hinsdale, | Raleigh. |
| 4th Vice Pres. | Miss T. L. Patton, | Asheville. |
| Cor. Sec. | Mrs. A. A. Watson, | Wilmington. |
| Historian | Mrs. Fannie F. Tiernan, | Salisbury. |
| Registrar | Miss Annie T. Bragaw, | Washington. |
| Treasurer | Mrs. Col. Gaston Meares, | Wilmington. |
| Rec. Sec. | Miss Kate McKimmom, | Raleigh. |

The above officers were duly elected, and the President authorized, in case of a refusal to accept on the part of any one or more of the same, to appoint a substitute.

Mrs. Jackson, the widow of the lamented "Stonewall

## UNITED DAUGHTERS OF THE CONFEDERACY 3

Jackson'' was proposed for nomination for President but up on examination, her name could not be found on the roll of any chapter, the nominations therefore resulted as above. Instructions were given to the secretary to address a letter to Mrs. Jackson asking her to allow her name placed on the roll of the Cape Fear Chapter, this being the Charter Chapter of the State.

The time and place of the next convention was taken up resulting in the second Wednesday in October, 1897, as the time, and the place, Wilmington, N. C.

No further business being on hand the convention adjourned to meet at time and place above named.

M. F. Sanders.
Secretary.

EXHIBIT E

# MINUTES

OF THE

## Eleventh Annual Convention

OF THE

# United Daughters of the Confederacy,

North Carolina Division

HELD AT

Greensboro, N. C., October 9th, 10th, and 11th, 1907.

MRS. W. S. PARKER, President.
MRS. FRANK M. WILLIAMS, Recording Sec.

NEWTON, N. C.
Enterprise Job Print,
1908.

The matter of erecting a fountain in Raleigh and endowing scholarships at the A. and M. for the descendants of Confederate Veterans to the memory of Henry Lawson Wyatt, the first man killed in the war between the States, was presented to the Convention by the Selma chapter. The fountain met with hearty endorsement, and each chapter agreed to aid in its erection, but the scholarships were disapproved of, as they were to be for the benefit of boys.

The Mrs. Stonewall Jackson scholarship, which has been established by Salem Academy, was heartily endorsed.

A telegram from Mrs. Parker, in response to the one sent the first day, was received and read to the Convention.

Chapter reports were now again taken up, but a motion being made to dispense with the reading of any others, unless special work had been done during the year, most of the reports were handed in unread. Some of th Children's chapter reports were also read, and all were approved at once.

A motion to endorse the Reformatory was introduced and passed, after which the Convention adjourned for dinner.

## THIRD DAY.— AFTERNOON SESSION.

At 3 o'clock the hall was again filled with delegates, all eager to continue the business of the day.

A mortion was made to have a portrait of Josiah Turner painted, but no definite action was taken.

A motion was then made and unanimously carried that hereafter all general taxes be sent with State taxes to the State Treasurer, and by her forwarded to the

general treasurer.

Invitations to hold the Convention of 1905, in their cities, were then read from Gastonia, Concord, Goldsboro, Winston-Salem and Salisbury. On the vote being taken Goldsboro was declared to be the place of the next meeting.

After some discussion "The Keystone" was chosen as the official organ of the North Carolina Division, and Mrs. H. De B. Wills was selected as its representative in the State.

Mrs. James Kenan then introduced the following resolution, which was passed:

"That the next work undertaken by the North Carolina Daughters, be the erection, on the campus at the State University, of a monument to the students and faculty, who went out from its walls in 1861 to fight and die for the South."

Mrs. I. W. Faison was unanimously selected to represent North Carolina at the Norfolk Convention, and read the President's report. She was also instructed to vote against the raising of the general tax to $1.00 per member.

The continuing of the use of the Chapter Report blanks was taken up and discussed, and it was decided to use them another year.

Mrs. E. E. Moffitt here introduced to the Convention Capt. Richmond Pearson Hobson, of Merrimac fame, who made a short talk to the delegates.

It was decided by vote to allow Mrs. H. A. London to draw from the State Treasury the amount needed to make up the uncontributed balance to the $10 pledged by her at Gulfport to the Wirz monument.

It here being announced that the cars were waiting to carry the Daughters to the reception at the State

## EXHIBIT F

175

Meeting of the Board of Trustees of the University

Alumni Hall - Chapel Hill N.C.
Monday June 1st 1908 - 3½ P.M.

The Board met pursuant to Call & Standing order

Present

A. B. Andrews   E. M. Armfield   Kemp P. Battle
R. H. Battle   S. C. Bragaw   Victor E. Bryant
F. H. Busbee   Perrin Busbee   Geo. W. Connor
Josephus Daniel   L. H. Eller   Y. M. M. Fember
John V. Denham   R. H. J. Gay   W. A. Guthrie
J. W. Hancock   Alfred W. Haywood   Jno. Sprunt Hill
V. P. Hobgood   Thos. S. Kenan   R. R. R. Beans
Thos. Ruffin   Paul B. Means   Geo. G. Stephens
Thos. Duckman   Henry Weil
Also President F. P. Venable

In the absence of the Chairman R. B. Glenn, on Motion
John W. Graham was called to the Chair

The Secretary read the proceedings of the annual meeting
of the Board held in January and of a meeting of the Executive
Committee held since, which were approved.

Mr. Brown & Steary, a member of the Graduating Class, was
permitted to appear before the Board to ask that Mr. J. H. Coward
be granted a diploma without passing the examinations upon which
the request had been refused by the Faculty, and on motion the ac-
tion of the Faculty was approved & the request refused by the Board.

The following communication in behalf of the President & Faculty
was presented.

To the Honorable Board of Trustees
    Gentlemen: At the annual meeting of the trustees of
the Carnegie Foundation for the advancement of Teaching, held in New
May, 1908, memorials were presented from many State universities as-
king that they be included in the scope of the plan of retiring allowances
Action looking to the same end was also taken at the last meeting of the
National Association of State Universities. This Carnegie has now adopted
the willingness to extend the provisions of the foundation to state Insti-
tutions, provided their entrance requirements reach the standard
prescribed by the foundation and provided also that the state acting
through its legislature make known its desire to have its University
included.

For the time intervening before the meeting of the State Legislature
it will be necessary for the trustees of a State University to endorse
the petition of the University which endorsement with that of
the Governor will put the University within the benefits of the plan
soon until the Legislature meets.

176

The value to a university of being thus included need not be dwelt upon. Mr Carnegie's Foundation is not a form of charity. It provides for the superannuated, but its appeal is primarily to those actively engaged in teaching. It lifts the whole profession to a higher plane, calls more men to the service of education, enables teachers by relieving them of the pressure of financial anxiety, to devote their own hearts energies to teaching & investigation and thus pays rich dividends to the State in better service, happier lives & more untrammeled devotion to the work in hand. It is evident also that a university coming within the provisions of the Foundation can draw its teachers from a wider circle, and thus command abler men than are not otherwise eligible.

The President and the Faculty, therefore, of the University of North Carolina through the undersigned Committee appointed April 15, 1905, were hereby petition you to take proper action on this matter & to forward to Mr Henry S. Pritchett President of the Carnegie Foundation, 572 Fifth Avenue, New York such statement as you may deem proper. It is hardly necessary to inform you that the entrance requirements at the University of North Carolina are in advance of those required by the Foundation, or to remind you that two former members of the Faculty of the University have already, through official action been become recipients of Mr Carnegie's noble benefaction.

(Signed)                     C. Alphonso Smith
                    Committee { Chas. H. Herty
May 15, 1905.                  H. M. Wagstaff

Thereupon it was Resolved that the recommendation of the Communication of the Committee is approved, and that the proper statement be prepared & forwarded to the President of the Carnegie Foundation.

President Venable in fitting terms announced the death of professor W. F. [Row] late Professor of Physics, and it was on motion Resolved by a rising vote that the regret of the Trustees for Prof. [Ennis] Death & their appreciation of his long & efficient services be expressed to his widow by resolutions to be prepared by the Chairman of this Meeting & perhaps Daniels as a Committee and that the resolutions be not on the instrument to [money], and they sent to Mrs. Rowe, as an evidence of the sympathy of the Trustees with her.

On the recommendation of the President and Faculty, Prof Chas. H. Herty was unanimously elected Dean of the Department of applied Sciences, in place of Prof. Rowe.

Prof. A. H. Patterson, now of the University of Georgia, a graduate of this University, was unanimously elected Professor of Physics, with a salary of $2000, to begin Sept. 1st 1906.

William W. Ashe a Graduate of this Institution & an expert in Forestry, was, on the recommendation of the President & State Geologist for N. C. Faette, elected Lecturer in Forestry, without salary, he being in the employment of the U.S. Department of Agriculture.

On the recommendation of the President and the Dean of the Medical Department, Dr. Robt B Lawson, Demonstrator of Anatomy, was elected Associate Professor of Anatomy.

(For list of instructors & assistants approved see Pages 843)

On Motion a request from Mr. J. F. Hickerson, Instructor in Mathematics for a leave of absence for one year, in order that he may study at the "Massachusetts Institute of Technology", is granted.

A request was presented from the Daughters of the Confederacy, North Carolina Division, signed by the following members of a Committee appointed at their State Convention in Greensboro, Oct 10 1907, Mesdames Jos. S. Kenan Chairman, B. F. Long, H. A. London, H. W. Miller, Robinson, B. W. Spier, Chas Brooks, H. E. Faison, B. H. Griffin, C. W. Tillett, Matthew Martin, Kenneth Taylor, Jno. C. McRae, E. J. Hale & J. Stephen Daniels, and asking permission to erect a handsome & suitable monument on the grounds of our State University, in memory of the Chapel Hill boys who left College, 1861–65 & joined the Southern Army in defense of our State, and on motion, the request was granted.

A request from Mrs James Sprunt on behalf of the N. C. Society of Colonial Dames, that they be permitted to offer certain prizes was on Motion approved & granted — $50 for first prize & $25 for second prize for the two best essays on the Colonial Period of North Carolina.

On Motion, Resolved that a Committee of three be appointed to investigate the matter of the practicability & desirability of purchasing the Hotel Property on the East of the present North end of the Campus, and report to the Executive Committee.

The Chair appointed Jno. Sprunt Hill, F. H. Busbee & Wm Q Guthrie as the Committee.

On the recommendation of the President & Faculty, Prof. J. G. de R. Hamilton was elected Alumni Professor of History with a salary of $1500.00, and H. M. Wagstaff, Associate Professor of History with a salary of $1500.00 to begin Sept. 1st next.

The Report of the Committee of Visitation is follows, was read by Robert J Long, the Chairman.

Report of Visiting Committee.

To His Excellency, R. B. Glenn, Commander in chief President and the Board of Trustees of the University of North Carolina:

Gentlemen: —

The undersigned having been appointed a Visiting Committee of the University by His Excellency the Governor, met at the Office of the President of the University on Thursday, April 16, 1908 and made examination and enquiry into the affairs, present condition and pressing needs of the Institution.

We had a full & frank conference with President Venable and various members of the Faculty of the College and visited & inspected the dormitories and several of the lecture rooms & dormitories.

Exhibits - 23
063

## EXHIBIT G

36993    June 9, 1936.

Mrs. James C. Kenan,

    Chairman Committee U. D. C.,

        Wallace, N. C.

Dear Mrs. Kenan:

    At the meeting of the Trustees, June 1st, I presented your letter with regard to the memorial proposed by the U. D. C. The Trustees were much pleased by the suggestion made by the N. C. Division and will be glad to cooperate with you in any way. It was suggested that a very appropriate memorial would be a memorial gateway to the campus. I think it would be best for some of the ladies on the Committee to visit the University and decide upon the proper form of memorial.

    We shall be very glad to have you come here and it will give me pleasure to aid you in any way in my power.

        Very truly yours,

        President.

EXHIBIT H

# *MINUTES*

OF THE

## Twelfth   Annual   Convention

OF THE

# United Daughters Of The Confederacy,

## NORTH   CAROLINA   DIVISION,

HELD AT

Goldsboro, N. C., October 13th, 14th, 15th, 1908

MRS. I. W. FAISON, President.
MRS. F. M. WILLIAMS, Rec-Sec'y.

———————

NEWTON, N. C.
ENTERPRISE JOB PRINT.
1909.

| | |
|---|---|
| Bethel Heroes Chapter, Rocky Mount | 100.00 |
| Fanny Bird Chapter, Windsor | 5.00 |
| Graham Chapter, Graham | 3.00 |
| Gen. Anderson Chapter, Hillsboro | 12.00 |
| Person County Chapter, Roxboro | 3.00 |
| Anson Chapter, Wadesboro | 4.50 |
| Scotland Neck Chapter, Scotland Neck | 10.00 |
| Red Spring Chapter, Red Spring | 25.00 |
| Battle of Bentonville Chapter, Mooresville | 5.00 |
| Bell Battery Chapter, Edenton | 2.00 |
| John Durham Chapter, Wilson | 25.00 |
| Julian Carr Chapter, Durham | 5.00 |
| Roanoke Minute Men, Littleton | 8.43 |
| Statesville Chapter, Statesville | 5.00 |
| Ransom-Sheriff Chapter, Newton | 1.00 |
| A. M. Waddell Chapter, Kinston | 6.75 |
| Kinston Children Chapter | 5.00 |
| Robinson Chapter, Lumberton | 5.00 |
| Johnston-Pettigrew Chapter, Raleigh | 5.00 |
| Thomas Ruffin Chapter, Goldsboro | 102.00 |
| Confederate Grays Chapter, Mt. Olive | 5.00 |
| Perquimans Chapter, Hertford | 1.00 |
| Wm. Allen Chapter, Kenansville | 2.60 |
| Holt-Sanders Chapter, Smithfield | 50.00 |
| Henry Wyatt Chapter, Salem | 92.27 |
| Total | $586.51 |

Daughters of the Confederacy, let us not now grow weary, but start the new year with renewed energy, firmly resolved to show honor to the memory of Henry Wyatt.

Will not every chapter that has laid no part in this work now pledge themselves to lend a helping hand, and those that have been so faithful will you stand by us until the monument to Henry Wyatt is no longer a fond hope, but a proud realization?

Respectfully submitted,

MARGARET BURGWYN,
Chairman Henry Wyatt Mon. Com.

A vote of thanks was given to Mr. Mitchener for his aid to the local chapter in this work, and Mrs. Visit was requested to deliver the thanks. It was urged that

---

all money from chapters be sent direct to Miss Ethelredge, as she alone was authorized to solicit funds from the chapters for this monument. The business session now adjourned, so as to allow the presentation of the portraits of General Robert Ransom, Colonel Samuel McDowell Tate, and Captain John Pfohr Young, after which exercises ceases was taken until 2:30 o'clock.

SECOND DAY—AFTERNOON SESSION.

At the opening of the afternoon session Mrs. Bridges asked unanimous consent to say that the money for the U. D. C. Monument had been given by its relatives, and that so kindly contributed by the chapters had been released to them. The following motion was then made and seconded by the chapter:

Those chapters of the convention who have contributed to the Wm. L. Saunders monument be asked to turn the money over to Miss Hettie Jones for the George Davis monument.

Mrs. Green.

The Chapel Hill Monument report was then read by Miss Rosebud together with a letter of approval of the work. This report was approved as read, with the exception that each of the Daughters pay fifty cents to erect it each year.

CHAPEL HILL MONUMENT REPORT.

Madam Treasurer, and Daughters of the Convention:

At our last meeting last October in Greensboro, the suggestion was made to build a landscape memorial, to be placed on the campus of the State University, to the student body, who last said aside their college duties and joined our Southern army in 1861-65. It is said the University furnished 1,000 soldiers for the cause,

Exhibits - 26
066

74    MINUTES OF TWELFTH ANNUAL CONVENTION

many of them were hardly grown, but like their forefathers, were brave, faithful and true, willing to give their lives as a sacrifice for principle.

Four hundred of these soldiers were killed, some of them gifted as few men are, both in personal and intellectual attainments.

With our Kaiser buried, and their loved hopes gone, the remnant that was left, have been and are still passing away.

These men have a history, that must be left to posterity, their lives are worthy of every honor. Their like again the earth will scarcely see.

In chronicle, or on the tuneful lyre, none greater tribute will inspire.

The State University now has over 700 students; every year they come and go with this historic monument standing silent and alone, appealing to their noble sentiments of courage and patriotic love, of home; our Southern history will be read with more interest so that our sons can challenge the world, and refute any charge reflecting upon the honor of our cause.

The Daughters of our State, have the sacred privilege of paying this tribute to them.

Let us build this monument, and build it quick, for time is passing and we are losing opportunities.

Mrs. Faison appointed us chairman of the University monument committee, and wrote me she had given us a strong committee. I need not tell you I felt gratified and our president took us kindly to the suggestion, for my heart is in this work, not alone for love of the Southern soldiers, but also for pride of the living.

As soon as I was notified of my appointment, I wrote every member of my committee, telling them we had only preliminary work for this year, laying plans, etc.

I then wrote Dr. Venable, president of our University, as a matter of courtesy, telling him what we proposed to do, and would be glad to have him, with the board of trustees, co-operate with us. The idea seemed to appeal to him; also to the trustees, as you will see from a communication.

My committee will need the help and interest of all chapters in the division for this work. I consider this the most important and beautiful we have ever undertaken in our own State; it will take patience and we must devise means of raising money.

To begin with, I ask most earnestly that each president of the

UNITED DAUGHTERS OF THE CONFEDERACY    75

chapter collect from each member of their chapter 25 cents in January and June each year, making the assessment 50 cents.

Every Daughter will gladly pay it; I believe if called upon. I ask every chapter to have some kind of an entertainment in the spring and fall to add to this fund. In this way out of the 82 chapters representing 3,500 members, we will have a good beginning. Our committee think we should be able to build this monument in a few years and we should try and raise the required amount at once. We leave that to you and if any suggestions are to be made we would gladly hear them.

As the chapters pay in each assessment, the chapter president can forward a check payable to me, as chairman of the University monument committee, I will return receipt for same.

Daughters of North Carolina our work is one of love but it requires both patience and determination, and we are not a hand to be discouraged. I am one of your senior members now, but I was a little girl during that period. I did not then suffer the heart aches and anxieties that older members of my family did but I know nothing but to love my Southland, its sons and daughters. Every day I live I realize what these men were to our country, and if we hope for our boys to be worthy of such kinsmen, let us place their noble deeds before them. This monument will inspire State pride and I am sure will do good, besides it is a tribute to those noble boys.

Mrs. John G. Kenly,
Chairman University Mon. Com.

LETTER FROM TRUSTEES.

Mrs. James G. Kenly, Chairman Committee, U. D. C.

Wallace, N. C.

DEAR MRS. KENLY:

At the meeting of the trustees, June last, I presented your letter with regard to the memorial proposed by the U. D. C. The trustees were much pleased by the suggestion by the North Carolina division and will be glad to co-operate with you in any way. It was suggested that a very appropriate memorial would be a memorial gateway to the campus. I think it would be best for some one of the ladies on the committee to visit the University and decide upon the proper form of memorial.

We shall be very glad to have you come here, and it will give

me pleasure to aid you in any way in my power.

Very truly yours,
Francis P. Venable, President.

The election of officers was then called for and resulted as follows:

MRS. I. W. FAISON, Charlotte, President.
MISS SUE COLLIER, Goldsboro, first Vice President.
MRS. M. S. WILLARD, Wilmington, second Vice President.
MRS. LEAH J. STEVENS, New Bern, third Vice President.
MRS. F. M. WILLIAMS, Newton, Recording Secretary.
MRS. GORDON FINGER, Charlotte, Corresponding Secretary.
MRS EUGENE LITTLE, Wadesboro, Treasurer.
MRS. LEO D. HEARTT, Raleigh, Registrar.
MRS. THOS. LEE CRAIG, Gastonia, Recorder of Crosses.
MISS REBECCA CAMERON, Hillsboro, Historian.
MRS. W. O. SHANNOR, Henderson, Assistant Historian.
MRS. JAMES KENAN, Wallace, Chaplain.

A motion was made that the president appoint a special committee to petition the Legislature to provide a home for the wives and widows of Confederate veterans.

Mrs. Eugene Little gave a brief verbal report of the North Carolina Room at Richmond, saying it was such a short time before the convention that she knew of her appointment as chairman, and has received no contributions for the room except the three portraits just unveiled.

The General Robert Ransom Portrait Committee report was read by Mrs. Cuthbert Martin in the absence of the chairman and approved.

FINAL REPORT OF ROBERT RANSOM PORTRAIT COMMITTEE.

---

MADAM PRESIDENT, DAUGHTERS OF THE CONFEDERACY:

As chairman of the Robert Ransom Portrait Committee, I respectfully submit report of contributions as follows:

| Chapter | Amount |
|---|---|
| Cape Fear Chapter | $3.00 |
| Pamlico Chapter | 5.00 |
| Johnston Pettigrew | 3.00 |
| Asheville Chapter | 1.00 |
| Vance County Chapter | 7.00 |
| New Bern Chapter | 2.00 |
| James B. Gordon Chapter | 2.00 |
| Dodson-Ramseur Chapter | 2.00 |
| Stonewall Jackson Chapter | 2.50 |
| Winnie Davis Chapter | 1.00 |
| Guilford Chapter | 4.00 |
| Robert E. Lee Chapter | 2.50 |
| Geo. B. Anderson Chapter | 1.00 |
| Thomas Ruffin Chapter | 1.00 |
| Julian S. Carr Chapter | 2.00 |
| Anson Chapter | 1.00 |
| John W. Dunham Chapter | 3.00 |
| A. M. Waddell Chapter | 1.00 |
| Cleveland Guards Chapter | 1.00 |
| Southern Stars Chapter | 1.00 |
| J. E. B. Stuart Chapter | 1.00 |
| Bell Battery Chapter | 1.00 |
| Joseph J. Davis Chapter | 1.00 |
| Patton-Hicks Chapter | 1.00 |
| Leonidas Polk Chapter | 1.00 |
| Red Springs Chapter | 4.00 |
| Mt. Airy Chapter | 1.00 |
| Rockingham Chapter | 2.00 |
| William Dorsey Pender Chapter | 2.00 |
| Bethel Heroes Chapter | 2.00 |
| Ransom-Sharrill Chapter | 6.00 |
| Pettigrew Chapter | 1.00 |
| Chicora Chapter | 1.00 |
| Harry Burgwyn Chapter | 1.00 |
| Harry Wyatt Chapter | 1.00 |
| Scotland Chapter | 1.00 |

Case 4:19-cv-08148-KAW   Document 1-1   Filed 12/13/19   Page 68 of 179

Exhibits - 28
068

**EXHIBIT I**

given up the idea of building
this Memorial to our Chapel
Hill certain boys — I
have the honor, of propo-
sing this undertaking,
& I shall devote my
life to it, — until it is
finished & turned over
to the State — With your
kind help, I feel much
more able to undertake
it — I have appealed for
concerted action in the

State U.D.C. Div— but it is [illegible]
to impossible to get the Chapter
interested as they desired, hence the
delay— Any design we, to want a
[illegible] Confederate Soldier;
with heavy gray granite base
surmounted by a pedestal; on one
side in the relief a Student in
the position of Attention with his
rifle thrown down at his side—
on another side the Confederate &
N.C. Flags— & "Confederate" above—
& on the 3d side an inscription
from the Daughters of the Confederacy
& on the 4th Side— Some historic
data & there for young men
& [illegible] a Confederate
of the [illegible] — I
feel this would be a part
of our State history; teaching the
[illegible] as authority at the [illegible]

[Mar. 20, 1909]

of the Lessons to me, a Station
would be even dignified
of the foregoing but there is
only one idea & I am
altogether willing to yield
to your better judgment —
I want you to feel at per-
fect liberty to arrange
both details in every way.
I have done nothing
in the way of work yet
on the Daughter [illegible]
[illegible] undertaking

to long saily — but to will
got to work on it — before
long & I hope it — will
last so many years be-
fore it — will stand
silent & alone, as our
beautiful University grows
surrounding future gen-
erations by my record
of these times, nothing
ever done — Could you
advise one how to get a
dozen dozen of Ohm

described to you — I will thank
you so much — I intend writing
an appeal for the [illegible] in [illegible]
[illegible] More & [illegible] — thinking
in that way to reach the [illegible] —
I am sending you under separate
cover one of the U.D.C. Minutes
with my appeal in it — I hope to
go all to Chicago [illegible] some time
& talk the whole matter over with
you — Thanking you again for
your kind interest & with high
regard —

Yours very truly —
Annie Hill [illegible]

## EXHIBIT J

43323        Sept. 24, 1909.

Mrs. James Moran.

Wallace, N. C.

Dear Mrs. Moran:

I have been thinking a good deal about the proposed monument to the students of the University who entered the Confederate service. I believe that your original plan was the wisest one and that really the only fitting memorial would be an artistic statue on the University grounds which would possibly cost some $5000 or $8000. I do not know just how much the Daughters of the Confederacy in this State can raise, but I am confident that a goodly sum can be raised from the alumni and that the Trustees will supplement this out of the University funds; certainly, I shall strongly urge that upon them. By pulling together we should be able to raise this amount and the monument could be unveiled at the Commencement of 1911, when we could gather here the students of the antebellum days as well as hundreds of others who have been to the University since, and have a great reunion.

The gateway that I mentioned before does not now appeal to me as in every respect worthy and I am sure that I can secure the gateway by other means.

I will try to secure a preliminary sketch of the monument if you approve of it and then if some of the ladies of your Committee can visit the University, we can settle other details.

**EXHIBIT K**

Wallace. N. C.
Oct. [illegible]

My dear Dr. [illegible] —

I went down to Wilmington to see Mr. [illegible] of the Wil Chapter N. D. C. to [illegible] some that I could get a suitable time for your little talk to the Daughters — [illegible] [illegible] [illegible] to work on schedule time + they alotted me a half hour for the

Faith – Mr Parsley says that
would like for the to be
here, Thursday A. M., instead
of Friday, because some of the
Daughters will be leaving
Friday – so I will meet –
you & hope you will not be
inconvenienced by the change
of day – Please write me what
train you will be on –
I think the Daughters are much
pleased at the idea of you
talking to them – & I hope you
will speak before them on any

reason why he should build
a handsome monument at the
State University to perpetuate my
Southern history — Please let me
know if Thursday will suit you
instead of Friday — With kind
regards,
Yours truly —

Anniy H. Keenan.

EXHIBIT L

# MINUTES

OF THE

## THIRTEENTH ANNUAL CONVENTION

OF THE

# UNITED DAUGHTERS
# OF THE CONFEDERACY



## NORTH CAROLINA DIVISION

HELD AT

WILMINGTON, N. C., OCTOBER 13th, 14th, 15th, 1909

MRS. I. W. FAISON, President,
MRS. F. M. WILLIAMS, Rec-Sec.

NEWTON N. C.
ENTERPRISE PRINT
1910

64 MINUTES OF THIRTEENTH ANNUAL CONVENTION

lect.

4th. Also the Convention is asked to decide whether North Carolina wants to adopt June 3 as Memorial Day."

This change was talked against by a larger number of delegates and the Convention decided to keep May 10th as Memorial Day, without one dissenting voice.

5th. Further, whether the new scholarships be placed in the hands of the Committee we have that attends to State (Normal) Scholarships, or shall a new committee be formed to find ways and means for awards.

Very indefinitely voted, yes.

6th. As Mrs. Lutie Johnston has been appointed Regent of North Carolina room in Richmond Museum it was deemed best to have herwise made Chairman of the State Committee for that room."

Yes.

To place the $100 given by the State to this North Carolina room, in our state treasury, to be drawn on by equal through our president and treasurer for current expenses of maintaining the room, and any surplus to be held in the treasury towards the $2,000 endowment fund.

Accepted.

8th. The President further recommends that each chapter send $5.00 more than taxes or usual obligations to the state treasury to cover a sinking fund, to be used for annual expenses, for instance to meet state pledge to general work. Adopted.

9th. It was deemed best to discharge the Soldier's Home Committee till further work for that institution seems necessary or advisable. Adopted.

Announcement was here made that the hour for the boat ride down the river had arrived and the Convention adjourned to meet Thursday morning at 10 o'clock.

---

UNITED DAUGHTERS OF THE CONFEDERACY. 65

SECOND DAY - MORNING SESSION.

After the recitation of the Lord's prayer in unison led by the Chaplain, Mrs. Kenan, the business of the day began. The Minutes of the previous day were read and approved. A telegram was read from Mrs. Craig, thanking the convention for their kind remembrance of her, also a telegram of greeting from the General President. The President then announced the following committees, that on Resolutions of Thanks, Mrs. W. W. Watt, chairman; Mrs. B. L. Griffin, Miss Margaret Eldredge, Mrs. J. M. Gardner, Miss Carrie Lawyer, Miss Elsie Williams, Miss Emily Austin; to count the vote at election, Mrs. Cuthbert Martin, chairman, Miss Madge Webb, Miss Lott Redman, Miss Lawry Stanford.

The Memorial exercises to our deceased Daughters of the year, were then held. Chapters solemnly paid tribute to their members who have crossed over the river, and silent prayer was then held for a few moments. The Memorial pages elsewhere in these Minutes will show those thus remembered.

At the close of these exercises the President beautifully introduced Dr. F. P. Venable, President of the State University, who in eloquent, touching words pleaded for the Monument to the Boy Soldiers of '61 of Chapel Hill, who threw aside their books, and marched forth to war, many of them never to return.

DR VENABLE'S ADDRESS.

[WAS WITHHELD FROM PRINT]

Dr. Venable began his short but interesting and instructive

## 66 MINUTES OF THIRTEENTH ANNUAL CONVENTION

address by congratulating the Daughters upon their high mission, the honoring of the bravery of the old soldiers and the cheering of the disappointed war and time-worn veterans and the preservation of the history of the struggle. "They are dutiful," he said, "and notify are you fulfilling them. I address you today, not of my own seeking, but rather at your command. A few months ago I received a communication from Mrs. Kenan asking that I secure the permission of the trustees of the University to erect upon the campus a monument to the students who volunteered to fight in defence of the Southern Cause. The permission was readily given by the trustees."

Dr. Venable said that he was an adopted son of North Carolina, but one who loves the State as a native son. He had been thrilled with the historic story of the University and knew of no story in history that would compare with it. [The placing of the monument on the campus is not a local matter, for North Carolina and the University are inseparable. The pages of the civil history of the State are filled with the deeds of University men. He regretted that the records had been imperfectly kept, and stated that even though the records are not complete the story is an inspiring one. There were all told more than 1,000 University men in the struggle between the States, enlisting from various States of the South and out of this number one-third were killed. At least 40 per cent. of the students entered the military service which is a record not equaled by any other institution. From some of the big Northern institutions there were 21 per cent. from University of Virginia, the speaker's alma mater, 25 per cent. Of those who volunteered from Virginia 225 were killed while of the North Carolinians between 340 and 350 never returned home. They laid down their lives in the most important battles of the war.

Dr. Venable said that he would like to see the monument at the University because it would tell eloquently of the story of the sacrifice made by the students prior to the civil war. Their record should ever be before the eyes of the present-day students. Tablets have been erected in memory of those who lost their lives and those who enlisted are worthy of a monument.

A rising vote of thanks was given Dr. Venable for his excellent address.

This motion was then made and carried:

## UNITED DAUGHTERS OF THE CONFEDERACY. 67

I move that every effort be made to unveil this monument in 1911, the fiftieth anniversary of the departure of these boys for the war.

MRS. HENRY A. LONDON.

Mrs. Kenan then began to take pledges for the monument, but owing to the fact of its disturbing the attention of the delegates this was stopped by vote.

The report of the Soldiers' Home Committee from the State and Mrs. Brooks was next read and approved.

### SOLDIERS' HOME, EASTERN SECTION.

MADAM PRESIDENT AND DAUGHTERS OF THE CONFEDERACY:

The work of your Soldiers' Home Committee during the past year has been light owing to the fact that it has not been necessary to make an effort to raise money for this cause.

A detailed account of the work is contained in the report of Mrs. R. O. Brooks, and a financial statement from our State Treasurer, Mrs. Eugene Little, both of which are attached hereto.

The work of Mrs. Brooks during the year has been conducted with the same fidelity and love for the cause that has always characterized her efforts and the Home is now in as good condition as we could desire. The improvement in the health of Mr. Brooks is gratifying to us all and it is our sincere wish that he may be fully restored to complete health.

Although there has been an urgent call upon us during the past year in behalf of the Soldiers' Home we should bear this great work on our hearts at all times and be ever ready to respond when necessary.

Respectfully submitted,
MRS. MARTIN S. WILLARD, Chairman.

### MRS. BROOKS' REPORT.

MADAM PRESIDENT, DAUGHTERS OF THE CONFEDERACY:

As your representative at the Soldiers' Home I submit a report of such matters of interest during the past year as have come under my personal, or immediate supervision: the Home is about full

# EXHIBIT M

44385      February 28, 1919.

Mrs. James C. Nyman,

    Wallace, N. Y.

Dear Mrs. Nyman:

        I thank you for your kind letter of February 21st. The designs and photographs have been received and I will hold them for the meeting of the Committee.

        I am still very much in favor of the Boston design if we can possibly raise the money. I expect you are right about the changes in the dimensions of the pedestal.

        My desire in regard to this monument is to have it appear not as a monument to the dead but to a noble ideal and as marking the heroic period of the University's history. I hope that the Committee will agree with me in this.

        With regard to the check which you so kindly enclosed, I hope you will permit me to devote this to the monument. Aside from the task of speech-making which is always a depressing one to me, I greatly enjoyed my visit to Wilmington and my meeting with you and the ladies of the U. D. C.

        I shall be glad to be at your service at any time with regard to this or any other matter.

          Sincerely yours,

# EXHIBIT N

*(from* https://en.wikipedia.org/wiki/John_A._Wilson_(sculptor))

John A. Wilson (sculptor)

From Wikipedia, the free encyclopedia

**John Albert Wilson** (1877–1954) was a Canadian sculptor who produced public art for commissions throughout North America. He was a professor in the School of Architecture at Harvard University for 32 years. He is most famous for his American Civil War Monuments: the statue on the Confederate Student Memorial (*Silent Sam*) on the campus of the University of North Carolina, Chapel Hill, and the Washington Grays Monument (*Pennsylvania Volunteer*) in Philadelphia.

Renowned sculptor and art historian Lorado Taft wrote of the latter work, "No American sculpture, however, has surpassed the compelling power which John A. Wilson put into his steady, motionless 'Pennsylvania Volunteer'."[1] Wilson created his studio (the "Waban Studio") at Chestnut Hill, Massachusetts. Walter Gropius , known as a pioneering master of modern architecture, said the studio "is the most beautiful in the world."[2]



John Albert Wilson

John A. Wilson sculpting Washington Grays Monument (1907)

| | |
|---|---|
| **Born** | 1877<br>New Glasgow, Nova Scotia |
| **Died** | December 8, 1954<br>New Glasgow, Nova Scotia |
| **Nationality** | Canadian |
| **Known for** | Sculpture |
| **Notable work** | Silent Sam, Daniel A. Bean, Washington Grays Monument |
| **Movement** | American Renaissance |
| **Awards** | Kimball Prize |

**Contents** [hide]

1 Life and career
2 Death
3 Works
   3.1 American Civil War
   3.2 Firemen's Memorial, Boston
   3.3 Harvard University
   3.4 Nova Scotia
      3.4.1 The Lion Series
   3.5 Other
   3.6 Image gallery
4 References
5 External links

## Life and career   [edit]



Washington Grays Monument, Philadelphia

He was born in New Glasgow, Nova Scotia (Potter's Brook), son of John and Annie (Cameron) Wilson. His grandfather was a stonemason who emigrated from Beauly, Scotland.[3] Wilson attended New Glasgow High School. At the age of fifteen he created a sculpture of a lion out of freestone (1891).[4]

In 1896, at age nineteen, he went to Boston to study art. During the day he attended the Cowles Art School of the Museum of Fine Arts, Boston, where he studied drawing and painting under Bela Pratt. He worked in the evenings as an usher in a theatre, and he worked on the weekends as a professional boxer at the Boston Athletic Club. While at the Fine Arts school, Wilson displayed his work *The Crawling Panther* (also known as the *Stalking Panther*) at the Boston Art Club (1905). He received attention from the *Boston Globe* and *Boston Herald* newspapers for this work. The latter wrote that it was a "powerful work by a very young man".[5] He graduated from the School of the Museum of Fine Arts, Boston in 1905. He next worked as an assistant to Henry Kitson.[6]

Beginning in 1906, Wilson taught classes for the Copley Society of Art in Boston.[7] He joined the board of directors in 1913 and taught there for 32 years until 1945. In 1927, he was named Director of Classes.[8] One of his students at the Society was John Hovannes (1900-1973).[9]

In 1917, Wilson started to teach at Harvard University when the scholarly Abbott Lawrence Lowell was president. He was appointed Instructor in Modelling, School of Architecture, Harvard University. He served at Harvard for 32 years, retiring in 1949.[10] During his tenure at the Copley Society and Harvard, Wilson also taught in various other places.

Wilson taught for 5 years at the Worcester Art Museum (1917–22), where he would complete the *Hector Monument* (1923) with his student Evangeline Eells Wheeler.[11] He taught one year at the School of the Museum of Fine Arts, Boston (1921–22),[12] three years at Children's Walker School, and three years at Bradford College. He also taught at his own studio in Chestnut Hill.

In 1913, he had built his home and his "Waban Studio" at 101 Waban Hill Rd, Chestnut Hill, where he lived for 36 years. After 50 years, when he retired, Wilson returned in 1949 to New Glasgow, Nova Scotia. He lived there for five years at East River, Potter's Bridges, New Glasgow. [*citation needed*]

## Death   [edit]

Wilson died on December 8, 1954 at Aberdeen Regional Hospital, New Glasgow. Before his passing, he donated property to the Aberdeen Hospital. It was later replaced by Glen Haven Manor now stands. A plaque in his honor hangs in the Hospital's cafeteria.[13] He is buried in the Riverside Cemetery, New Glasgow, Nova Scotia.

## Works   [edit]

### American Civil War   [edit]

The year after Wilson graduated from School of the Museum of Fine Arts, Boston (1905), he received his first major recognition when he was commissioned by the State of Pennsylvania to make the Washington Grays Monument in Philadelphia to the men who served in the American Civil War.[14]



In 1909, Wilson's monument for all soldiers of war was unveiled on Dudley's Town Common (in front of the First Congregational Church), Dudley, Massachusetts. A crowd of 1200 was in attendance.[15] Four-sided and capped with the sculpture of an American eagle, the multiwar memorial has inscriptions for the American Revolution: "To the memory of Dudley's Heroes who bore arms to found an Independent Nation - 1776"; the American Civil War: "Her Patriots of 1861-1865 who offered their lives to Preserve this Union"; and the Spanish–American War/Philippine–American War: "her soldiers in the Spanish-Philippines War, 1878."

John A
Wilson in
studio
creating
Washington
Grays
Monument,
Boston

In 1909, Wilson created the "Massachusetts Monument" in the Baton Rouge National Cemetery. The commemorative monument on its grounds, was erected to honor Massachusetts sailors and soldiers who died in Civil War battles in the Gulf region. The granite monument is inscribed with the names of the Infantries and Light Batteries that served in the Gulf theater of operations. Massachusetts Governor Ebenezer Sumner Draper attended the proceedings.

In 1911, he created a statue of Private Daniel A. Bean of Brownfield, Maine, 11th Maine Volunteer Infantry Regiment. Major Sylvanus Bangs Bean[16] served with the 11th Maine Regiment along with his son, Daniel A. Bean. Daniel was killed in Hampton, Virginia as a result of being shot in both thighs during the war. Daniel died before his father Sylvanus could see him at the field hospital. Daniel died on 06/06/1864 and is buried at Plot: D 2820, Hampton National Cemetery, City of Hampton, Virginia, USA. The statue of Daniel Bean stands in Brownfield, Maine, where the roads to Hiram and Denmark diverge. Of all the Civil War memorials erected by Maine towns, this remarkable monument was the only one cast in the image of a real person. The absence of weapons distinguishes it even further. The boy stands as he would have on his last day at home, taking the Oath of Induction.[17]

In 1913, Wilson was commissioned by the North Carolina Chapter of the United Daughters of the Confederacy to make the Confederate Monument (Silent Sam) for the students of University of North Carolina at Chapel Hill who served in the war. It was the first major work Wilson created in his new "Waban Studio". At least 40 per cent of the students entered the service, which is a record not equaled by any other institution. Similar to the unarmed statue of Bean, Wilson created a "silent" statue by not including a cartridge box on the Confederate soldier belt so he cannot fire his gun.[18] On August 20th, 2018 a group of protesters surrounded the statue and tore it down, one person was arrested, the University made a comment understanding the sentiment but not condoning the actions and vandalism.[19]

### Firemen's Memorial, Boston   [edit]



Firemen's Memorial

In 1909, Wilson created Firemen's Memorial (Boston) for the Firemen's Lot at Forest Hills Cemetery, Jamaica Plain, Boston.[20] Each year on the second Sunday in June, memorial services sponsored by the Charitable Association of the Boston Fire Department are held at the Firemen's Memorial at Forest Hills Cemetery in order to pay tribute to deceased members so they would be assured of a decent and final resting place and they would not necessarily end up in Pauper's Field.

On a lofty granite base a larger-than-life fireman in bronze, attired for service but in a moment of contemplation. On each side of the pedestal were set bronze plaques, 3 ft. by 4 ft., depicting the life of a fireman in the spirit of a renowned set of Currier & Ives prints. Shown in vivid bas-relief were horse-powered equipment and men en route to their duty. The plaque on the rear of the statue pictures a nineteenth century pumper as it would have looked between fires in the firehouse with no horses, men, or background. The memorial was dedicated in grand style on June 14, 1909. On that day, set aside in all the state for past firemen, the memorial was dedicated in a ceremony partially presided over by John F. Fitzgerald, grandfather of John F. Kennedy and former mayor of Boston.[21]

### Harvard University   [edit]

While teaching at Harvard University (1917–46), Wilson made numerous sculptures of figures connected to the University. Perhaps the best known figure is the Janitor in the Fogg Museum entitled "George". Articles with a photo of George Archambeau were printed in both Time Magazine and the New York Times when the bust was unveiled in September 1932.[22] Wilson also made two busts of William Crowninshield Endicott, one in the Fogg Museum and the other in Harvard University Law School (1932). Wilson also made two busts of Harvard president Abbott Lawrence Lowell. One is a marble bust in the Faculty Room, University Hall (Harvard University) (1930)[23] and the other is a bronze bust at Lowell House Residence, Harvard University (1936).[24][25] Wilson also made the mould for the commorative punch bowl and dishes for Harvard University's tercentennial (1936).[25]



Abbott Lawrence Lowell by John A. Wilson

One of Wilson's most famous Harvard graduates was sculptor Wheeler Williams who wrote to him,

> How very lucky I was to find myself in your class in the basement of Robison Hall. If it had not been for that, classes at the Copley Society of Art and Sundays in your studio, I fear my life long dream of being a sculptor would not have materialized. Where anybody today could get the sound training you gave us, I have no idea.[26]

### Nova Scotia   [edit]

The Nova Scotia monuments were made in the same year (1923). The Hector Pioneer was made in the Worcester Art Museum. Wilson's assistant for the work was Evangeline (Eells) Wheeler. The sculpture was unveiled 17 July 1923 on the 150 Anniversary of the arrival of the ship Hector. The Governor General of Canada Field Marshal Julian Byng, 1st Viscount Byng of Vimy led the proceedings.

**The Lion Series**  [ edit ]

Wilson made a series of nine lions in freestone early in his career. The location of six of these lions is unknown. Three of these lions remain in Pictou County, Nova Scotia.[27] One of the lions is on the grounds of the Lionstone Inn, an establishment named after the sculpture.[28] The other two lions are at the Carmichael-Stewart House Museum. One of these Wilson made at the age of 15 before he moved to Boston (1891). The other lion at the museum Wilson made while studying in Boston (1902). The sculpture representing Great Britain in South Africa during the Boer War and was noted as being "an admirable piece of modelling from one of his age".[29] In March 1902 the Royal Canadian Academy of Arts accepted this lion for its annual exhibition in Montreal.[30]



Carmichael-Stewart House Museum, New Glasgow, Nova Scotia

**Other**  [ edit ]

. Monument on the American Civil War Antietam National Battlefield, Maryland
. Major Henry Gustavus Dorr, made at Grundmann Studios (1915)
. William Crowninshield Endicott at the Harvard University Law School (1982) [31]
. Death mask of Admiral William Sims
. Soldier's monument Dudley, Massachusetts
. Massachusetts Monument, Baton Rouge National Cemetery, Baton Rouge, Louisiana
. Abbott Lawrence Lowell, Marble Bust, Faculty Room, University Hall (Harvard University) (1930)[32]
. Abbott Lawrence Lowell, Bronze Bust, Lowell House, Harvard University[33]
. "Dancing Figure", Algonquin Club, Boston
. Symbolic Panels, Brookline High School, Boston (1923)
. "Panther"
. "Stalking Panther", Boston Art Club Exhibition (1905)
. "The Chase"
. "Goat", Sandy, Poland Spring, Maine
. Alexander Forrester tablet, Nova Scotia Community College, Truro, Nova Scotia[34] (c. 1923)

# EXHIBIT O

46504        August 26, 1910.

Mr. John Wilson,

    400 Northampton St.,

        Boston, Mass.

Dear Mr. Wilson:

On my return home from Europe I found certain letters from Mrs. London, and also am in receipt of your change of design for the monument. I do not wish to write about these matters, however, this morning but to make clear to you the state of affairs which I find in connection with the monument.

I had a conversation with General Carr who is one of the Trustees and is also a member of the monument committee. We find that the ladies of the committee have only a small fund on hand at present and are basing their expectations upon the convention of the Daughters of the Confederacy this fall. As a Trustee, General Carr is unwilling to sign a contract, and he advises me that as President of the University I cannot sign a contract which would involve the University in financial responsibility. This could only be done by permission of the Council of State under the act of the Legislature. Now, I am altogether willing that you should expend time and money on this monument unless I can clearly see before me the funds from which you are to be repaid. I am determined that the monument shall be

Mr. John Wilson.

[26 July 1910]

placed here and as soon as possible will undertake the further collection
of funds, but you should have a signed contract for your work and I cannot
sign such a contract until I see the money either altogether or almost en-
tirely in hand. This means a postponement which I greatly regret but it is
the only method of procedure to which I could lend my name.

I am sorry that I missed you when you visited the University and I
hope very much that I can get to Boston sometime during the year and call
upon you in your studio.

As I wrote you in the spring I have been acting only as an agent for
the committee appointed by the Daughters of the Confederacy but if the
responsibility of it all is to be turned on me I can only take the course
which is outlined in this letter.

Very truly yours,

President.

EXHIBIT P

46657          Sept. 5, 1910.

Mr. John Wilson,

401 Northampton St.,

Boston, Mass.

Dear Mr. Wilson:

Your letter of August 29th has been received. Mrs. London was mistaken in the idea that the University was to furnish any part of the money for the monument. It is hardly probable that those who have the appropriation of the University funds in hand would consent to any diversion of the State funds from the direct maintenance of the institution.

I had based my hopes on a large contribution from one who I thought was deeply interested and was well able to pay the largest part of the expenses, but so far I have been disappointed in this.

Now the matter rests just as I told you in my last letter. The ladies of the U.D.C. Committee will use every effort to make their collections and meanwhile I shall enter upon the campaign and do my best to raise the necessary funds. I am unwilling that you should go to further expense with the uncertainty involved in such subscriptions and collections. The ladies will probably have to abandon their plan of the dedication of the monument next spring.

If you will give me a statement as to the amount of expense already incurred I will see that you are reimbursed out of the first funds collected.

Very truly yours,

President.

**EXHIBIT Q**



*United Daughters of the Confederacy,*

*Winnie Davis Chapter. No. 259.*

Aug 1910

My dear Dr Venable          Pittsboro, N. C.   n ay

I am indeed glad to know yr your
safe return — I feel sure your trip was most
delightful.   Today we received a telegram
from our son Jack from Seattle — saying he had
reached the Bremerton Yard in good health &c —
& hoped to start for home scene in Content
Sept 1st

Now about Mr. Dilson — I'm sending you
a photo he sent me — It is fine — But
so far as I can see — it is exactly like
the other — with no changes made in
it        He came here from Va Hill
and spent a day at our home — Mr

liked him exceedingly — I had some
veterans, capt Langdon & Dr. Tyson there, to talk amid him about the
picture — we had out the Regimental
sketches, and the looks, and he saw
pictures of soldiers in uniform. All
agreed that the coat was a more
modern blouse — he said he would alter
it — and make the shaft more
massive — But you notice in the
picture he does not yet give the
measurements — I have written him
asking for the measurements & will
send for to you — we wish to get the
portrait pictures as soon as possible & have
cuts made for the papers — I gave
him a N.C. and several battle flags
as models — for these & he carries on

[Aug 1910]

**United Daughters of the Confederacy.**
Winnie Davis Chapter No. 259.

Pittsboro, N.C.

they should be placed — It seems to me a flag would not show for what it is, unless of some size — Something was said about putting them on one of the sides — and some one suggested placing them instead of the wreath — but what was your idea? He said

The inscription could be settled on later — I asked who was to sign the contract — He did not know. I told him some of us women could do it of course. It would be worthless. He asked how much money we had in hand — I told him very little. He expected to get our part in October at Convention. It evidently means I think that your name and correspondence has convinced him he will get his pay — through his custom I believe is to get 3 dozen in the start. I'll send you his reply to my letter — I know billie is helping to have you at home —

## EXHIBIT R

49276        June 19, 1911.

Mrs. Henry A. London

    Pittsboro, N. C.

Dear Mrs. London:

    I enclose a letter and contract received to-day from Mr. John Wilson. Please read this over and see whether the form and all are entirely satisfactory to you.

    I have assumed that you would prefer the business end of this to be handled by me, but it is entirely satisfactory to me if you wish to sign this contract and to have the payments made by the Treasurer of the U.D.C.'s. In that case, Mr. London, who is the secretary of the alumni association, could make the collections for the alumni association and turn over the amount to your treasurer. I have secured a few subscriptions since the close of the session and would turn over all funds in my hands to him. Either method of handling this matter will be satisfactory so far as I am concerned. Of course, Mr. Wilson understands that my signing this does not bind the University nor myself personally.

    I hope that you can arrange to come over some time soon and talk over the location of the monument; also such changes in the design as you had thought of last fall or as may occur to us. I notice in the contract that Mr. Wilson

June 19, 1911

Mrs. H. A. London.

suggests one of two kinds of granite. Of course, a choice would have to be made between them. Nallie and I shall be glad to have you stay with us when you come.

When we get all the details settled I think it would be best for me to go to Boston and explain them in person to Mr. Wilson.

Sincerely yours,

**EXHIBIT S**



Wednesday morning.
6/21/1911

My dear Dr Venable,

Your letter with
the contract for the monument
was received last night.
Of course I do not
wish to sign it. You are
the proper one to do so.
But I think we ought to
go over his letters and
record by you, and
me, from time to time,

and see if there is
any point left out
which we had thought
advisable, and he
had agreed to.
Comparing them
with the contract.
I think he is an
honorable man — and
a gentleman — and will
honestly try to please us

but me, (the Committee) right to be perfectly
satisfied before the contract is signed.
Mr. London says he prefers for the
financial end of it to be handled
by you — The money to be
collected and turned over to
you or the purser, I think he
said. I've written to the Treasurer
for her last statement, and also this.
Williams for her "O.K." I will attach
mine to it, and send the order for
the money to be transferred to you.
I agree with you that it would
be best to come over soon, and
talk it over with you and the
ladies — then appoint a Committee
meeting. I wrote you, and
our letters crossed, that Mr.
London and I would leave here
in the cool of the early morning.

6/21/1911

next monday 26th for the
Pres Convention at Lenoir.
Hoping that I could see
you at the station for a
little talk before leaving
at 8 o'clock.
If it would suit you better
we could come up Sunday
afternoon instead, and
talk it over that evening,
accepting your invitation
to spend the night.

EXHIBIT T



tion; in the tenth, the place of the celebration; in the eleventh, the names of all or at least three of the witnesses who signed the return as present at the celebration. The original license and return thereto shall be filed and preserved.

Code, c. 1819; 1899, c. 541, s. 8; 1871-2, c. 193, s. 9.

**2092. Penalty for failure to record license and the return.** Any register of deeds who shall fail to record, in the manner above prescribed, the substance of any marriage license issued by him, or who shall fail to record, in the manner above prescribed, the substance of any return made thereon, within ten days after such return made, shall forfeit and pay two hundred dollars to any person who shall sue for the same.

Code, c. 1819; 1871-2, c. 193, s. 10.

---

## CHAPTER 51.

## MARRIED WOMEN.

|      |                                  | Sections.   |
|------|----------------------------------|-------------|
| I.   | Separate estate of,              | 2093—2101   |
| II.  | Rights and liabilities of husband, | 2102—2106 |
| III. | Contracts between husband and wife, | 2107—2108 |
| IV.  | Divorce and separation,          | 2109—2111   |
| V.   | Free traders,                    | 2112—2113   |

### I. SEPARATE ESTATE OF.

**2093. Secured; disposed of by will; conveyed with husband's written assent.** The real and personal property of any female in this state, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried.

Const., Art. X, s. 6.

Note, For purchase money mortgage executed by husband alone, see c. 2055.

**2094. Can not contract without husband's consent.** No woman during her coverture shall be capable of making any contract to affect her real or personal estate, except for her necessary personal expenses, or for the support of the family, or such as may

629

be necessary in order to pay her debts existing before marriage, without the written consent of her husband, unless she be a free trader, as hereinafter allowed.

Code, s. 1826; 1871-2, c. 193, s. 17.
Note. For laborer's and material liens against, see s. 2016.

**2095. May draw checks.** Bank deposits made by or in the name of a married woman shall be paid only to her or on her order, and her check, receipt or acquittance shall be valid in law to fully discharge the bank from any and all liability on account thereof.

1891, c. 221, s. 30; 1893, c. 344.

**2096. What leases require joinder of husband and privy examination.** No lease or agreement for a lease or sublease or assignment by any married woman, not a free trader, of her lands or tenements, or chattels real, to run for more than three years, or to begin in possession more than six months after its execution, or any conveyance of any freehold estate in her real property, shall be valid, unless the same be executed by her and her husband, and proved or acknowledged by them, and her free consent thereto, appear on her examination separate from her husband, as is now or may hereafter be required by law in the probate of deeds of femes covert.

Code, s. 1834; 1871-2, c. 193, s. 26.

**2097. Land of, not sold or leased without their consent; husband's interest exempt from execution.** No real estate belonging at the time of marriage to females, married since the third Monday of November, one thousand eight hundred and forty-eight, nor any real estate by them subsequently acquired, nor any real estate acquired on and since the first day of March, one thousand eight hundred and forty-nine, by femes covert, who were such on the said third Monday of November, one thousand eight hundred and forty-eight, shall be subject to be sold or leased by the husband for the term of his own life or any less term of years, except by and with the consent of his wife, first had and obtained, to be ascertained and effectuated by deed and privy examination, according to the rules required by law for the sale of lands belonging to femes covert. And no interest of the husband whatever in such real estate shall be subject to sale to satisfy any execution obtained against him; and every such sale is hereby declared null and void.

Code, s. 1840; R. C., c. 56; 1848, c. 41.

**2098. May make a will.** Every married woman shall have power to devise and bequeath her real and personal estate as if she were a feme sole; and her will shall be proved as is required of other wills.

Code, s. 1838; 1871-2, c. 193, s. 31.

## EXHIBIT U

PUBLIC LAWS AND RESOLUTIONS

OF THE

# STATE OF NORTH CAROLINA

PASSED BY THE

## GENERAL ASSEMBLY

AT ITS

## SESSION OF 1911,

BEGUN AND HELD IN THE CITY OF RALEIGH

ON

WEDNESDAY, THE FOURTH DAY OF JANUARY, A. D. 1911.

PUBLISHED BY AUTHORITY.

RALEIGH:
E. M. UZZELL & CO., STATE PRINTERS AND BINDERS.
1911.

272                    1911—Chapter 107—108—109.

Compensation to be fixed by court.   in lieu thereof the words, "The compensation of the Supreme Court Reporter shall not exceed fifteen hundred dollars per annum, to be fixed by the Court."

Sec. 2. That this act shall be in force from and after its ratification.

Ratified this the 6th day of March, A. D. 1911.

---

### CHAPTER 108.

### AN ACT TO AMEND CHAPTER 830 OF THE PUBLIC LAWS OF 1907.

*The General Assembly of North Carolina do enact:*

Chief clerk to auditor.   Section 1. That section five of chapter eight hundred and thirty of the Public Laws of one thousand nine hundred and seven be and the same is hereby amended as follows: By striking out the words "eighteen hundred," in line three of said section, and inserting in lieu thereof the words "two thousand."

Deputy insurance commissioner.   Sec. 2. That section ten of chapter eight hundred and thirty of the Public Laws of one thousand nine hundred and seven be and the same is hereby amended as follows: By striking out the word "fifteen," in line four of said section, and inserting in lieu thereof the word "eighteen."

Sec. 3. That all laws and clauses of laws in conflict with this act are hereby repealed.

Sec. 4. That this act shall be in force from and after its ratification.

Ratified this the 6th day of March, A. D. 1911.

---

### CHAPTER 109.

### AN ACT TO AUTHORIZE MARRIED WOMEN TO CONTRACT AND DEAL AS IF UNMARRIED.

*The General Assembly of North Carolina do enact:*

Power of married women to contract and deal with property.   Section 1. That section two thousand and ninety-four of the Revisal of one thousand nine hundred and five be and the same is hereby repealed, and the following substituted therefor: "That, subject to the provisions of section two thousand one hundred and seven of the Revisal of one thousand nine hundred and five, every married woman shall be authorized to contract and deal so as to affect her real and personal property in the same manner and with the same effect as if she were unmarried, but no con-

Conveyance of real estate.

Exhibits - 64

veyance of her real estate shall be valid unless made with the written assent of her husband as provided by section six of article ten of the Constitution, and her privy examination as to the execution of the same taken and certified as now required by law." *Privy examination.*

Sec. 2. That this act shall be in force from and after its ratification.

Ratified this the 6th day of March, A. D. 1911.

---

## CHAPTER 110.

AN ACT TO AMEND CHAPTER 803 OF THE PUBLIC LAWS OF 1907, RELATIVE TO THE SALARY OF THE ADJUTANT GENERAL.

*The General Assembly of North Carolina do enact:*

Section 1. That chapter eight hundred and three of the Public Laws of North Carolina, session of one thousand nine hundred and seven, be and the same is hereby amended by striking out the words "sixteen hundred," in line four of section one of said act, and inserting in lieu thereof the words "two thousand." *Salary $2,000.*

Sec. 2. That this act shall be in force from and after its ratification.

Ratified this the 6th day of March, A. D. 1911.

---

## CHAPTER 111.

AN ACT TO AMEND THE GENERAL INSURANCE LAW, CHAPTER 100 OF THE REVISAL OF 1905 OF NORTH CAROLINA, IN REGARD TO CLASSES OF INSURANCE.

*The General Assembly of North Carolina do enact:*

Section 1. That section four thousand seven hundred and twenty-six (4726) of the Revisal of one thousand nine hundred and five of North Carolina be amended to read as follows:

*Formed under articles of agreement; confined to business specified.* Insurance companies, associations, or orders may be formed *Formation of companies.* as provided in the next two succeeding sections for any one of the following purposes, to wit:

1. To insure against loss or damage to property by fire, light- *Property insurance.* ning, wind, hail, or tornado, use and occupancy, and for nonoccupancy, upon the stock or mutual plan.

2. To insure upon the stock or mutual plan, vessels, freights, *Marine insurance.* goods, money, effects, and money lent on bottomry or *respondentia*

Pub.—18

EXHIBIT V

49772       June 5, 1911.

Mrs. Henry A. London,

        Pittsboro, N. C.

My dear Mrs. London:

        I know that you were glad to hear the good news that the alumni had subscribed the $5000 on the monument fund, providing for over $4000 of it on the spot. It will be necessary now to put forth every effort for the completion of the fund. I hope that the U.D.C. chapters can raise at least $2500. I understand that more than half of this amount is already in hand in cash and pledges. It should be easily possible to raise the balance during the coming year. This will make the proportion of the U.D.C.'s one-third and that of the alumni two-thirds.

        I hope that you can come over to Chapel Hill some time this summer and go over the matters of the changes in the monument, etc. There was much dissatisfaction over the location selected and I think we shall have to change that, especially as the dissatisfaction seems to be well grounded.

        I shall write to Mr. Wilson and tell him that he can now go ahead with the making of the monument.

                        Sincerely yours,

                        Francis P.

                        President.

# EXHIBIT W

THIS AGREEMENT, made this 2 9 th day of June A.D. 1911, by and between JOHN WILSON, sculptor of Boston, Massachusetts, of the first part,. and

of

of the second part, witnesseth:

That the party of the first part, for the consideration hereinafter mentioned, agrees with the party of the second part to perform in a faithful and workmanlike manner the following specified work, viz:

To erect a monument on the College Grounds at Chapel Hill, N.C. The design consisting of a figure in Bronze eight feet in height supported by a Granite Pedestal of a design heretofore shown in a sketch submitted to the Committee. The front of the Pedestal shall bear a bronze panel 48 in. x 72 in. with two figures in relief as shown in the sketch submitted. On the member below and also on the front of the Pedestal shall be incised the inscription "Erected under the auspices of the North Carolina Division of the United Daughters of the Confederacy." The back of the die shall bear a tablet. The tablet containing historical data. This tablet shall be of applied bronze. The entire design throughout to be carried out as shown in submitted sketch except for such changes as shall be made for the improvement of the monument. These changes being recommended by the Committee. The figure and two panels shall be cast in U. S. Government Standard Bronze. The Pedestal of grey granite or "Balfour Pink" granite. A suitable concrete foundation shall be constructed and the Pedestal erected on it. The bronze figure and panels fixed in place and the monument completed for unveiling. The entire work to be executed in an artistic and workmanlike manner subject to the approval of the party of the second part. And in addition to the above to become responsible for all material employed or used in the said work, which is to be commenced the fifteenth day of June A.D. 1911, and completed free from all mechanic or other liens before the twenty-ninth day of May A.D. 1912.

And the party of the second part agrees with the party of the first part in consideration of the faithful performance of the above specified work to pay to the party of the first part the sum of seven thousand five hundred dollars($7500.00), as follows: ONE THOUSAND FIVE HUNDRED DOLLARS($1500.00) on the signing and delivery of this contract. Two thousand dollars($2000.00) when models are approved, complete and ready for the bronze foundry, and the remaining four thousand dollars to be paid on the completion of the work.

The sculptor shall give his personal supervision to all the work.

IN WITNESS WHEREOF, we hereunto set our hands and seals on the day and year first above written.

Executed in presence of

Frank V. Richardson          John Wilson

Thos. J. Wilson Jr.          Javis Pflueske

# EXHIBIT X

59865      March 29,1913.

Mrs. H.A.London,

Pittsboro, N.C.

Dear Mrs. London:

I wish to acknowledge the receipt of your letter which I have handed over to the ladies here to see what can be done in the matter of decorations.

I have a letter from Mrs. Williams about the program. I think the exercises should be not longer than an hour and an half at the outside. There are so many things happening in Commencement week that it is difficult to hold an audience for a longer period than that. Of course, if you desire it, I shall be glad to preside over the exercises and make a few introductory remarks which will be limited to two or three minutes. Mrs. Williams suggests that both you and herself should say something and that strikes me as eminently appropriate. I doubt whether it would be wise, however, to have any other speech in addition to those than the one to be delivered by Governor Craig. Mrs. Williams suggests Colonel Brainfoot and you have mentioned Major Stedman, but I feel sure that it would be wiser for us to rest content with the program as outlined above.

The next question is as to where the exercises should

[Mar 24, 1913]

should be held. Personally I believe that it would be best to have the exercises in the chapel and proceed from there to the monument for the unveiling. It will be difficult to arrange for the seating of the audience our-of-doors and also difficult for the audience to hear anything that is said.

We could have music by the commencement orchestra, but I do not see how we could carry out Mrs. Williams' suggestion of singing by the Glee Club, as this latter organization is made up of all classes of students and most of them coming from the lower classes leave usually several days before commencement, as soon as their examinations are over. If you desire it, however, I think a quartet could be retained.

Sincerely yours,

President.

# EXHIBIT Y

https://archive.org/stream/aschairmanofmonu00lond#page/n1/mode/2up



As Chairman of the Monument Committee of the North Carolina Division of the United Daughters of the Confederacy I have the honor, and it gives me much pleasure, to present in their name to the trustees of the University of North Carolina this monument which is erected in memory of those students of this University who served in the armies of the Confederate States of America.

No man in any age or country more richly deserves to be commemorated in bronze or stone than those youths who at the call of their respective states rushed to arms and suffered the indescribable hardships and dangers of a Confederate soldier's life. While this monument is an outward expression of our love for them and our admiration of their heroism, yet also the loving hearts of the women of the South will ever be memorial tablets on which will be inscribed the memory of their virtues and valor. Governor Craig has given you in part a history of the services rendered by the students of this University to the Southern Confederacy, but no tongue can tell nor pen describe all that can be said or written in their praise.

Inhonoring the memory of our Confederate heroes we must not be misunderstood as having in our hearts any hatred to those who wore the Blue, but we do not wish to forget what has been done forus by those who wore the Gray. The love that we have for them is like the faithful clinging ivy.

> "So we who stand beneath the stripes and stars
> Upon the threshold of these later years,
> Like ivy, clinging to a dear Lost Cause,
> Still yield the tribute of our love and tears.
> Thus may, with all the future's slow decline,
> The reverence of generations be,
> Forever an ivy, that will still entwine
> The ruins of the proud Confederacy."

We have erected this monument not only in honor of the dead but also of the living. To the latter I would say in behalf of the women of the South that we hope that their last years may be their happiest and

-2-

when they Cross over the River that they may rest under the shade of the trees with their immortal leaders, Stonewall Jackson and Robert E. Lee.    Of those who have died we may well say, in the words of Father Ryan, the poet priest of the South,

> "We care not whence they came,
> Dear in their lifeless clay;
> Whether unknown or known to fame,
> Their cause and coun'ry still the same,
> They died—and wore the Gray. "

Accept this monument and may it stand forever as a perpetual memorial to those xkm sons of the University who suffered and sacrificed so much at the call of duty.

by Mrs. H. A. London
(Bettie Jackson)
June 3, 1913

Perry
9th George London

# EXHIBIT Z

https://archive.org/stream/aschairmanofmonu00lond#page/n1/mode/2up



Acceptance of the Monument

by

Francis P. Venable.

To mark the last resting places of fallen he-
roes and to erect monuments in memory of their heroism
is the duty and privilege of every grateful people. The
sons of the University fell on many a battlefield in the
great war between the states and to their memory the sorrow-
ing mother has placed tablets in her Memorial Hall, and now
in commemoration of a great era and of a noble ideal there
has been erected on her campus this beautiful monument.

This then is no mere monument to the dead but a
worthy memorial to that heroic era in the history of the
University when men's hearts were stirred mightily and the
clear call of duty was answered even at the sacrifice of
life itself. It is well to remember the record of the
University in the great struggle, for I believe it to be
without parallel.

It was to that patriotic organization, the United
Daughters of the Confederacy, that the gracious thought first
came of erecting this monument to the sons of the University
who entered the War. Four years ago the North Carolina Div-
ision of the Daughters asked permission of the Trustees to

-2-

place the monument up n the campus, which was gladly granted them. A committee was appointed, competitive designs were submitted and the design of a young Canadian artist, John W ilson, was selected as the most beautiful and as most appropriately carrying out the great ideal which it was to commemor ate. It might well be entitled "The Call of Duty." The alumni came to the aid of the ladies and through their joint efforts the necessary funds were subscribed.

And now the monument stands complete, an ornament to the campus, and a splendid lesson in granite and bronze to all coming generations of students throughout the years, that in the words of the immortal Lee " Duty is the sublimest word in the English language." If they learn this lesson they will not fail to emulate the virtues of the heroic sons of the University who have gone before them, and will nobly answer to the call as it comes to them day by day in great things and in small.

In the name of the University and with an abiding gratitude I accept the gracious gift of this monument, embodying as it does grateful memory for the past and high hope for the future.

**EXHIBIT AA**

# Minutes

of the

## Seventeenth Annual Convention

of the

# United Daughters of the Confederacy

### North Carolina Division

held at

## Tarboro, North Carolina

### October 8, 9 and 10, 1913

———————

**MRS. MARSHALL WILLIAMS, President**
**MRS. THAD W. THRASH, Recording Secretary**

———————

OWEN G. DUNN, PRINTER,
NEW BERN, N. C.

the schools. Mrs. Winstead read the resolutions drawn up by Mrs. Archibull.

Motion to appoint a Managing Committee of three to keep up this magazine, seconded and carried.

Adjourned until 2 o'clock, P. M.

## Second Day—Afternoon Session.

Election of officers:

President, Mrs. Marshall Williams, Faison (Rising Vote).
First Vice-President, Mrs. Frank Huggins (Unanimous Vote).
Second Vice-President, Mrs. M. O. Winstead (Unanimous Vote).
Third Vice-President, Mrs. H. L. Rigsins (Unanimous Vote).
Recording Secretary, Mrs. T. W. Thrash (Rising Vote).
Corresponding Secretary, Miss Winnifred Faison (Rising Vote).
Registrar, Mrs. Felix Harvey (Majority).
Treasurer, Miss Margaret Etheredge (Rising Vote).
Recorder of Crosses, Mrs. H. L. Reid (Unanimous Vote).
Historian, Miss Carry Laznar (Rising Vote).
Chaplain, Miss Bettie James (Rising Vote).
Director of Children's Chapter, Mrs. Gordon Finger (Rising Vote).

Report on Chapel Hill Monument Committee read by Mrs. H. A. London, chairman. Approved and accepted.

### REPORT OF CHAPEL HILL MONUMENT COMMITTEE.

The Chapel Hill Monument was unveiled during the last commencement at the University. It is very beautiful. It is not only in memory of the boys who left the University from 1861 to 1865, but also those who attended the University and afterwards became Confederate soldiers.

Tablets have been erected in Memorial Hall in memory of those who lost their lives, and all who enlisted are surely worthy of a monument.

Dr. Venable and others have worked unceasingly for it and

now it stands there for all time; and it will be an object lesson to all future generations—and will impress upon the present day students their obligation to the end of life.

There were more than 1,000 University men in the struggle between the States, in view of our immortal leader, "duty is the sublimest word in the English language."

MRS. H. A. LONDON.

Motion was made to call roll of Chapters to give for this fund. Only $500 is needed.

Motion seconded and carried.

Motion by Mrs. L. D. Henri

"That North Carolina endorse Mrs. P. M. Williams, for our Secretary General."

Motion seconded and carried. Mrs. Williams was endorsed.

Report on Woman's Confederate Home. Approved and accepted.

### REPORT OF CONFEDERATE WOMAN'S HOME.

Madam President and Paughters:

It is with deepest regret that I am unable to meet with you and read my report, for I feel I have so much to say to you that I cannot write; but Providence has prevented me and I am in the hospital, but my heart and thoughts are with you.

I send you glad tidings of great joy that our four years' of labor has been crowned with success and in the near future, our fond hope will be realized in the erection at Fayetteville, of a Confederate Women's Home; a building that will stand for all ages as a comfort to the homeless. I wish I could think each daughter presently, who has responded so cheerfully and unselfishly for the erection of this Home and so faithfully to alleviate the sufferings, and provide comfort for those that remain of the followers of Lee and Jackson, will tower high in Glory to the credit of the women of North Caro-

**EXHIBIT BB**

https://www.dukechronicle.com/article/2018/11/timeline-of-silent-sam-statue-unc-duke

**Timeline: The latest on Silent Sam**

The Chronicle
By John Markis
November 27, 2018 | 12:00am EST

In the months since protesters pulled down the University of North Carolina-Chapel Hill's "Silent Sam," a Confederate monument, the statue's place on campus has been mired in debate. This timeline provides context for its creation, the subsequent controversy and what the future entails.

**1908:** The United Daughters of the Confederacy proposed building the statue to honor the "Chapel Hill Boys" who left college to join the Confederate Army. John Wilson sculpted the statue and images on the base and modeled it on Harold Langlois, a young man in Boston. The project cost $7,500—equivalent to roughly $200,000 today.

**June 2, 1913:** Delayed by two years due to fundraising difficulties, UNC formally unveiled Silent Sam to the public. Governor Locke Craig spoke at the ceremony, as did Civil War veteran Julian Carr, who boasted about "horse-whipping" a black woman for insulting a Southern lady.

**1955-1968:** UNC officially integrated its student body in 1955, and conversations about Silent Sam's presence evolved as a result of the broader Civil Rights Movement. After Martin Luther King Jr.'s assassination in April 1968, students defiled the monument for the first time.

**2011:** UNC history graduate student Adam Domby unearthed the transcript of the dedication ceremony from 1913 and published his findings in The Daily Tar Heel in a letter to the editor, quoting Carr's remarks. Students calling themselves the "Real Silent Sam Movement" then attracted the attention of national leaders, such as former North Carolina NAACP president Rev. William Barber II, to the statue.

**2015:** Silent Sam was vandalized several times in 2015. That year, the North Carolina General Assembly also passed the Cultural History Artifact and Patriotism Act, which barred the permanent removal of any "object of remembrance" without the approval of the North Carolina Legislature.

**August 2017:** At the "Unite the Right" rally, the so-called "alt-right" and counter-protesters clashed in Charlottesville, Va., about the removal of a Robert E. Lee statue. Just days after, protesters toppled a Confederate monument in Durham. In the wake of these events, Chapel Hill Mayor Pam Hemminger asked the university to remove the statue and Chancellor Carol Folt said in September that it would be best for the statue to be moved. However, she said that the university would follow the law—which banned the statue's removal without the state legislature's approval.

**September 2017-April 2018:** Debate raged throughout the year. Activists petitioned Folt, holding rallies outside her office.

**April 30, 2018:** Maya Little, a history doctoral student, splattered red paint and blood on Silent Sam, justifying the action as "providing historical context" for white supremacy. The University charged Little, who was arrested, with an honor code violation.

**Aug. 20, 2018:** Protesters gathered around Silent Sam and tore down the statue. Police arrested several participants. Groundskeepers drove the statue to an undisclosed storage location. The next day, UNC and Chapel Hill leaders issued the following joint statement:

"Last night's rally was unlike any previous event on our campus," the statement read. "This protest was carried out in a highly organized manner and included a number of people unaffiliated with the University. While we respect that protesters have the right to demonstrate, they do not have the right to damage state property."

**August 31, 2018:** A neo-Confederate group rallied at the site where Silent Sam once stood, but the group was heavily outnumbered by counter-protesters.

**Oct. 26, 2018:** The undergraduate Honor Court ruled that Little violated the school's honor code and sanctioned her with 18 hours of community service and a letter of warning. Little has since appealed the ruling, saying that she did not receive a "fair and impartial trial." The case has not yet been decided.

**Present:** University leaders have said they will have a proposal on what to do with the statue before the Dec. 14 Board of Governors meeting.

## EXHIBIT CC

https://www.wral.com/unlawful-and-dangerous-unc-chancellor-on-silent-sam-toppling/17783175/

**Unlawful and dangerous: UNC chancellor on 'Silent Sam' toppling**
Posted August 20, 2018
Updated August 23, 2018

**By Natalie Matthews, WRAL.com editor, Sarah Krueger & Candace Sweat, WRAL reporters**

**CHAPEL HILL, N.C.** — Protesters on Monday night toppled the controversial "Silent Sam" statue on the campus of the University of North Carolina at Chapel Hill.

More than 200 protesters first gathered at the Peace and Justice Plaza at about 7 p.m., before marching to the base of the statue, calling for its removal. By 9:30 p.m., the statue was on the ground and the crowd erupted in cheers.

Chancellor Folt released a statement about the toppling.

**UNC-Chapel Hill**
✓**@UNC**

A message from Chancellor Folt on the Confederate Monument: https://unc.live/2nTnjOv

Dear Carolina Community:

As you are probably aware, a group from among an estimated crowd of 250 protesters brought down the Confederate Monument on our campus last night.

The monument has been divisive for years, and its presence has been a source of frustration for many people not only on our campus but throughout the community.

However, last night's actions were unlawful and dangerous, and we are very fortunate that no one was injured. The police are investigating the vandalism and assessing the full extent of the damage.

I appreciate the actions taken by the police to ensure the community's safety and will keep you informed as additional information is available.

Sincerely,

Carol L. Folt

12:48 AM - Aug 21, 2018

"Silent Sam" had been standing on the UNC campus since 1913.

Gov. Roy Cooper issued a statement Monday night, saying that he "understands that many people are frustrated by the pace of change and he shares their frustration, but violent destruction of public property has no place in our communities."

On Tuesday, other North Carolina leaders issued statements.

"Many of the wounds of racial injustice that still exist in our state and country were created by violent mobs and I can say with certainty that violent mobs won't heal those wounds. Only a civil society that adheres to the rule of law can heal these wounds and politicians – from the Governor down to the local District Attorney – must start that process by ending the deceitful mischaracterization of violent riots as 'rallies' and reestablishing the rule of law in each of our state's cities and counties," said North Carolina Senate Leader Phil Berger, R-Rockingham.

"There is no place for the destruction of property on our college campuses or in any North Carolina community; the perpetrators should be arrested and prosecuted by public safety officials to make clear that mob rule and acts of violence will not be tolerated in our state," State House Speaker Tim Moore, R-Cleveland, said.

Protesters on Monday night first sectioned off the area around the controversial statue with large banners, blocking it from view. Throughout the course of the evening, people in the crowd speculated about what might be going on behind the banners, but no one confessed to knowing the plan.

People chanted "stand up, fight back" and "hey, hey, ho, ho, this racist statue has got to go." Many also held signs.

Chelsea Manning, the former U.S. soldier who disclosed 750,000 government documents to Wikileaks, was also in attendance.

**Chelsea E. Manning**
✓@xychelsea

we stand in solidarity with UNC students  tear them all down or we will
#silentsam #WeGotThis
10:08 PM - Aug 20, 2018

WRAL's Candace Sweat said she saw a rope that was connected to something behind the banners, and that she heard a creak before the statue came down.

At one point, there were tense moments between protesters and police officers. Protesters deployed smoke canisters.

One person was arrested and charged with resisting arrest and for concealing one's face during a public rally.

Around 9 p.m., protesters left the base of "Silent Sam" and marched to Franklin Street, where they formed a large circle in the street, briefly blocking the intersection of Franklin and Columbia.

The march continued down Franklin Street and ended back at the base of "Silent Sam." Soon after, the Confederate statue came crashing down.

Once it was on the ground, protesters were shoveling dirt on top of it and stomping on it.

UNC issued a statement Monday night, calling the actions of the protesters "dangerous."

"Tonight's actions were dangerous, and we are very fortunate that no one was injured. We are investigating the vandalism and assessing the full extent of the damage," the university said in a statement.

Police surrounded the statue once it was on the ground, but they made no further arrests. Overnight, university officials carried the toppled statue away.

As a precaution, authorities were patrolling the area around the Confederate statue on the State Capitol grounds in Raleigh.

Some of the people who were charged in connection with toppling a Confederate monument in Durham were at Monday's protest. One of those people was Raul Jimenez.

"I'm supporting all the students here today," he said. "As someone who was tried and found not guilty of taking down a statue in Durham, I am here to support them in taking down this statue."

First-year students Nora Dickson and Gretchen Mackie said the scene was tense and emotional.

A biology professor at UNC-Chapel Hill said she came out to the protest after she put her kids to bed.

"...all people deserve to be treated with dignity," she said.

The "Silent Sam" statue has been the site of protests for the past year, with students, faculty and alumni calling it a racist image and begging for officials to remove it.

# EXHIBIT DD

https://www.wral.com/hours-after-folt-orders-removal-of-silent-sam-pedestal-crews-arrive-to-remove-it-from-unc-campus/18124227/

**Hours after Folt orders removal of 'Silent Sam' pedestal, crews remove it from UNC campus**

Posted January 14
Updated January 15

5.8K

**By Natalie Matthews, WRAL digital journalist**

**CHAPEL HILL, N.C.** — Hours after University of North Carolina at Chapel Hill Chancellor Carol Folt said she would step down following graduation and authorized the base of "Silent Sam" be removed, crews descended upon McCorkle Place to do just that.

Around 11 p.m., crews with a large construction- type truck and flood lights arrived at the UNC-Chapel Hill campus, along with a group of law enforcement officers. Wood was being put down over the grass to create some sort of track.

By midnight, a man was seen drilling into the stop of the statue and a forklift was on hand, and by 12:45 a.m., the pedestal had been removed.

A crowd of people gathered around to watch and a small cheer erupted when the pedestal was lifted.

The last piece of the base was removed by 2:40 a.m. The pedestal was later towed away.

A spokesperson for the university said the base and plaques of the Confederate monument would be stored in a "secure location."

A small group of people were involved in a scuffle with police, and one person was arrested and taken away in handcuffs.

In a letter to the UNC community on Monday afternoon, Folt said that, before she leaves, she plans to focus on the university's core mission and will "push forward with Carolina's campaign and history task force."

"I'm deeply proud of what you've accomplished and what we've accomplished together since I became a Tar Heel nearly six years ago in 2013. I am writing today to let you know that I have decided to step down as chancellor following graduation, at the end of the academic year," Folt said.

"I have authorized the removal of the base and commemorative plaques from the Confederate monument site in McCorkle Place. As chancellor, the safety of the UNC-Chapel Hill community is my clear, unequivocal and non-negotiable responsibility. The presence of the remaining parts of the monument on campus poses a continuing threat both to the personal safety and well-being of our community and to our ability to provide a stable, productive educational environment."

The Silent Sam statue, in honor of UNC's Confederate dead, stood on the campus from its dedication in 1913 until August, when a group decrying its racist history toppled it from a pedestal. Since that time, campus leaders have considered next steps.

Late last year, Folt announced a plan to build a $5.3 million "center for history and education" to house the statue on campus.

A few weeks later, UNC Board of Governors rejected that plan, saying the cost of the center – beyond the construction expense, it would cost $800,000 a year to operate -- and concerns over safety made it unworkable.

Board of Governors members Darrell Allison, Jim Holmes, Wendy Murphy, Anna Nelson and Bob Rucho were named to a committee to work with Folt and the UNC-Chapel Hill trustees to come up with a new plan for Silent Sam that the full board can take up at its March 15 meeting.

Board of Governors Chairman Harry Smith said Folt decided in a closed-door meeting with the board on Monday to resign. But her announcement regarding Silent Sam caught the board off-guard.

"We are incredibly disappointed at this intentional action. It lacks transparency and it undermines and insults the board's goal to operate with class and dignity," Smith said in a statement. "We strive to ensure that the appropriate stakeholders are always involved and that we are always working in a healthy and professional manner."

The March time frame for the Board of Governors to discuss Silent Sam's future remains unchanged, he said.

"Moving forward, the board will continue to work tirelessly and collaboratively with all relevant parties to determine the best way forward for UNC-Chapel Hill," he said. "We will do so with proper governance and oversight in a way that respects all constituencies and diverse views on

this issue. The safety and security of the campus community and general public who visit the institution remains paramount."

On Twitter, Gov. Roy Cooper praised Folt's efforts to make the university more inclusive.

**Governor Roy Cooper**
✓@NC_Governor

I appreciate the Chancellor's actions to keep students and the public safe. North Carolina is welcoming to all, and our public university should reflect that. - RC

https://twitter.com/ChancellorFolt/status/1085144839979745281 ...

> **Carol Folt**@ChancellorFolt
> Overnight, workers removed the base and tablets from the Confederate Monument site. I am confident this is the right decision for our community – one that will promote public safety, enable us to begin the healing process and renew our focus on our great mission.

7:49 AM - Jan 15, 2019

Folt said in her letter that "safety concerns alone should preclude the monument from returning to campus," adding that the UNC-Chapel Hill Board of Trustees also supports that position.

"The base and tablets will be preserved until their future is decided. While I recognize that some may not agree with my decision to remove the base and tablets now, I am confident this is the right one for our community – one that will promote public safety, enable us to begin the healing process and renew our focus on our great mission," Folt said.

Leaders with the Board of Trustees issued a statement supporting Folt's actions.

"The chancellor has ultimate authority over campus public safety, and we agree Chancellor Folt is acting properly to preserve campus security. Nothing is more important than keeping our campus community and visitors as safe as possible," the statement said.

Gov. Roy Cooper echoed much of the same.

"I appreciate the Chancellor's actions to keep students and the public safe. North Carolina is welcoming to all, and our public university should reflect that," he said in a statement.

**EXHIBIT EE**

**From:** Peggy Wooddlrf Johnson
**Sent:** Wednesday, August 22, 2018 10:01 AM
**To:** haywoodxcochrane
**Subject:** A sad time in North Carolina

Haywood,

I, as a representative of the United Daughters of the Confederacy, request that the Boy Soldier, referred to as Silent Sam, be returned to the United Daughters of the Confederacy. We are willing to take possession of both the base and the sculpture. We have been saddened that the message of this monument has been so misconstrued. He no longer belongs on the campus of UNC Chapel Hill.

Peggy W. Johnson
NC UDC Division President

STATE OF NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
File No. 19CVS _____

2019 NOV 27 A 11: 12

ORANGE CO., C.S.C.

BY _____

| | |
|---|---|
| NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) **Acceptance of Service** |
| THE UNIVERSITY OF NORTH CAROLINA and THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS, | ) ) ) ) ) |
| Defendants. | ) ) |

---

The undersigned counsel for Defendants The University of North Carolina and The University of North Carolina Board of Governors hereby represents that he has been authorized and instructed by Defendants to accept service of process in this civil action and has this day accepted on Defendants' behalf service of a copy of the Summons and Complaint in this action. This acceptance of service is expressly made without waiver of any defenses.

*[The remainder of this page was left blank intentionally.]*

1

This, the ____ day of _____, 2019.

WOMBLE BOND DICKINSON (US) LLP

Ripley Rand
N.C. Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Telephone: 919-755-2100
Facsimile: 919-755-2150
Email: ripley.rand@wbd-us.com

*Attorney for Defendants The University of*
*North Carolina and The University of North*
*Carolina Board of Governors*

CERTIFIED TRUE COPY
FROM ORIGINAL

Clerk of Superior Court Orange County

2

STATE OF NORTH CAROLINA     FILED IN THE GENERAL COURT OF JUSTICE
COUNTY OF ORANGE     SUPERIOR COURT DIVISION

2019 NOV 27 A 11: 12   File No. 19CVS 1599

ORANGE CO., C.S.C.

| | |
|---|---|
| NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation, ) ) ) ) | |
| Plaintiff, ) | |
| v. ) | **ANSWER** |
| THE UNIVERSITY OF NORTH CAROLINA and THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS, ) ) ) ) ) | |
| Defendants. ) | |

---

Defendants The University of North Carolina and The University of North Carolina Board of Governors (collectively, "Defendants"), respectfully respond to Plaintiff's Verified Complaint as follows:

## PARTIES

1. Upon information and belief, Defendants admit the allegations in Paragraph 1.

2. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, and the allegations are therefore denied.

3.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and the allegations are therefore denied.

4.     Defendants admit the allegations in Paragraph 4.

5.     Defendants admit the allegations in Paragraph 5.

6.     Defendants admit the allegations in Paragraph 6.

7.     Defendants admit the allegations in Paragraph 7.

8.     Defendants deny the allegations in Paragraph 8.

9.     Upon information and belief, Defendants admit the allegations in Paragraph 9.

10.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and the allegations are therefore denied.

## JURISDICTION, VENUE, LIMITATIONS, AND STANDING

11.     Defendants deny the allegations in Paragraph 11.

12.     Defendants admit the allegations in Paragraph 12.

13.     Upon information and belief, Defendants admit the allegations in Paragraph 13.

14.     Defendants deny the allegations in Paragraph 14.

15.     Defendants admit the allegations in Paragraph 15.

16.     Defendants deny the allegations in Paragraph 16.

17.     Defendants deny the allegations in Paragraph 17.

18.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and the allegations are therefore denied.

19.     Paragraph 19 contains legal conclusions to which no response is required. To the extent that allegations in Paragraph 19 include facts to which a response is required, Defendants deny the allegations in Paragraph 19.

20.     Paragraph 20 contains legal conclusions to which no response is required. To the extent that allegations in Paragraph 20 include facts to which a response is required, Defendants deny the allegations in Paragraph 20.

## FACTUAL BACKGROUND

21.     Upon information and belief, Defendants admit the allegations in Paragraph 21.

22.     Upon information and belief, Defendants admit the allegations in Paragraph 22.

23.     Defendants admit the allegations in Paragraph 23.

24.     Defendants admit the allegations in Paragraph 24.

25.     Defendants admit the allegations in Paragraph 25.

26.     Defendants admit the allegations in Paragraph 26.

27.     Defendants admit the allegations in Paragraph 27.

28.     Defendants admit the allegations in Paragraph 28.

29.     Defendants admit the allegations in Paragraph 29.

30.     Defendants admit the allegations in Paragraph 30.

3

31.     Defendants admit the allegations in Paragraph 31.

32.     Defendants admit the allegations in Paragraph 32.

33.     Defendants admit the allegations in Paragraph 33.

34.     Defendants admit the allegations in Paragraph 34.

35.     Defendants admit the allegations in Paragraph 35.

36.     Defendants admit the allegations in Paragraph 36.

37.     Defendants admit the allegations in Paragraph 37.

38.     Defendants admit the allegations in Paragraph 38.

39.     Defendants admit the allegations in Paragraph 39.

40.     Defendants admit the allegations in Paragraph 40.

41.     Defendants admit the allegations in Paragraph 41.

42.     Defendants admit the allegations in Paragraph 42.

43.     Defendants admit the allegations in Paragraph 43.

44.     Defendants admit the allegations in Paragraph 44.

45.     Defendants admit the allegations in Paragraph 45.

46.     Defendants admit the allegations in Paragraph 46.

47.     Defendants deny the allegations in Paragraph 47.

48.     Defendants deny the allegations in Paragraph 48.

49.     Defendants admit the allegations in Paragraph 49.

50.     Defendants admit the allegations in Paragraph 50.

51.     Defendants admit the allegations in Paragraph 51.

52.     Defendants admit the allegations in Paragraph 52.

53.     Defendants deny the allegations in Paragraph 53.

54.     Defendants admit the allegations in Paragraph 54.

55.     Defendants admit the allegations in Paragraph 55.

56.     Defendants admit the allegations in Paragraph 56.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment – Monument Law)**

57.     Defendants repeat and re-allege each response to each allegation in this Answer as if each were fully set forth herein.

58.     Defendants admit the allegations in Paragraph 58.

59.     Defendants deny the allegations in Paragraph 59.

60.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 60 are denied.

61.     Paragraph 61 contains legal conclusions to which no response is required. To the extent that allegations in Paragraph 61 include facts to which a response is required, Defendants deny the allegations in Paragraph 61.

62.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 62 are denied.

63.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 63 are denied.

64.     Defendants admit the allegations in Paragraph 64.

65.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 65 are denied.

5

66.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 66 are denied.

67.     Defendants admit that the contents of the statute speak for themselves and any other allegations in Paragraph 67 are denied.

68.     Defendants admit the allegations in Paragraph 68.

69.     Paragraph 69 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 69 include facts to which a response is required, Defendants deny the allegations in Paragraph 69.

70.     Defendants deny the allegations in Paragraph 70.

71.     Defendants deny the allegations in Paragraph 71.

72.     Defendants admit the allegations in Paragraph 72.

73.     Paragraph 73 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 73 include facts to which a response is required, Defendants deny the allegations in Paragraph 73.

74.     Defendants deny the allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment – Contract)

76.     Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

77.     Defendants admit the allegations in Paragraph 77.

78.     Defendants deny the allegations in Paragraph 78.

79.     Paragraph 79 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 79 include facts to which a response is required, Defendants deny the allegations in Paragraph 79.

80.     Paragraph 80 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 80 include facts to which a response is required, Defendants deny the allegations in Paragraph 80.

81.     Paragraph 81 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 81 include facts to which a response is required, Defendants deny the allegations in Paragraph 81.

82.     Paragraph 82 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 82 include facts to which a response is required, Defendants deny the allegations in Paragraph 82.

83.     Paragraph 83 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 83 include facts to which a response is required, Defendants deny the allegations in Paragraph 83.

84.     Defendants deny the allegations in Paragraph 84.

85.     Paragraph 85 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 85 include facts to which a response is required, Defendants deny the allegations in Paragraph 85.

86.     Defendants deny the allegations in Paragraph 86.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract)

87.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

88.   Paragraph 88 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 88 include facts to which a response is required, Defendants deny the allegations in Paragraph 88.

89.   Paragraph 89 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 89 include facts to which a response is required, Defendants deny the allegations in Paragraph 89.

90.   Paragraph 90 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 90 include facts to which a response is required, Defendants deny the allegations in Paragraph 90.

91.   Paragraph 91 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 91 include facts to which a response is required, Defendants deny the allegations in Paragraph 91.

92.   Defendants deny the allegations in Paragraph 92.

93.   Paragraph 93 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 93 include facts to which a response is required, Defendants deny the allegations in Paragraph 93.

94.   Defendants admit the allegations in Paragraph 94.

8

95.    Paragraph 95 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 95 include facts to which a response is required, Defendants deny the allegations in Paragraph 95.

96.    Paragraph 96 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 96 include facts to which a response is required, Defendants deny the allegations in Paragraph 96.

97.    Paragraph 97 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 97 include facts to which a response is required, Defendants deny the allegations in Paragraph 97.

98.    Paragraph 98 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 98 include facts to which a response is required, Defendants deny the allegations in Paragraph 98.

99.    Defendants deny the allegations in Paragraph 99.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**(Specific Performance)**

</div>

100.    Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

101.    Paragraph 101 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 101 include facts to which a response is required, Defendants deny the allegations in Paragraph 101.

102.    Paragraph 102 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 102 include facts to which a response is required, Defendants deny the allegations in Paragraph 102.

<div align="center">9</div>

103.    Defendants deny the allegations in Paragraph 103.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment – Conditional Gift)

104.    Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

105.    Defendants admit the allegations in Paragraph 105.

106.    Defendants deny the allegations in Paragraph 106.

107.    Paragraph 107 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 107 include facts to which a response is required, Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Paragraph 109 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 109 include facts to which a response is required, Defendants deny the allegations in Paragraph 109.

110.    Paragraph 110 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 110 include facts to which a response is required, Defendants deny the allegations in Paragraph 110.

111.    Paragraph 111 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 111 include facts to which a response is required, Defendants deny the allegations in Paragraph 111.

112.    Paragraph 112 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 112 include facts to which a response is required, Defendants deny the allegations in Paragraph 112.

10

113.   Paragraph 113 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 113 include facts to which a response is required, Defendants deny the allegations in Paragraph 113.

114.   Paragraph 114 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 114 include facts to which a response is required, Defendants deny the allegations in Paragraph 114.

115.   Paragraph 115 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 115 include facts to which a response is required, Defendants deny the allegations in Paragraph 115.

116.   Paragraph 116 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 116 include facts to which a response is required, Defendants deny the allegations in Paragraph 116.

117.   Defendants admit that the contents of the statute speak for themselves, and any other allegations in Paragraph 117 are denied.

118.   Paragraph 118 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 118 include facts to which a response is required, Defendants deny the allegations in Paragraph 118.

119.   Paragraph 119 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 119 include facts to which a response is required, Defendants deny the allegations in Paragraph 119.

120.   Defendants deny the allegations in Paragraph 120.

## SIXTH CLAIM FOR RELIEF
### (Quiet Title)

121.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

122.   Paragraph 122 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 122 include facts to which a response is required, Defendants deny the allegations in Paragraph 122.

123.   Defendants deny the allegations in Paragraph 123.

## SEVENTH CLAIM FOR RELIEF
### (Trespass to Chattel)

124.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

125.   Defendants admit the allegations in Paragraph 125.

126.   Paragraph 126 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 126 include facts to which a response is required, Defendants deny the allegations in Paragraph 126.

127.   Defendants deny the allegations in Paragraph 127.

128.   Defendants deny the allegations in Paragraph 128.

129.   Defendants deny the allegations in Paragraph 129.

130.   Defendants deny the allegations in Paragraph 130.

131.   Paragraph 131 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 131 include facts to which a response is required, Defendants deny the allegations in Paragraph 131.

12

132.   Defendants deny the allegations in Paragraph 132.

## EIGHTH CLAIM FOR RELIEF
### (Conversion)

133.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

134.   Paragraph 134 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 134 include facts to which a response is required, Defendants deny the allegations in Paragraph 134.

135.   Defendants admit the allegations in Paragraph 135.

136.   Defendants admit the allegations in Paragraph 136.

137.   Defendants admit the allegations in Paragraph 137.

138.   Paragraph 138 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 138 include facts to which a response is required, Defendants deny the allegations in Paragraph 138.

139.   Paragraph 139 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 139 include facts to which a response is required, Defendants deny the allegations in Paragraph 139.

140.   Paragraph 140 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 140 include facts to which a response is required, Defendants deny the allegations in Paragraph 140.

141.   Defendants deny the allegations in Paragraph 141.

## NINTH CLAIM FOR RELIEF
### (Replevin/Claim and Delivery)

142.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

143.   Paragraph 143 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 143 include facts to which a response is required, Defendants deny the allegations in Paragraph 143.

144.   Defendants deny the allegations in Paragraph 144.

145.   Defendants admit that the UDC requested on August 22, 2018, that Defendants return the Confederate Monument to the UDC. Defendants deny all other allegations in Paragraph 145.

146.   Defendants admit the allegations in Paragraph 146.

147.   Defendants admit that they have not returned the Confederate Monument to UDC. The rest of Paragraph 147 contains legal conclusions to which no response is required. To the extent that the remaining allegations in Paragraph 147 include facts to which a response is required, Defendants deny the remaining allegations in Paragraph 147.

148.   Defendants deny the allegations in Paragraph 148.

149.   Defendants deny the allegations in Paragraph 149.

## TENTH CLAIM FOR RELIEF
### (Quasi-Contract/Unjust Enrichment)

150.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

14

151.   Paragraph 151 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 151 include facts to which a response is required, Defendants deny the allegations in Paragraph 151.

152.   Paragraph 152 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 152 include facts to which a response is required, Defendants deny the allegations in Paragraph 152.

153.   Paragraph 153 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 153 include facts to which a response is required, Defendants deny the allegations in Paragraph 153.

154.   Defendants admit the allegations in Paragraph 154.

155.   Paragraph 155 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 155 include facts to which a response is required, Defendants deny the allegations in Paragraph 155.

156.   Paragraph 156 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 156 include facts to which a response is required, Defendants deny the allegations in Paragraph 156.

157.   Defendants deny the allegations in Paragraph 157.

## ELEVENTH CLAIM FOR RELIEF
### (Constructive Trust)

158.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

159.   Defendants deny the allegations in Paragraph 159.

160.   Paragraph 160 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 160 include facts to which a response is required, Defendants deny the allegations in Paragraph 160.

161.   Defendants deny the allegations in Paragraph 161.

162.   Paragraph 162 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 162 include facts to which a response is required, Defendants deny the allegations in Paragraph 162.

## TWELFTH CLAIM FOR RELIEF
### (Negligence/Damage to Property)

163.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

164.   Defendants deny the allegations in Paragraph 164.

165.   Defendants admit the allegations in Paragraph 165.

166.   Defendants deny the allegations in Paragraph 166.

167.   Paragraph 167 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 167 include facts to which a response is required, Defendants deny the allegations in Paragraph 167.

168.   Paragraph 168 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 168 include facts to which a response is required, Defendants deny the allegations in Paragraph 168.

169.   Paragraph 169 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 169 include facts to which a response is required, Defendants deny the allegations in Paragraph 169.

170.   Paragraph 170 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 170 include facts to which a response is required, Defendants deny the allegations in Paragraph 170.

171.   Defendants deny the allegations in Paragraph 171.

## THIRTEENTH CLAIM FOR RELIEF
### (Injunction)

172.   Defendants repeat and re-allege each response to each allegation as set forth in this Answer as if each were fully set forth herein.

173.   Paragraph 173 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 173 include facts to which a response is required, Defendants deny the allegations in Paragraph 173.

174.   Defendants admit that the Confederate Monument is a historic creation that is over 100 years old. The rest of Paragraph 174 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 174 include facts to which a response is required, Defendants deny the remaining allegations in Paragraph 174.

175.   Paragraph 175 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 175 include facts to which a response is required, Defendants deny the allegations in Paragraph 175.

176.   Paragraph 176 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 176 include facts to which a response is required, Defendants deny the allegations in Paragraph 176.

17

177.   Paragraph 177 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 177 include facts to which a response is required, Defendants deny the allegations in Paragraph 177.

178.   Paragraph 178 contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph 178 include facts to which a response is required, Defendants deny the allegations in Paragraph 178.

179.   Defendants deny the allegations in Paragraph 179.

## AFFIRMATIVE DEFENSES

Subject to the responses set forth above, Defendants allege and assert the following affirmative defenses in response to Plaintiff's allegations, undertaking the burden of proof only as to those defenses deemed affirmative under North Carolina law.

### First Defense

Defendants affirmatively allege that Plaintiff's Complaint fails to state any claim upon which relief can be granted.

### Second Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because Plaintiff lacks standing to bring claims against Defendants.

### Third Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because there is no private right of action for which Plaintiff may seek a remedy.

### Fourth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because of a lack of subject matter jurisdiction.

### Fifth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because jurisdiction is not proper in this Court.

### Sixth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the doctrine of sovereign immunity.

### Seventh Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the applicable statute of limitations.

### Eighth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because of the failure of Plaintiff to join a necessary party.

19

## Ninth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the doctrine of waiver.

## Tenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the doctrine of estoppel.

## Eleventh Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the doctrine of laches.

## Twelfth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because Plaintiff failed to exhaust administrative remedies.

## Thirteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because of a lack of consideration necessary to form a contract.

## Fourteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by a prior material breach of the contract.

20

## Fifteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the statute of frauds.

## Sixteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the parol evidence rule.

## Seventeenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the common law rule against perpetuities and the North Carolina Uniform Rule Against Perpetuities.

## Eighteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part by the defense of duress.

## Nineteenth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because the transfer of the Confederate Monument to the University of North Carolina was a completed gratuitous gift.

## Twentieth Defense

Defendants affirmatively allege that Plaintiff's claims asserted against Defendants are barred in whole or in part because of the doctrine of assumption of the risk.

<u>Twenty-First Defense</u>

Defendants affirmatively allege that Plaintiffs claims asserted against Defendants are barred in whole or in part because they are nonjusticiable.

<u>Twenty-Second Defense</u>

As to the matters set forth in Plaintiff's Prayer for Relief:

A.      Paragraph A contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph A include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph A.

B.      Paragraph B contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph B include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph B.

C.      Paragraph C contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph C include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph C.

D.      Paragraph D contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph D include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph D.

22

E.     Paragraph E contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph E include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph E.

F.     Paragraph F contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph F include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph F.

G.     Paragraph G contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph G include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph G.

H.     Paragraph H contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph H include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph H.

I.     Paragraph I contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph I include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph I.

J.     Paragraph J contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph J include facts to which a response is

23

required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph J.

K.    Paragraph K contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph K include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph K.

L.    Paragraph L contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph L include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph L.

M.    Paragraph M contains legal conclusions to which no response is required. To the extent that the allegations in Paragraph M include facts to which a response is required, Defendants deny that the Plaintiffs are entitled to the relief requested in Paragraph M.

WHEREFORE, based on the foregoing, Defendants pray to the Court as follows:

1.    Plaintiff should have and recover nothing;

2.    Plaintiff's claims should be dismissed with prejudice;

3.    The costs of this action should be taxed against Plaintiff;

4.    Defendants' attorneys' fees should be taxed against Plaintiff; and

24

5.      Any other and further relief as the Court may deem just and proper.

This, the _____ day of _____, 2019.

WOMBLE BOND DICKINSON (US) LLP

Ripley Rand
N.C. Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Telephone: 919-755-2100
Facsimile: 919-755-2150
Email: ripley.rand@wbd-us.com

*Attorney for Defendants The University of*
*North Carolina and The University of North*
*Carolina Board of Governors*

CERTIFIED TRUE COPY
FROM ORIGINAL

Clerk Superior Court Orange County

25

STATE OF NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

File No. 19CVS 1579

| | | |
|---|---|---|
| NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CONSENT JUDGMENT, DECLARATORY JUDGMENT, AND ORDER** |
| THE UNIVERSITY OF NORTH CAROLINA and THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS, | ) ) ) ) | |
| Defendants. | ) ) ) | |

This matter comes before this Court on the parties' request for entry of a Consent Judgment and Declaratory Judgment in this matter between Plaintiff North Carolina Division Sons of Confederate Veterans, Inc. ("Plaintiff"), and Defendants The University of North Carolina ("the UNC System") and The University of North Carolina Board of Governors ("the UNC BOG") (collectively, "Defendants"). Plaintiff has filed a Complaint making a number of different allegations against Defendants related to the Confederate monument ("the Confederate Monument") formerly located at McCorkle Place on the campus of the University of North Carolina at Chapel Hill ("UNC-CH" or "the University") and seeking declaratory relief, injunctive relief, and money damages. Counsel for Plaintiff and Defendants have advised the Court that all Parties desire to settle all claims and issues in this action, have come to a reasonable resolution, and as evidenced by the signatures below have reached an agreement as to the matters set forth in the claims in Plaintiff's Complaint and to the disposition of this action by entry of a Consent

Judgment as set forth herein. The Court has considered the record proper in this matter, including a full review of the matters set forth in the pleadings. Based on the Court's consideration of the record proper, the Court memorializes the following Findings of Fact, Governing Law, Conclusions of Law, and Entry of Judgment.

## FINDINGS OF FACT

1.      Plaintiff North Carolina Division Sons of Confederate Veterans, Inc., is a North Carolina registered nonprofit corporation organized under the laws of North Carolina with headquarters in Sanford, Lee County, North Carolina.

2.      SCV's Articles of Incorporation filed with the North Carolina Secretary of State provide that SCV was organized for the following purposes:

> To associate in one united, compact body men of Confederate ancestry, and to cultivate perpetuate and sanctify the ties of fraternity and friendship entailed thereby; to aid and encourage the history and achievement from Jamestown to this present era, constantly endeavoring to see that the events of the War Between The States and the heroic contributions of the Confederate soldiers of Indian Territory are authentically and clearly written, and that all documents, relics and momentoes [sic] produced and handed down by those active participants therein are properly treasured and preserved for posterity; to aid and assist in the erection of suitable and enduring monuments and memorials to all Southern valor, civil and military, wherever done and wherever found; to instill into our descendants a devotion to and reverence for the principles represented by the Confederate States of America, to the honor, glory and memory of our fathers who fought in that cause . . . .

> . . . .

> Said corporation is organized exclusively for charitable, religious, educational, and scientific purposes . . . . [T]he corporation shall not carry on any other activities not permitted to be carried on . . . by a corporation exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code . . . .

3.      As a registered nonprofit corporation under North Carolina law, Plaintiff has the capacity to bring this action and is authorized to bring this action pursuant to the provisions of its charter and rules of internal governance, and the signatory to the Verified Complaint has the

2

authority to institute this action on behalf of Plaintiff and to enter into and bind Plaintiff to the terms and conditions of this Consent Judgment on behalf of Plaintiff.

4.       The UNC System is a public, multi-campus university system authorized and governed by Article IX, Section 8, of the North Carolina Constitution and Chapter 116 of the North Carolina General Statutes.

5.       The UNC BOG is the body politic and corporate organized and authorized under Section 116-3 of the North Carolina General Statutes and is charged under Section 116-11 with (among other things) is charged under Section 116-11 with (among other things) governing the constituent institutions of the UNC System, including UNC-CH, and with the general determination, control, supervision, management, and governance of all affairs of the constituent institutions of the UNC System. Under N.C. Gen. Stat. § 116-3, the UNC BOG is able to be sued in "all courts whatsoever."

6.       UNC-CH is located on a parcel of land in Chapel Hill, North Carolina ("the University campus"), part of which includes McCorkle Place in the 200 block of East Franklin Street.

7.       For the purposes of this Consent Judgment, "the Confederate Monument" means the combination of the statue, pedestal, and bronze tablets created and configured by artist John Wilson in 1913.

8.       Because this action involves conduct and circumstances related to the realty of the University campus, the UNC System and the UNC BOG are proper parties in their positions of authority, control, governance, dominion, supervision, management, development, administration, direction, and oversight of the realty of the University campus and the affairs of the constituent

3

institutions and all conduct and circumstances related to the realty of the University campus and the affairs of the constituent institutions.

9.  Non-party The United Daughters of the Confederacy – North Carolina Division, Inc. ("UDC") is a North Carolina nonprofit corporation organized under the laws of North Carolina with headquarters in Raleigh, Wake County, North Carolina.

10.  UDC's Articles of Incorporation filed with the North Carolina Secretary of State provide that the purposes for which UDC was organized was (among other things) to

> [T]o achieve the objectives of the United Daughters of the Confederacy, which include historical, benevolent, memorial, educational and patriotic programs, plans events and scholarships by members who are lineal or collateral descendants of men and women who served the cause of the Confederate States of America. . . . [These purposes] are exclusively charitable, literary and educational within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 . . . .

11.  UDC was organized and adopted a Constitution and By-Laws on April 28, 1897.

12.  One of UDC's early aims was to preserve the history of the Confederate effort in the Civil War, including the accomplishments of women who supported the Confederate armed forces and the families of Confederate soldiers during the War. As part of this undertaking, UDC raised money to finance the creation and erection of monuments throughout North Carolina to honor various Confederate heroes and ideals.

13.  At the Eleventh Annual Convention of UDC in October 1907, a resolution was introduced "that the next work undertaken by [UDC] be the erection, on the campus at the State University, of a monument to the students and faculty, who went out from its walls in 1861 to fight and die for the South." This resolution passed the Convention.

14.  A UDC representative wrote to University of North Carolina President Francis P. Venable in early 1908 to suggest that UDC could raise funds to erect a monument to be placed on the University campus in Chapel Hill to honor UNC-CH students who had served in the

4

Confederate armed forces and asked permission for UDC to place a monument on the University campus.

15.     UDC's request was presented to the June 1, 1908, meeting of the University of North Carolina Board of Trustees. The Board of Trustees approved UDC's request for permission to erect a monument on the University campus.

16.     On June 9, 1908, Venable wrote to UDC to offer cooperation with UDC's plans to erect a monument on the University campus and to propose a meeting with UDC representatives to discuss the kind of monument that would be erected.

17.     UDC named a Chapel Hill Monument Committee to work on the plans for creating and erecting a monument on the University campus.

18.     On or about March 20, 1909, a UDC representative wrote Venable the following about plans for the monument: "I hope it will not be many years before it will stand silent & alone, on our beautiful University grounds, reminding future generations of the sacrifice of those men, nothing can dim . . . ."

19.     Over the next several months, Venable and UDC representatives corresponded about the plans for the monument. They eventually decided that (1) the monument would be a statue and would be placed on a central location on the University campus, (2) UDC would raise the money for the creation and purchase of the monument, and (3) any additional funds necessary to complete the project would come from private donors.

20.     In an October 5, 1909, letter to Venable, a UDC representative wrote the following about plans for Venable to speak at UDC's Convention: "I think the Daughters are much pleased at the idea of your talking to them & I hope you will place before them many reasons why we should build a handsome monument at our State University to perpetuate our Southern history."

5

21.     On or about October 14, 1909, Venable spoke at UDC's Thirteenth Annual Convention in support of the effort to erect the monument on the University campus. A motion was made to unveil the monument in 1911, the fiftieth anniversary of the beginning of the Civil War when the students and faculty left the University to join the Confederate armed forces. This motion passed the Convention.

22.     Venable and representatives of UDC settled on John Wilson, a renowned sculptor from Massachusetts who taught art at the Copley Society of Boston and at Harvard University, to create the monument.

23.     UDC members worked to raise funds for the monument into 1910, but it appeared that they would not be able to raise sufficient funding in time for the monument to be erected in 1911. In August 26, 1910, and September 5, 1910, letters to John Wilson about the work on the monument, Venable noted that he was acting as the "agent" of the UDC committee and that he was helping to raise funds from private donors.

24.     In August 1910, a UDC representative wrote the following to Venable: "I asked [John Wilson, the artist] who was to sign the contract. He did not know. I told him none of us women could do it of course."

25.     On June 19, 1911, Venable wrote the following in response to the August 1910 letter he received:

> I have assumed that you would prefer the business end of this to be handled by me, but it is entirely satisfactory to me if you wish to sign this contract and to have the payments made by the Treasurer of the U.D.C. . . . Of course, Mr. Wilson [the artist] understands that my signing this does not bind the University nor myself personally.

26.     On June 21, 1911, a UDC representative wrote back the following to Venable:

> Your letter with the contract for the monument was received last night. Of course I do not wish to sign it. You are the proper one to do so. . . . [The UDC

6

representative's husband] says he prefers for the business end of it to be handled by you – the money to be collected and turned over to you . . . .

27.     During much of the period of negotiations between UDC and Venable about who would be responsible for signing the contract, North Carolina law on the doctrine of coverture provided that married women did not have the right to make contracts in their own name without being adjudged a "free trader" and being subject to a privy examination. *See, e.g.*, N.C. Revisal of 1905, § 2094. This statute was repealed on March 6, 1911. *See* N.C. Laws 1911, ch. 109.

28.     Over time, UDC and Venable also negotiated other terms related to the monument, including the cost of the monument and its design..

29.     On June 29, 1911, the contract for the creation of the monument was signed between "John Wilson, sculptor of Boston, Massachusetts, of the first part" and "_____ of the second part," with a blank space for the name of the other party to the contract. The contract was signed by John Wilson, Francis P. Venable, Frank S. Richardson, and Thos. J. Wilson, Jr.

30.     The contract for the monument called for the sculpting of a bronze figure ("the statue"), representative of a Confederate soldier, to be placed on top of a granite pedestal ("the pedestal") with bronze tablets that displayed information about the monument, the UNC-CH students who served in the Confederate armed forces, and UDC's involvement in the creation of the monument.

31.     UDC members continued to raise money for the Confederate Monument in 1912 and 1913 with the aid of private donors solicited by Venable and others connected to UNC-CH. Plans were made for the monument to be completed during the Spring of 1913. Venable and UDC agreed that the monument would be unveiled at the commencement ceremonies during June 1913.

32.     At the June 2, 1913, commencement ceremonies, Mrs. H.A. London, Chair of UDC's Chapel Hill Monument Committee, presented the Confederate Monument to UNC-CH and made the following remarks:

> As Chairman of the Monument Committee of [UDC] I have the honor, and it gives me much pleasure, to present in their name to the trustees of the University of North Carolina this monument which is erected in memory of those students of this University who served in the [Confederate armed forces]. . . . We have erected this monument not only in honor of the dead but also of the living. . . . Accept this monument and may it stand forever as a perpetual memorial to those sons of the University who suffered and sacrificed so much at the call of duty.

33.     In accepting the Confederate Monument on behalf of the University, Venable made the following remarks:

> [N]ow in commemoration of a great era and of a noble ideal there has been erected on [the] campus this beautiful monument. . . . It was to that patriotic organization, [UDC], that the gracious thought first came of erecting this monument to the sons of the University that entered the War. Four years ago [UDC] asked permission of the Trustees to place the monument upon the campus, which was gladly granted them. . . . In the name of the University and with an abiding gratitude I accept the gracious gift of this monument, embodying as it does grateful memory for the past and high hope for the future.

34.     The Confederate Monument was annexed to the realty of the University campus at McCorkle Place.

35.     On or about October 9, 1913, Mrs. H.A. London provided a report to the Seventeenth Annual Convention of UDC on behalf of the Chapel Hill Monument Committee about the installation proceedings at the June 1913 University commencement. In her report, Mrs. London made the following remarks:

> The Chapel Hill Monument was unveiled during the last commencement at the University. It is very beautiful. It is not only in memory of the boys who left the University from 1861 to 1865, but also those who attended the University and afterwards became Confederate soldiers. . . . Dr. Venable and others have worked unceasingly for it and now it stands there for all time and it will be an object lesson to all future generations – and will impress upon the present day students their obligation to respond to the call of duty.

8

36.     Beginning no later than the 1960s, there were various protests about the history of the Confederate Monument and its place on the University campus. These protests intensified in 2017 and 2018, with several large rallies against the Confederate Monument and numerous incidents of vandalism.

37.     On or about the night of August 20, 2018, there was a protest at the site of the Confederate Monument. During this protest, a group of protestors rigged ropes to the Confederate Monument and pulled the statue off of the Confederate Monument's pedestal.

38.     Neither Defendants nor their representatives reinstalled the statue on the pedestal of the Confederate Monument.

39.     On or about August 20, 2018, Defendants or their representatives loaded the statue portion of the Confederate Monument onto a truck and took it to an undisclosed location.

40.     On or about August 22, 2018, then-UDC President Peggy W. Johnson wrote the following to Haywood Cochrane, the Chair of the UNC-CH Board of Trustees, about the Confederate Monument:

> I, as a representative of the United Daughters of the Confederacy, request that the Boy Soldier, [referred] to as Silent Sam, be returned to the United Daughters of the Confederacy. We are willing to take possession of both the base and the sculpture. We have been saddened that the message of this monument [has] been so misconstrued. He no longer belongs on the campus of UNC Chapel Hill.

41.     On or about January 14, 2019, UNC-CH Chancellor Carol Folt ordered that the pedestal on which the statue portion of the Confederate Monument was mounted was to be removed from the University campus.

42.     On or about the evening of January 14, 2019, Defendants or their representatives severed the pedestal of the Confederate Monument from the realty of the University campus,

9

removed the pedestal part of the Confederate Monument from the University campus, and took the pedestal part of the Confederate Monument to an unknown location.

43.     Neither Defendants nor their representatives have returned the Confederate Monument to UDC.

44.     The Confederate Monument is currently located on public property under the dominion and supervision of Defendants or their representatives.

45.     Plaintiff and Defendants have agreed to settle this dispute as to the following general terms and conditions set forth in detail below and subject to the approval of the Court: (1) Defendants shall turn over possession of the Confederate Monument to Plaintiff within thirty days of the entry of this Consent Judgment; (2) Plaintiff shall take possession of the Confederate Monument from Defendants and will relocate the Confederate Monument as set forth herein; and (3) Defendants shall, using exclusively non-state funds, fund a charitable trust as set forth herein for the preservation and benefit of the Confederate monument.

## GOVERNING LAW

A.     Standing/Real Party in Interest

Standing is a jurisdictional requirement; if a plaintiff does not establish standing, then the court does not possess subject matter jurisdiction to hear the case. *See Munger v. State*, 202 N.C. App. 404, 410, 689 S.E.2d 230, 235 (2010). "A party has standing to initiate a lawsuit if he is a 'real party in interest.'" *Slaughter v. Swicegood*, 162 N.C. App. 457, 463, 591 S.E.2d 577, 582 (2004); *see also* N.C. Gen. Stat. § 1-57. "A real party in interest is a party who is benefited or injured by the judgment in the case [and] who by substantive law has the legal right to enforce the claim in question." *Carolina First Nat'l Bank v. Douglas Gallery of Homes, Ltd.*, 68 N.C. App. 246, 249, 314 S.E.2d 801, 803 (1984) (internal quotation marks and brackets omitted). Under

10

North Carolina law, "tort and contract claims arising from property damage or loss may be assigned *in toto*." *J & B Slurry Seal Co. v. Mid-South Aviation, Inc.*, 88 N.C. App. 1, 10, 362 S.E.2d 812, 818 (1987). Furthermore, "[a]n assignee of a contractual right is a real party in interest and may maintain [an] action." *Morton v. Thornton*, 259 N.C. 697, 699, 131 S.E.2d 378, 380 (1963).

B.    Gift

There are two "essential elements" of an *inter vivos* gift: (1) "donative intent," and (2) "delivery, actual or constructive." *Holloway v. Wachovia Bank & Trust Co., N.A.*, 333 N.C. 94, 100, 423 S.E.2d 752, 755 (1992). That said, "[a] person has the right to give away his or her property as he or she chooses and 'may limit a gift to a particular purpose, and render it so conditioned and dependent upon an expected state of facts that, failing that state of facts, the gift should fail with it.'" *Courts v. Annie Penn Mem. Hosp., Inc.*, 111 N.C. App. 134, 139, 431 S.E.2d 864, 866 (1993) (quotation and citation omitted). "The intent of the donor to condition the gift must be measured at the time the gift is made, as any 'undisclosed intention is immaterial in the absence of mistake, fraud, and the like, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts.'" *Id.*, 431 S.E.2d at 866–67 (quoting *Howell v. Smith*, 258 N.C. 150, 153, 128 S.E.2d 144, 146 (1962)).

C.    Fixtures

"A fixture is personal property that is attached to land or a building and that is regarded as an irremovable part of the real property." *Moore's Ferry Dev. Corp. v. City of Hickory*, 166 N.C. App. 441, 445, 601 S.E.2d 900, 903 (2004) (internal quotation marks omitted). "A fixture has been defined as that which, though originally a movable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as a part of the land, partaking of its character." *Little*

11

by *Davis v. Nat'l Servs. Indus., Inc.*, 79 N.C. App. 688, 692, 340 S.E.2d 510, 513 (1986) (internal quotation marks omitted). "The factors to be examined in identifying fixtures include: (1) the manner in which the article is attached to the realty; (2) the nature of the article and the purpose for which it is attached to the realty; and (3) the intention with which the annexation of the article to the realty is made." *Moore's Ferry Dev. Corp.*, 166 N.C. App. at 445–46, 601 S.E.2d 900, 903 (quotation, citation, and internal quotation marks omitted). A fixture "loses its distinctive character" as personal property, "until it is parted from the soil," when it regains its status as personal property. *Pemberton v. King*, 13 N.C. 376, 378, 2 Dev. 376, 378 (1830).

D.   Chapter 100 of the North Carolina General Statutes

State law places significant limitations on actions that can be taken in regards to an "object of remembrance." *See* N.C. Gen. Stat. § 100-2.1. An "object of remembrance" is "a monument, memorial, plaque, statue, marker, or display of a permanent character that commemorates an event, a person, or military service that is part of North Carolina's history." *Id.* § 100-2.1(b). If an object of remembrance is located on public property, it may only be removed in accordance with specific rules. *See id.* If the object is temporarily relocated, it "shall be returned to its original location within 90 days." *Id.* If the object is permanently relocated, the new site must be "of similar prominence, honor, visibility, availability, and access that are within the boundaries of the jurisdiction from which it was relocated." *Id.* An object "may not be relocated to a museum, cemetery, or mausoleum unless it was originally placed at such a location." *Id.*

## CONCLUSIONS OF LAW

1.   This Court has subject matter jurisdiction over Plaintiff and Defendants pursuant to N.C. Gen. Stat. §§ 7A-240 and 1-253 *et seq.*

2.      This Court has personal jurisdiction over Plaintiff and Defendants pursuant to N.C. Gen. Stat. § 1-75.4. Plaintiff is a North Carolina corporation, and Defendants are all North Carolina entities.

3.      This Court has in rem jurisdiction over the subject matter of this action, in particular over the Confederate Monument as described above, under N.C. Gen. Stat. § 1-75.9.

4.      Venue for this action is proper in Orange County under N.C. Gen. Stat. §§ 1-76(4), 1-79(a), and 1-82.

5.      An actual justiciable controversy exists between the parties.

6.      Plaintiff has standing to bring this action and is a real party in interest for the purposes of this action.

7.      As an organization, Plaintiff has complied with Rule 9 of the North Carolina Rules of Civil Procedure in showing its legal existence and capacity to bring this action.

8.      The causes of action pled in this Complaint accrued no earlier than on or about January 14, 2019, when Defendants or their representatives did not reannex the Confederate Monument to the realty of the University campus. As such, all claims made by Plaintiff are within any relevant statute of limitations within the North Carolina General Statutes.

9.      UDC's presentation of the Confederate Monument to UNC-CH was a gift subject to the express material condition subsequent that the Confederate Monument remain annexed to the realty of the University campus "forever."

10.      When UDC's gift of the Confederate Monument was annexed to the realty of the University campus, it became a fixture and therefore part of the realty of the University campus.

11.      The express material condition subsequent that the Confederate Monument remain annexed to the realty of the University campus "forever" failed when Defendants or their

13

representatives did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019.

12.     At the time that Defendants did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, the Confederate Monument was no longer an annexed fixture and reverted back to personal property.

13.     At the time that Defendants or their representatives did not reannex the Confederate Monument to the realty of the University campus on or about January 14, 2019, any and all rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, reverted to UDC based on the conditional nature of its gift to UNC-CH.

14.     The reversion of any and all rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, to UDC does not require any approval from the North Carolina Council of State or other State entity under Chapter 143 of the North Carolina General Statutes.

15.     The reversion of any and all rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument, to UDC does not violate the North Carolina common law rule against perpetuities or the statutory uniform rule against perpetuities. UDC's rights pursuant to the condition subsequent vested at the time UDC presented the Confederate Monument to UNC-CH.

16.     N.C. Gen. Stat. § 36C-4-405 further provides that no gift shall be invalidated by the rule against perpetuities.

14

17.     Prior to the entry of this Consent Judgment, UDC executed a valid contract assigning any and all rights, title, and interests that it possessed in the Confederate Monument, including any and all choses of action related to the Confederate Monument, to Plaintiff.

18.     Plaintiff is the current owner of any and all rights, title, and interests in the Confederate Monument, including any and all choses of action related to the Confederate Monument.

19.     As the owner of any and all rights, title, and interests in the Confederate Monument, including any and all choses of action related to the Confederate Monument, Plaintiff is entitled to an order of the Court declaring the rights and liabilities of the parties with respect to the ownership of rights, title, and interests in the Confederate Monument.

20.     As the owner of any and all rights, title, and interests in the Confederate Monument, Plaintiff is in constructive possession of the Confederate Monument under North Carolina law.

21.     Under N.C. Gen. Stat. § 100-2.1(b), the Confederate Monument is an "object of remembrance."

22.     Because the Confederate Monument is an "object of remembrance" under N.C. Gen. Stat. § 100-2.1(b), the provisions of Chapter 100 related to the protection of monuments apply for the purpose of this Consent Judgment.

23.     Because of the nature of the disposition of this matter, there is no need to determine whether the North Carolina General Assembly provided a private right of action for litigants to seek relief under N.C. Gen. Stat. § 100-2.1. The Court accordingly declines to address this issue.

24.     The Confederate Monument is an "object of remembrance" owned by a private party (Plaintiff), the "object of remembrance" is currently in the possession of Defendants or their representatives and under the dominion and control of Defendants or their representatives, and the

15

"object of remembrance" is currently located on public property under the dominion and supervision of Defendants.

25.     The provisions of this Consent Judgment contain and recite a legal agreement between a private party (Plaintiff) and Defendants (each being political subdivisions of the State) governing the relocation of the Confederate Monument that complies with N.C. Gen. Stat. § 100-2.1(c)(2).

26.     The provisions of this Consent Judgment regarding the possession and disposition of the Confederate Monument comply with Chapter 100 of the North Carolina General Statutes.

27.     The entry of the Consent Judgment will resolve all outstanding issues in this matter and conclude this litigation.

## ENTRY OF FINAL JUDGMENT

Based on the foregoing Findings of Fact, Governing Law, and Conclusions of Law, and with the consent of all parties, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

I.     The Court hereby DECLARES, based on the agreement of the parties and on full consideration of all matters presented to the Court, that Plaintiff owns any and all rights, title, and interests in the Confederate Monument, including any and all choses in action related to the Confederate Monument.

II.     The Court hereby DECLARES that Plaintiff, as owner of any and all rights, title, and interests to the Confederate Monument, including any and all choses in action related to the Confederate Monument, is entitled to actual possession of the Confederate Monument, and Defendants or their representatives shall turn over possession of the Confederate Monument to Plaintiff within thirty days of the entry of this Consent Judgment.

16

III.     Based on the agreement of the parties and on full consideration of all matters presented to the Court, the Court hereby ORDERS that Plaintiff shall at all times maintain possession of the Confederate Monument outside of any North Carolina county currently containing a constituent institution of the UNC System: Buncombe County, Cumberland County, Durham County, Forsyth County, Guilford County, Jackson County, Mecklenburg County, New Hanover County, Orange County, Pasquotank County, Pitt County, Robeson County, Wake County, and Watauga County.

IV.     The Court hereby DECLARES that the provisions of this Consent Judgment and the agreement between the parties comply with the relevant provisions of Chapter 100 of the North Carolina General Statutes.

V.     Based on the agreement of the parties, the Court hereby ORDERS that Defendants shall in conjunction with the entry of this Consent Judgment fund a charitable trust ("the Monument Trust") with the sum of $2,500,000 (two million, five hundred thousand dollars) using exclusively non-state funds. This Trust shall in all respects be drafted to qualify as an organization exempt under Section 501(c)(3) of the Internal Revenue Code, and the initial Trustees of the Trust shall pursue tax exempt status for the Trust immediately upon execution of the Trust Agreement and creation of the Trust. The purposes of this Trust will be exclusively charitable, and funds from this Trust may be used only for the preservation and benefit of the Confederate Monument as provided in a Monument Trust Agreement. No part of the property or net earnings of the Trust shall inure at any time to the benefit of any private individual or the activities of Plaintiff or any other group other than for the preservation and benefit of the Confederate Monument. The parties shall agree on provisions for the creation and administration of the Trust and shall execute

17

documents related to the creation and administration of the trust. The documents governing the creation and administration of the trust shall include the following provisions:

      A.      The trust will provide for "allowable expenses" related to the Confederate Monument, including allowing for the construction of a Facility to support the Confederate Monument as provided for below.

      B.      "Allowable expenses" means the actual and reasonable out-of-pocket costs and expenses paid or incurred by the Trust Beneficiary for the Facility purposes, pursuant to arms-length, third-party transactions, agreements, or other arrangements, on terms that the Trust Beneficiary reasonably believes to be substantially similar to (or more favorable than) those terms otherwise available from comparable third-party vendors or providers, as applicable, within the greater metropolitan area in which the Confederate Monument and/or the Facility may be located.

      C.      The purposes of the "Facility" include the following:

            1.      Real property acquisition, including but not limited to acquisition of a fee interest, a leasehold interest, or otherwise, and improvement and development for the purpose of displaying the Confederate Monument (including as set forth above the statue, pedestal, and tablets), and/or construction costs to build a Facility and grounds to support the Confederate Monument (including without limitation real estate brokerage, legal and professional fees associated with the acquisition, development, and construction) (collectively, the "Facility") in any location outside the counties set forth in Section III above;

18

2.      Utilities, taxes, maintenance, repair, refurbishment, renovation, and insurance of the Facility and the Confederate Monument;

3.      Transportation expenses related to the refurbishment or repair of the Confederate Monument;

4.      Security costs, including hardware, software, and monitoring services associated with the Facility and the Confederate Monument;

5.      Professional fees (including legal and financial fees) associated with the Facility and the Confederate Monument, including without limitation the costs associated with any legal action associated with the acquisition, possession, or location of the Confederate Monument; and

6.      Such other reasonably necessary and appropriate costs and expenses as may arise from and/or relate to the previously described activities.

VI.     Except for the documents related to the creation and administration of the trust provided for herein, this Consent Judgment embodies in full the terms of the understanding and agreement between the parties related to all of the claims and issues in this action.

VII.     Each side shall bear its own costs, expenses, and attorneys' fees.

This, the ___27ᵗʰ___ day of ___November___, 2019.

_____
The Honorable R. Allen Baddour, Jr.
Superior Court Judge Presiding

CERTIFIED TRUE COPY
FROM ORIGINAL

Clerk of Superior Court Orange County

19

173

**WE CONSENT** TO THE ENTRY OF THIS CONSENT JUDGMENT

FOR PLAINTIFF

NORTH CAROLINA DIVISION SONS OF CONFEDERATE VETERANS, INC., a North Carolina corporation

_____
Kevin Stone
Division Commander

DATE: November 27th 2019

CONRAD BOYD STURGES III
I, _____, a Notary
Public for said County and State, do hereby certify
that _____Kevin Stone_____ personally
appeared before me this day and acknowledged the
due execution of the foregoing instrument.

Witness my hand and official seal, this, the 27th
day of ___Nov___, 2019.

(Official Seal) Notary Public

My commission expires
___10/9___, 20 20

CONRAD BOYD STURGES III
NOTARY PUBLIC
FRANKLIN CO., NC

20

174

**WE CONSENT** TO THE ENTRY OF THIS CONSENT JUDGMENT

COUNSEL FOR PLAINTIFF

**DAVIS, STURGES & TOMLINSON, PLLC**
Attorneys at Law

C. Boyd Sturges III, N.C. Bar No. 22342
101 Church Street
P.O. Drawer 708
Louisburg, North Carolina 27549
Phone: 919-496-2137
Email: bsturges@dstattys.com

DATE: November 27th 2019

21

**WE CONSENT** TO THE ENTRY OF THIS CONSENT JUDGMENT

**FOR DEFENDANT THE UNIVERSITY OF NORTH CAROLINA**

William L. Roper
Interim President
The University of North Carolina

DATE: 11-26-19

**FOR DEFENDANT THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS**

Randy Ramsey
Chair
University of North Carolina Board of Governors

DATE: _____

**COUNSEL FOR DEFENDANTS**

**WOMBLE BOND DICKINSON (US) LLP**

Ripley Rand
N.C. State Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, NC 27602
Phone: 919-755-8125
Email: ripley.rand@wbd-us.com

DATE: _____

22

For William L. Roper

I, _Ruth A Brill_, a Notary Public for said County and State, do hereby certify that _William L. Roper_ personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this, the _26_ day of _November_, 2019.

(Official Seal) Notary Public

```
┌─────────────────────────────────┐
│         RUTH ANN BRILL          │
│ Notary Public, North Carolina   │
│          Person County          │
│     My Commission Expires       │
│        MAY 31, 2020             │
└─────────────────────────────────┘
```

My commission expires

_MAY 31_, 20 _20_.


For Randy Ramsey


I, _____, a Notary Public for said County and State, do hereby certify that _____ personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this, the _____ day of _____, 2019.

(Official Seal) Notary Public

My commission expires

_____, 20 ____.

23

**WE CONSENT** TO THE ENTRY OF THIS CONSENT JUDGMENT

**FOR DEFENDANT THE UNIVERSITY OF NORTH CAROLINA**

_____

William L. Roper
Interim President
The University of North Carolina

DATE: _____

**FOR DEFENDANT THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS**

_____

Randy Ramsey
Chair
University of North Carolina Board of Governors

DATE: _____11-22-19_____

**COUNSEL FOR DEFENDANTS**

**WOMBLE BOND DICKINSON (US) LLP**

_____

Ripley Rand
N.C. State Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, NC 27602
Phone: 919-755-8125
Email: ripley.rand@wbd-us.com

DATE: _____

For William L. Roper

I, _____, a Notary
Public for said County and State, do hereby certify
that _____ personally
appeared before me this day and acknowledged the
due execution of the foregoing instrument.

Witness my hand and official seal, this, the _____
day of _____, 2019.


(Official Seal) Notary Public


My commission expires

_____, 20 ____.




For Randy Ramsey


I, *Marian L. Leonard*, a Notary
Public for said County and State, do hereby certify
that *Randy Ramsey* personally
appeared before me this day and acknowledged the
due execution of the foregoing instrument.

Witness my hand and official seal, this, the *22nd*
day of *November*, 2019.

*Marian L. Leonard*
(Official Seal) Notary Public

My commission expires

*October 28*, 20 *24*.

179